# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   C.A. No. 07-822-GMS |
| | ) |
| QWEST COMMUNICATIONS | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT'S OPENING BRIEF IN SUPPORT OF MOTION TO STAY FEDERAL PROCEEDINGS PENDING RESOLUTION OF PARALLEL STATE COURT ACTION

Of Counsel:
Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, 22nd Floor
Denver, CO   80202-4437
Telephone:  303-223-1100

Dated:  January 22, 2008

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Attorneys for Defendant
Qwest Communications Corporation

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

NATURE AND STAY OF THE PROCEEDING ............................................................ 1

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

ARGUMENT ....................................................................................................... 7

I.  THIS COURT SHOULD STAY THIS ACTION PENDING
    RESOLUTION OF THE COLORADO PROCEEDING BECAUSE
    THE TWO ACTIONS ARE PARALLEL AND EXCEPTIONAL
    CIRCUMSTANCES ARE PRESENT ........................................................... 7

    A.  The State Action and the Federal Action Are Parallel
        Proceedings ............................................................................... 8

    B.  Exceptional Circumstances Warrant Deference to the
        Colorado Proceeding ................................................................... 9

        1.  The Delaware District Court is an inconvenient
            forum for litigating this dispute ........................................ 10

        2.  Staying the federal action will avoid piecemeal
            litigation ......................................................................... 10

        3.  State court jurisdiction was obtained first and the
            Colorado proceeding has progressed almost to trial ........... 13

        4.  This federal action and the Colorado proceeding
            involve issues of state law ................................................ 14

        5.  The Colorado Proceeding Is Adequate to Protect
            the Parties' Rights ........................................................... 16

            a.  Section 207, 47 U.S.C. contains no explicit
                statutory directive of exclusive federal
                jurisdiction ............................................................. 18

            b.  No legislative history exists for 47 U.S.C.
                §207 to indicate exclusive federal jurisdiction ........... 20

c. State court jurisdiction over claims brought pursuant to 47 U.S.C. §207 is not clearly incompatible with federal interests ........................................ 21

6. Plaintiffs' federal complaint is reactive ......................................... 25

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*In re Access Charge Reform,*
19 F.C.C.R. 9108 (F.C.C. 2004) .................................................................................3, 4

*Allen v. La. State Bd. of Dentistry,*
835 F.2d 100 (5th Cir. 1988) ..................................................................................12, 13

*Allstate Ins. Co. v. Brown,*
920 F.2d 664 (10th Cir. 1990) ......................................................................................16

*American Tel. and Tel. Co. v. Central Office Tel., Inc.,*
524 U.S. 214 (1998) .......................................................................................................12

*Brillhart v. Excess Ins. Co. of America,*
316 U.S. 491 (1942) .......................................................................................................15

*Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.,*
962 F.2d 698 (7th Cir. 1992) ........................................................................................14

*Charles Dowd Box Co. v. Courtney,*
368 U.S. 502 (1962) ..................................................................................................17, 22

*Colo. River Water Conservation Dist.,*
424 U.S. 800 (1976) ................................................................................................*passim*

*Currie v. Group Ins. Co.,*
290 F.3d 1 (1st Cir. 2002) ...............................................................................................9

*Fax Telecommunicaciones Inc. v. AT&T,*
138 F.3d 479 (2d Cir. 1998) ..........................................................................................23

*Fox v. Maulding,*
16 F.3d 1079 (10th Cir. 1994) ...........................................................................7, 8, 9, 25

*Great W. Sugar Co. v. N. Natural Gas Co.,*
661 P.2d 684 (Colo. Ct. App. 1982) ..........................................................................16, 22

*Gulf Offshore Co. v. Mobil Oil Corp.,*
453 U.S. 473 (1981) ................................................................................................*passim*

*IFC Interconsult, AG v. Safeguard Int'l Partners,*
438 F.3d 298 (3d Cir. 2006), *cert. denied,* 127 S. Ct. 136 (2006) ....................................8, 9

iii

*ITC DeltaCom Commc'ns., Inc. v. U.S. LEC Corp.,*
2004 WL 3709999 (N.D. Ga. Mar. 15, 2004)...................................................4

*Jenkins v. Entergy Corp.,*
197 S.W.3d 785 (Tex. App. 2006)...........................................................22

*MCI Worldcom Network Servs., Inc. v. Paetec Commc'ns., Inc.,*
2005 WL 2145499 (E.D. Va. Aug. 31, 2005), *aff'd*, 2006 WL 3026293 (4th Cir.
2006) ..............................................................................................3, 4

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.,*
460 U.S. 1 (1983)...........................................................................*passim*

*Pan Am. Petro Corp. v. Superior Court,*
366 U.S. 656 (1961).......................................................................21, 24

*Public Serv. Co of Colo. v. Mile Hi Cable Partners,*
995 P.2d 310 (Colo. App. 1999)...............................................................22

*Quackenbush v. Allstate Ins. Co.,*
517 U.S. 706 (1996)...........................................................................7

*Rienhardt v. Kelly,*
164 F.3d 1296 (10th Cir. 1999) .......................................................7, 11, 12

*Ryan v. Johnson,*
115 F.3d 193 (3d Cir. 1997)...............................................................7, 8

*Spring City Corp. v. Am. Bldgs. Co.,*
193 F.3d 165 (3d Cir. 1999)...............................................................12

*In re Sprint PCS and AT&T Corp. Declaratory Ruling Regarding CMRS Access
Charges,*
17 F.C.C.R. 13192 (F.C.C. 2002), *petitions for review dismissed, AT&T Corp. v.
F.C.C.,* 349 F.3d 692 (D.C. Cir. 2003) ......................................................4

*TON Servs., Inc. v. Qwest Corp.,*
493 F.3d 1225 (10th Cir. 2007) .............................................................22

*Tafflin v. Levitt,*
493 U.S. 455 (1990)...........................................................................*passim*

*Telluride Co. v. Varley,*
934 P.2d 888 (Colo. Ct. App. 1997) ........................................................17

*Trevino v. Southwestern Bell Telephone Co., L.P.*,
2005 WL 2346950 (S.D. Tex. Sept. 26, 2005) .......................................................23

*Tyrer v. City of S. Beloit*,
456 F.3d 744 (7th Cir. 2006) ....................................................................*passim*

*U.S. Fid. & Guar. Co. v. Murphy Oil USA, Inc.*,
21 F.3d 259 (8th Cir. 1994) ...........................................................................16

*US Sprint Commc'ns Co. v. Computer Generation, Inc.*,
401 S.E.2d 573 (Ga. Ct. App. 1991)......................................................16, 20, 23

*Univ. of Md. at Balt. v. Peat Marwick Main & Co.*,
923 F.2d 265 (3d Cir. 1991)...........................................................................14

*Will v. Calvert Fire Ins. Co.*,
437 U.S. 655 (1978)...................................................................................16

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995)...................................................................................15

*Worldcom, Inc. v. Graphnet, Inc.*,
343 F.3d 651 (3d Cir. 2003)..........................................................................15

*Yellow Freight Sys., Inc. v. Donnelly*,
494 U.S. 820 (1990)..............................................................................*passim*

## FEDERAL STATUTES

15 U.S.C. § 78aa ......................................................................................19

15 U.S.C. § 80a-35(b)(5) ...............................................................................19

18 U.S.C. § 3231 ......................................................................................19

29 U.S.C. § 1132(e)(1)..................................................................................19

47 U.S.C. § 207........................................................................................18

47 U.S.C. § 227(f)(2) ..................................................................................19

47 U.S.C. § 414........................................................................................23

v

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs HyperCube, LLC ("HyperCube") and KMC Data, LLC ("KMC Data") (collectively, "Plaintiffs") filed their complaint in this Court on December 17, 2007, asserting claims against Defendant Qwest Communications Corporation ("Qwest") for breach of interstate tariff, breach of implied contract, action on open account, quantum meruit, unjust enrichment, and declaratory judgment. In response, Qwest is simultaneously filing this Motion to Stay Federal Proceedings Pending Resolution of Parallel State Court Action, a Motion to Dismiss Counts II, III, IV and V of Plaintiff's Complaint and a Motion to Transfer this Proceeding to Colorado pursuant to 28 U.S.C. § 1404. Qwest respectfully requests that this Court decide the motion to transfer this case to the District of Colorado before deciding this motion or its Motion to Dismiss.

## SUMMARY OF ARGUMENT

1.    This Court should stay these federal proceedings pending the resolution of parallel state court litigation in light of the exceptional circumstances that are present in this case. This parallel proceeding was filed eighteen months after Qwest commenced an action regarding the dispute in Colorado state court (the "Colorado proceeding"), which is now scheduled for trial beginning June 9, 2008. Although Plaintiffs could have removed the Colorado proceeding to federal court based on Qwest's assertion of a claim for relief under the Federal Communications Act (the "Communications Act" or "Act") in August of 2007, they chose not to do so. Plaintiffs instead asserted counterclaims in the Colorado proceeding that are identical to the claims they

make here. Then, after discovery had closed[1] and expert witness reports had been provided, Plaintiffs filed a parallel proceeding in this Court.

2.    The factors which this Court may consider in staying a parallel federal proceeding counsel in favor of a stay. First, although the parties are incorporated in Delaware, the dispute has no connection to Delaware and Delaware is an inconvenient forum for litigating this dispute. Second, a stay of this federal action will avoid piecemeal litigation by ensuring that inextricably intertwined claims are resolved in a single forum and eliminating the risk of inconsistent interpretations of Plaintiffs' federal tariff in contravention of the filed rate doctrine. Third, while Plaintiffs' complaint was only recently filed, the Colorado proceeding has been ongoing for nineteen months and is nearing trial. Fourth, a majority of the claims at issue in this federal action and in the Colorado proceeding involve issues of state law. Fifth, Plaintiffs concede that their claims are subject to the jurisdiction of the Colorado state court, and accordingly, the Colorado proceeding is an adequate forum to protect Plaintiffs' rights. Finally, Plaintiffs' filing of a complaint in this Court eighteen months after the Colorado proceeding commenced appears to be simply a reactive attempt to muddle the issues and proceedings.

3.    Plaintiffs' assertion that Qwest's claims in the Colorado proceeding are subject to exclusive federal jurisdiction is both premature and legally erroneous. First, Qwest has not asserted these claims in this action and, thus, these claims are not before this Court. Second, state courts have concurrent jurisdiction over claims brought pursuant to 47 U.S.C. § 207 because this statute contains no explicit statutory directive of exclusive federal jurisdiction, no unmistakable implication of exclusive jurisdiction from legislative history, and no underlying policies suggesting a clear incompatibility between state court jurisdiction and federal interests.

---

[1] Discovery was closed when Plaintiffs commenced this action. On January 11, 2008, however,

## STATEMENT OF FACTS

Qwest is a long-distance company that transmits telephone calls originated by other companies to a point where the call can be transferred to the called party's local phone company. *See* Compl., ¶ 3. Companies that originate or terminate the calls to the calling parties may be wireless companies or landline companies. Landline companies that originate and terminate landline calls are referred to as local exchange carriers ("LECs"). Plaintiff KMC Data is a form of a local exchange carrier that is referred to as a competitive local exchange carrier ("CLEC"). *Id.*, ¶ 7. HyperCube is KMC Data's parent corporation and provides billing and collection services to KMC Data. *Id.*

At issue in this dispute are the access charges billed by Plaintiffs for toll-free calls originated by wireless callers. Access charges (also called switched access charges) are charges that long distance companies like Qwest pay to landline companies to originate or terminate long distance calls. *See* Compl., ¶ 7; *MCI Worldcom Network Servs., Inc. v. Paetec Commc'ns., Inc.*, 2005 WL 2145499, at *1. (E.D. Va. Aug. 31, 2005), *aff'd,* 2006 WL 3026293 (4th Cir. 2006). Access charges are typically defined by tariff and compensate the LEC for the use of its network. *See* Compl., ¶¶ 7, 15. If the call is an <u>inter</u>state call, the access charge is defined by the LEC's interstate access tariff, which is filed with the Federal Communications Commission ("FCC"). *Id.*, ¶ 15. If the call is an <u>intra</u>state call, the access charge is determined by the LEC's tariff filed in the state where the call occurs. *See Paetec Commc'ns*, 2005 WL 2145499, at *1.

All tariffs, including access tariffs, must clearly identify each of the services offered and the associated rates, terms and conditions. *In re Access Charge Reform*, 19 F.C.C.R. 9108, ¶ 18 (F.C.C. 2004) ("Eighth Report and Order"). Absent an express contractual agreement to pay

---

the Court granted Qwest's motion to amend its complaint and reopened discovery.

(and none is claimed here), the terms of applicable tariffs determine whether there is an obligation to pay for call origination or termination. *E.g.*, *Paetec Commc'ns.*, 2005 WL 2145499, at \*4 (granting summary judgment to long distance company on CLEC claim for payment of wireless originated toll-free call access charges that were not within the scope of the CLEC's tariffs); *ITC DeltaCom Commc'ns., Inc. v. U.S. LEC Corp.*, 2004 WL 3709999, at \*1 (N.D. Ga. Mar. 15, 2004) (vacated by stipulation of parties but cited with approval in *Eighth Report and Order*, n.62).

In November 2005, Plaintiffs began billing Qwest access charges for toll-free calls originated by wireless companies. Compl., ¶ 16. Under FCC rules, wireless companies are not allowed to charge access charges for the origination or termination of wireless calls. *In re Sprint PCS & AT&T Corp. Declaratory Ruling Regarding CMRS Access Charges*, 17 F.C.C.R. 13192 (F.C.C. 2002), *petitions for review dismissed, AT&T Corp. v. F.C.C.*, 349 F.3d 692 (D.C. Cir. 2003). Diving through a regulatory loophole, certain wireless companies send their calls to Plaintiffs and other wireline CLECs who then deliver them to Qwest and other long-distance companies. Plaintiffs then kick back a portion of the access charge revenue generated from the long distance carrier to the wireless carrier. *See* Compl., ¶ 9. In May 2004, the FCC largely limited this arbitrage opportunity for <u>inter</u>state calls. *Eighth Report and Order.* However, Plaintiffs continue to pursue this scheme for <u>intra</u>state calls. In addition, Plaintiffs are billing Qwest <u>inter</u>state charges that are not within the scope of their federal tariff or in compliance with the Eighth Report and Order.

Qwest filed an action in Colorado on June 12, 2006 after Plaintiffs threatened to block Qwest's calls if Qwest did not immediately pay all outstanding charges. Ex. 1 (Declaration of

Amy L. Benson) ("Benson Decl."), ¶ 2. That action is pending in the Colorado District Court for the City and County of Denver, Colorado as Civil Action No. 06-CV-6404. *Id.*

Prior to the initiation of the Colorado proceeding, Plaintiffs represented to Qwest that all of their charges were billed in accordance with their state and federal tariffs. Ex. 2 (May 23, 2006 letter from J. Mertz). Plaintiffs' representations were false. Qwest discovered after commencing the Colorado proceeding that not only were the intrastate charges outside the scope of Plaintiffs' filed state tariffs, but Plaintiffs did not even have state tariffs in the majority of states where they were charging for intrastate access. Ex. 3 (Oct. 30, 2007 Deposition of James Mert) ("Mertz Dep."), 118:7-118:16. During the course of the litigation, Qwest also discovered that Plaintiffs billed Qwest for interstate access services not provided under Plaintiffs' federal interstate tariff and that Plaintiffs manipulated their billing system so that intrastate calls in states where Plaintiffs had no state tariffs would be billed as interstate calls. *Id.*, 132:4-133:2

Nevertheless, Plaintiffs filed counterclaims in the Colorado proceeding seeking payment for the billed access charges. Ex. 4 (Answer and Second Am. Countercls., Colorado proceeding). Like Qwest's claims, Plaintiffs' counterclaims in the Colorado proceeding focus, in part, on the terms of Plaintiffs' federal interstate access tariff. At no time, however, did Plaintiffs seek to remove the Colorado proceeding to federal court, despite the presence of Qwest's federal claim which would have permitted them to do so. *See* Ex. 5 (Second Am. Compl., Colorado proceeding), ¶¶ 79-85.

Plaintiffs filed their complaint with this Court on December 17, 2007. At the time it was filed, the Colorado proceeding had been pending for eighteen months and Qwest's Second Amended Complaint, which asserted claims under the federal Communications Act, had been the

operative complaint for four months.[2]  Ex. 1 (Benson Decl.), ¶¶ 2-3.  Moreover, Plaintiffs filed their complaint in this Court shortly after Plaintiffs' expert testified in his deposition that he had no opinion on whether the federal charges at issue were within the scope of Plaintiffs' tariffs or in compliance with the requirements of the FCC's Eighth Report and Order.  Ex. 6 (Nov. 28, 2007 Deposition of Gary Ball) ("Ball Dep."), 94:15-94:19; 109:15-109:18.

At the time this Complaint was filed, the Colorado proceeding was in its very late stages. It had been ongoing for 18 months, discovery was closed and expert reports had been provided. Ex. 1, Benson Decl.),¶ 6.  Nevertheless, Plaintiffs now seek to shift to this Court – via a motion to dismiss in the Colorado proceeding and a newly filed complaint in this Court – various claims that not only are directly at issue in the Colorado proceeding, but are also highly interrelated with claims regarding intrastate wireless access charges which will proceed in Colorado.  *See* Compl., ¶ 27 (acknowledging that "QCC's claims and KMC Data's counterclaims concerning only *intrastate* issues will remain in the [Colorado proceeding]").  While Plaintiffs contend that such a fractured litigation is necessary because the interstate portions of *Qwest's claims* in the Colorado proceeding are subject to exclusive federal jurisdiction, Plaintiffs do not dispute that the Colorado court has jurisdiction over the federal claims Plaintiffs have brought here.

As is evident from these facts and as will be further demonstrated below, both conservation of judicial resources and practical realities strongly counsel in favor of staying this proceeding pending the forthcoming trial in the Colorado proceeding.

---

[2] Qwest filed its motion to amend its complaint in April 2007. Ex. 1 (Benson Decl.), ¶ 3.  The motion attached a copy of the Second Amended Complaint containing the federal Communications Act claim.  Thus, Plaintiffs were aware of these claims for almost eight months before commencing this action.

**ARGUMENT**

**I.    THIS COURT SHOULD STAY THIS ACTION PENDING RESOLUTION OF THE COLORADO PROCEEDING BECAUSE THE TWO ACTIONS ARE PARALLEL AND EXCEPTIONAL CIRCUMSTANCES ARE PRESENT.**

The *Colorado River* doctrine permits a federal court to dismiss or stay a federal action in deference to parallel litigation simultaneously proceeding in state court where "exceptional circumstances" are present. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 13 (1983); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-21 (1976); *Ryan v. Johnson*, 115 F.3d 193, 195-196 (3d Cir. 1997); *Fox v. Maulding*, 16 F.3d 1079, 1080 (10th Cir. 1994) ("The Colorado River doctrine applies to situations involving the contemporaneous exercise of concurrent jurisdictions . . . by state and federal courts.") (quotation omitted). In such circumstances, a stay of the federal suit may be appropriate based on "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colo. River*, 424 U.S. at 817 (quotation omitted). In short, the purpose of the *Colorado River* doctrine is to avoid duplicative litigation, such as that present in this case. *See Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999); *see also Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996) (explaining that "federal courts have the power to refrain from hearing . . . cases which are duplicative of a pending state proceeding").

While "the decision whether to defer to the state courts is necessarily left to the discretion of the district court in the first instance . . . such discretion must be exercised under the relevant standard prescribed by [the Supreme] Court." *Moses H. Cone*, 460 U.S. at 19. This standard requires the application of a two-part inquiry. First, the concurrent state and federal actions must constitute parallel proceedings such that the *Colorado River* doctrine is applicable. *Ryan*, 115

F.3d at 196; *Fox*, 16 F.3d at 1081. Second, where the state and federal actions are parallel, this Court must consider a number of non-exclusive factors to determine whether deference to the state court proceedings is appropriate under the particular circumstances. *Ryan*, 115 F.3d at 196; *Fox*, 16 F.3d at 1082. When applied to these cases, where Plaintiffs are themselves pursuing identical claims in state proceeding, the *Colorado River* doctrine counsels in favor of staying this action pending the resolution of the Colorado proceeding.

### A.    The State Action and the Federal Action Are Parallel Proceedings.

The threshold issue in any application of the *Colorado River* doctrine is whether the two actions are parallel proceedings. *Ryan*, 115 F.3d at 196. Generally, "cases are parallel when they involve the same parties and claims." *Id.*; *see also IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 306 (3d Cir. 2006) ("Parallel cases involve the same parties and substantially identical claims, raising nearly identical allegations and issues.") (quotations omitted), *cert. denied*, 127 S. Ct. 136 (2006); *Fox*, 16 F.3d at 1081 ("Suits are parallel if substantially the same parties litigate substantially the same issues in different forums.") (quotation omitted). Thus, in determining whether two suits are parallel proceedings, this Court must "examine whether the suits involve the same parties, arise out of the same facts and raise similar factual and legal issues." *Tyrer v. City of S. Beloit*, 456 F.3d 744, 752 (7th Cir. 2006).

This federal action is parallel to the ongoing Colorado proceeding. In fact, while complete identity between the two proceedings is not required, *see IFC Interconsult*, 438 F.3d at 306, the claims asserted by Plaintiffs in this federal action are identical to the counterclaims they have asserted in the Colorado proceeding in connection with the interstate access charges. *Compare* Compl. and Ex. 4 (Answer and Second Am. Countercls.). Plaintiffs concede that the Colorado court has jurisdiction to decide these claims. Ex. 1, (Benson Decl.), ¶9 (reciting

Plaintiffs' representation in the Colorado proceeding that: ("[T]his [Colorado] Court does have jurisdiction over KMC Data's claims that Qwest is liable to pay for KMC Data's *interstate* services."). Because this federal action involves the same parties, the same factual allegations, and the same claims for relief as the ongoing Colorado proceeding, these actions clearly constitute parallel proceedings.

**B.    Exceptional Circumstances Warrant Deference to the Colorado Proceeding.**

In *Colorado River* and its progeny, the Supreme Court set forth a number of nonexclusive factors which may be considered by a federal court in deciding whether exceptional circumstances exist that would warrant deference to parallel state proceedings. *See Colo. River*, 424 U.S. at 818; *Moses H. Cone*, 460 U.S. at 19-27. Although different courts use different formulations, most formulations include the following six factors among those considered: (1) which court first assumed jurisdiction over a relevant *res*; (2) whether the federal court is inconvenient; (3) whether abstention would aid in avoiding piecemeal litigation; (4) which court first obtained jurisdiction; (5) whether federal or state law applies; and (6) whether the state action is sufficient to protect the federal plaintiff's rights. *See IFC Interconsult*, 438 F.3d at 307 n.4; *see also Tyrer*, 456 F.3d at 754 (listing these six factors and four additional factors); *Currie v. Group Ins. Comm'n*, 290 F.3d 1, 10 (1st Cir. 2002); *Fox*, 16 F.3d at 1082 (listing these six factors and two additional factors). In applying these factors, no single factor is dispositive and "[t]he weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone*, 460 U.S. at 15-16. Because there is no property that is the subject of this federal action and subject to the jurisdiction of either court, the first consideration is inapplicable to the case at hand. We address the remaining five factors *seriatim*.

**1.   The Delaware District Court is an inconvenient forum for litigating this dispute.**

A significant factor in the Supreme Court's decision in *Colorado River* to affirm the dismissal of the federal action was the 300-mile distance between the District Court in Denver where the federal action was filed and the state court in which the state litigation was pending. *Colo. River*, 424 U.S. at 820; *see also id.* at 818 (noting "the inconvenience of the federal forum" as a relevant consideration). In this case, the federal forum in which Plaintiffs have commenced parallel litigation is not a mere 300 miles distant, but across the country from the forum in which the litigation has been proceeding for more than eighteen months. Moreover, the only apparent relevance of the State of Delaware to the dispute is that it is the state of the parties' respective incorporations. Indeed, despite having billed Qwest over 1.5 billion minutes of calls, Plaintiffs have not invoiced Qwest for a single interstate call originating in Delaware. Ex. 8 (Declaration of Derek Canfield in Support of Defendant's Motion to Transfer Proceeding to Colorado Pursuant to 28 U.S.C. § 1404) ("Canfield Decl."), ¶¶ 4-5. Accordingly, the inconvenience of the federal forum in which Plaintiffs have chosen to proceed weighs in favor of a stay of this federal action.[3]

**2.   Staying the federal action will avoid piecemeal litigation.**

The danger of piecemeal litigation is a factor that weighs heavily in favor of a stay of the federal proceeding. *Colo. River*, 424 U.S. at 819. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Tyrer*, 456 F.3d at 755 (quotation omitted). Such actions undermine both the efficient use of judicial resources and the public's perception of the legitimacy of judicial authority. *Id.*

---

[3] Qwest is simultaneously filing a motion to change venue to the Colorado District Court pursuant to 28 U.S.C. § 1404. If this motion is granted, this factor will become irrelevant.

Thus, where identical issues are raised simultaneously in different forums, "allowing the two suits to proceed concurrently would waste the parties' resources, risk duplicative rulings and reward a strategic gamesmanship [of rushing to judgment] that has no place in a dual system of federal and state courts." *Id.* at 756.

This Court's denial of a stay in this action would result in piecemeal litigation in two ways. First, with respect to the parties' dispute over interstate access charges, identical factual and legal issues would be raised simultaneously in state and federal court. As noted above, the claims asserted by Plaintiffs in this federal action are identical to the claims previously asserted as counterclaims in the state litigation regarding the interstate access charges. Therefore, identical actions involving the same claims will proceed concurrently in separate forums, thus resulting in duplicated efforts and risking inconsistent rulings. *Id.* at 755; *see also Rienhardt*, 164 F.3d at 1302 ("[T]he *Colorado River* Doctrine was adopted to avoid duplicative litigation.").

Second, the denial of a stay of this federal action would result in piecemeal litigation because it would separate the dispute regarding Plaintiffs' improper interstate access charges, which are at issue in this federal litigation, from the inextricably intertwined dispute regarding Plaintiffs' improper intrastate access charges, which are at issue only in the state litigation and will indisputably proceed in Colorado. This litigation concerns a comprehensive scheme through which Plaintiffs improperly billed Qwest for certain access charges in violation of various provisions of both their state and federal tariffs. Moreover, Plaintiffs acknowledge having rebilled intrastate calls in states where they have no state tariffs as interstate calls. Ex. 3. Plaintiffs also acknowledge that they manipulated their billing system so that all calls in certain states would be billed as interstate calls regardless of the jurisdictional nature of the call. *Id.* As such, a proper resolution of this case must take into account both the intrastate and interstate

access billings. If this Court were to proceed with this federal action, it would be presented with an incomplete picture of Plaintiffs' improper billing practices and could not address the complete dispute between the parties. Accordingly, these inextricably intertwined claims should be tried in one forum. *See Allen v. La. State Bd. of Dentistry*, 835 F.2d 100, 105 (5th Cir. 1988) (holding stay was appropriate where federal complaint was "inextricably intertwined with the issues being considered by the state courts"); *cf. Colo. River*, 424 U.S. at 819-20 (affirming stay to allow claims involving interdependent rights to be decided in a single forum).

Qwest understands that the mere pendency of the state proceeding and the resulting piecemeal litigation may not be alone sufficient to justify a stay of the federal proceeding pursuant to the *Colorado River* doctrine. *See Spring City Corp. v. Am. Bldgs. Co.*, 193 F.3d 165, 171-72 (3d Cir. 1999) (noting "*Colorado River* abstention must be grounded on more than just the interest in avoiding duplicative litigation"). Nevertheless, in combination with the other factors discussed in this Motion, particularly the June trial date in the Colorado proceeding, "the avoidance of piecemeal litigation may counsel against hearing the case in federal court." *Rienhardt*, 164 F.3d at 1303.

In addition, proceeding in two forums presents the risk of inconsistent interpretations of Plaintiffs' tariff obligations. Such a result could contravene the filed tariff doctrine, a doctrine intended to ensure that regulated companies charge only those rates and provide only those services that have been filed with the appropriate regulatory agency. Indeed, the filed tariff doctrine is grounded in the principal of nondiscrimination. *E.g. Am. Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 229 (1998) (the filed tariff doctrine "exists to protect the 'antidiscriminatory policy which lies at the "heart of the common carrier section of the Communications Act."'") (Rehnquist, C.J. concurring). Because of the overlap between the

claims and in light of Plaintiffs' acknowledgment that their claims for charges under their federal tariff are properly before the Colorado court, this Court should stay this proceeding to avoid the risk of piecemeal litigation in the context of these proceedings.

### 3. State court jurisdiction was obtained first and the Colorado proceeding has progressed almost to trial.

In *Colorado River*, the Supreme Court expressly noted "the order in which jurisdiction was obtained by the concurrent forums" as a relevant factor in determining whether a federal court should stay federal proceedings pending resolution of parallel state court litigation. *Colo. River*, 424 U.S. at 818. This factor should "be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." *Moses H. Cone*, 460 U.S. at 21. In other words, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Id.* Based upon this principle, courts have consistently held a stay of federal proceedings to be appropriate where the parallel state court proceeding has progressed to a far later stage of litigation than the proceedings in federal court. *See, e.g.*, *Tyrer*, 456 F.3d at 755 (affirming stay of federal proceedings where "state suit had been ongoing for approximately four years" at the time the federal suit was filed and "a number of significant events [had] taken place in [the state] case"); *Allen*, 835 F.2d at 104 (affirming stay where "there [had] been extensive discovery in state court" and "the federal suit had not moved beyond the filing of amended and supplemental complaints").

Here, the Colorado court obtained jurisdiction over this litigation with the filing of Qwest's initial complaint in June 2006, approximately eighteen months before the federal action was filed in this Court. More important, however, the Colorado proceeding is scheduled for trial in less than five months. Discovery in the Colorado proceeding is well advanced and is scheduled to be completed by April 20, 2008. Ex. 1 (Benson Decl.), ¶ 6. *Cf. Moses H. Cone*,

460 U.S. at 22 (holding federal proceedings should not be stayed where "[i]n the federal suit . . . the parties had taken most of the steps necessary to a resolution of the . . . issue"). In contrast, the federal action has not progressed beyond the filing of Plaintiffs' complaint. *See Colo. River*, 424 U.S. at 820 (listing "the apparent absence of any proceedings in the District Court, other than the filing of the complaint" as a "significant" factor justifying dismissal of federal action); *see also Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 702 (7th Cir. 1992) (affirming stay where "the controversy appeared to be closer to a resolution in the state proceedings than in the federal," even though federal action was filed four months earlier). In these circumstances, where all or a substantial portion of the dispute will be resolved in state court first, this Court's exercise of jurisdiction may be entirely unnecessary. *See Univ. of Md. at Balt. v. Peat Marwick Main & Co.*, 923 F.2d 265, 275-76 (3d Cir. 1991) (stating that where simultaneous litigation occurs in state and federal courts, the action that comes to judgment first "may create a res judicata or collateral estoppel effect on the other action").

As noted above, the relative weight given to any one of the *Colorado River* factors "may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone*, 460 U.S. at 15-16. In light of the exceptional circumstances of this case, the state court's priority of jurisdiction and the advanced progress of the Colorado proceeding should weigh heavily, and potentially determinatively, in favor of a stay of these federal proceedings.

### 4.    This federal action and the Colorado proceeding involve issues of state law.

The Supreme Court has explained that where "federal law provides the rule of decision on the merits," this may be a factor weighing against deferral to parallel state court proceedings under the *Colorado River* doctrine. *Moses H. Cone*, 460 U.S. at 23; *see also Colo. River*, 424 U.S. at 820 (listing "extensive involvement of state water rights" as a "significant" consideration

supporting the dismissal of the federal proceeding). This "source-of-law factor" is of less significance in this case than it may be in other cases because, as discussed below, the federal court's jurisdiction over the claims at issue in this litigation is concurrent with that of the Colorado proceeding. *See Moses H. Cone*, 460 U.S. at 25 (noting that the source-of-law factor has less significance in cases of concurrent jurisdiction than in cases of exclusive jurisdiction). In addition, Plaintiffs' failure to remove the action to federal court, and their corresponding decision to assert their claims first in state court, further weaken the significance of the presence of federal questions in determining whether a stay is appropriate. *See Tyrer*, 456 F.3d at 754, 757 (listing "availability of removal" as a relevant consideration and considering plaintiff's decision to bring his claims in state court first). In any event, however, the state law nature of the majority of the claims at issue in this litigation counsels in favor of a stay.

Although the claims set forth in Plaintiffs' complaint concern interstate access charges and interstate tariffs, the majority of the claims stated arise under state law. *See* Compl., Counts II (breach of implied contract), III (action on open account), IV (quantum meruit), and V (unjust enrichment).[4] While Plaintiffs' claim for declaratory judgment arguably arises under the Federal Communications Act, this Court has no obligation to exercise jurisdiction over actions for declaratory judgment and, thus, has considerably greater discretion to stay such actions. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288-90 (1995) (holding that the stay of a declaratory judgment action is governed not by the *Colorado River* standard, but by the discretionary standard set forth in *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942)).

Thus, the only federal claim at issue is the claim for payment pursuant to the terms of the federal tariff. *See Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir. 2003) (stating

that "a contract action for unpaid services under the terms and conditions set forth in a [federally] filed tariff 'arises under' the laws of the United States"). However, this claim does not raise any issue so uniquely federal as to weigh against deferral to the parallel state court action. *Great W. Sugar Co. v. N. Natural Gas Co.*, 661 P.2d 684, 690 (Colo. Ct. App. 1982) (holding "state courts are competent to interpret [interstate] tariffs as a question of law"); *US Sprint Commc'ns Co. v. Computer Generation, Inc.*, 401 S.E.2d 573, 575 (Ga. Ct. App. 1991) (holding state courts have jurisdiction to decide claims arising under Section 207 of the Communications Act).

### 5.    The Colorado Proceeding Is Adequate to Protect the Parties' Rights.

Finally, the Colorado proceeding is "an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone*, 460 U.S. at 28; *see also Allstate Ins. Co. v. Brown*, 920 F.2d 664, 668 (10th Cir. 1990) ("One of the factors to be considered in exercising this discretion [to stay a federal proceeding] is whether the claims of all parties in interest can satisfactorily be adjudicated in the state court proceeding.") (quotation and alteration omitted). First, Plaintiffs have conceded that all of their claims are subject to the jurisdiction of the Colorado state court and may properly proceed in that forum. Thus, there is no indication that the Colorado proceeding would not be sufficient to adequately protect Plaintiffs' rights. *See U.S. Fid. & Guar. Co. v. Murphy Oil USA, Inc.*, 21 F.3d 259, 263 (8th Cir. 1994) ("[T]here is no presumption that a state court is biased or otherwise inadequate to protect the federal plaintiff's rights.").

Second, any argument that the interstate portions of Qwest's claims which were asserted in the Colorado proceeding are subject to exclusive federal jurisdiction pursuant to 47 U.S.C. § 207 is premature. These claims are not before this Court. In any event, as discussed below, the

---

[4] Qwest has simultaneously with this motion filed a motion to dismiss the state law claims for

state court has concurrent jurisdiction over Qwest's claims in the Colorado proceeding. *See Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 666 (1978) (holding federal court could stay claims over which the state court could exercise concurrent jurisdiction); *Tyrer*, 456 F.3d at 754 (listing "the presence or absence of concurrent jurisdiction" as a factor to consider in determining whether to stay federal proceedings).

It is axiomatic that under the system of dual sovereignty, "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990); *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Indeed, while this principle has long lain at the heart of the federal judicial system, the Supreme Court has reaffirmed and emphasized the vigor of the principle in recent decisions. *See Yellow Freight*, 494 U.S. at 826 ("[T]he presumption of concurrent jurisdiction . . . lies at the core of our federal system."); *Tafflin*, 493 U.S. at 459 (describing the presumption in favor of concurrent state court jurisdiction as "deeply rooted"). Thus, there is a strong presumption in favor of concurrent state court jurisdiction, and exclusive federal jurisdiction has long been the exception rather than the rule. *See Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 523 (1962).

As such, federal courts have exclusive jurisdiction over a particular federal cause of action only if Congress, "in an exercise of its powers under the Supremacy Clause, affirmatively divest[s] state courts of their presumptively concurrent jurisdiction." *Yellow Freight*, 494 U.S. at 823; *see also Telluride Co. v. Varley*, 934 P.2d 888, 890 (Colo. Ct. App. 1997) ("When a federal question is presented, state and federal courts have concurrent jurisdiction unless Congress has affirmatively given exclusive jurisdiction to the federal courts."). Such a divestment of state

---

failure to state a claim upon which relief may be granted.

court jurisdiction can be demonstrated only in one of three ways: (1) an explicit statutory directive; (2) an unmistakable implication from legislative history; or (3) a clear incompatibility between state court jurisdiction and federal interests. *Tafflin*, 493 U.S. at 459-60 (quoting *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478 (1981)). It is not sufficient that those involved in enacting, enforcing, and interpreting the particular law at issue may have anticipated that litigation would occur solely in the federal courts. *See Yellow Freight*, 494 U.S. at 826. Rather, Congress must have unambiguously determined that state courts should not be permitted to exercise their concurrent jurisdiction over the claims. *See id.* at 825-26 (requiring a "legislative decision," as opposed to a "universally shared" expectation, to overcome the presumption of concurrent state court jurisdiction). Because none of the three factors necessary for exclusive federal jurisdiction is present with respect to Qwest's claims for violation of the Communications Act under 47 U.S.C. § 207, the Colorado court has jurisdiction over the claims at issue in this litigation pursuant to its presumptive concurrent jurisdiction.

   **a.**  **Section 207, 47 U.S.C. contains no explicit statutory directive of exclusive federal jurisdiction.**

Section 207 of the Communications Act states as follows:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

47 U.S.C. § 207.

This statutory provision does not contain an "explicit statutory directive" that divests state courts of their presumptive jurisdiction to hear claims brought under this section. *See Tafflin*, 493 U.S. at 460. For a statute to divest the presumptive jurisdiction of a state court

through an explicit statutory directive, there must be "language that expressly confines jurisdiction to federal courts or ousts state courts of their presumptive jurisdiction." *Yellow Freight*, 494 U.S. at 823. In another provision of the Communications Act, Congress unequivocally provided such a statement. *See* 47 U.S.C. § 227(f)(2) (providing that "[t]he district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under [47 U.S.C. § 227(f)]"). In fact, there are numerous examples of statutes in which Congress expressly confined jurisdiction to federal courts. *See, e.g.*, 29 U.S.C. § 1132(e)(1) ("Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter . . . ."); 15 U.S.C. § 80a-35(b)(5) ("Any action pursuant to this subsection may be brought only in an appropriate district court of the United States."); 15 U.S.C. § 78aa ("The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder . . . ."); 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."). Unlike these other statutes, the language of 47 U.S.C. § 207 contains no such explicit statutory directive. As the United States Supreme Court held in *Yellow Freight*, the omission of such language is "strong, and arguably sufficient, evidence" that Congress did not have the requisite intent to divest state courts of their presumptive jurisdiction. *Yellow Freight*, 494 U.S. at 823.

In *Yellow Freight*, the statute at issue provided that United States courts "*shall* have jurisdiction of actions brought under this subchapter." 494 U.S. at 823 (citing 42 U.S.C. § 2000e-5(f)(3) (1982 ed.)). Despite the apparently mandatory nature of this language, the Court

held that the text of the statute failed to "unequivocally stated that the jurisdiction of the federal courts is exclusive." *Id.* In *Tafflin*, the Supreme Court found that a statute providing that suit *may* be brought in any United States district court was "plainly permissive" and did not oust state courts of their concurrent jurisdiction. 493 U.S. at 460-61. If the *Yellow Freight* language is insufficient to divest state courts of their presumptive jurisdiction, then certainly the permissive wording of 47 U.S.C. § 207 is insufficient as well. Indeed, at least one court has held that the Supreme Court decisions in *Tafflin* and *Yellow Freight* compel the conclusion that 47 U.S.C. § 207 does not vest exclusive jurisdiction in the federal courts and the FCC. *See US Sprint Commc'ns Co.*, 401 S.E.2d at 575. Significantly, this is the *only* case concerning jurisdiction under 47 U.S.C. § 207 where the court has undertaken the analysis required by the Supreme Court in *Tafflin* and *Yellow Freight*.

        **b.**    **No legislative history exists for 47 U.S.C. § 207 to indicate exclusive federal jurisdiction.**

Although a grant of exclusive federal jurisdiction may also arise from an "unmistakable implication from legislative history," *see Tafflin*, 493 U.S. at 459, no such legislative history exists with regard to 47 U.S.C. § 207. Thus, like the statute at issue in *Tafflin*, the legislative history of 47 U.S.C. § 207 "reveals no evidence that Congress even considered the question of concurrent state court jurisdiction." *Id.* at 461. The absence of any legislative history whatsoever should end the inquiry with respect to this factor. *Id.* at 463 ("Under *Gulf Offshore*, legislative silence counsels, if not compels, us to enforce the presumption of concurrent jurisdiction."); *see also US Sprint Commc'ns Co.*, 401 S.E.2d at 575 (holding that state courts have concurrent jurisdiction over claims under the Communications Act based in part on the "total lack of proof of any preemptive legislative understanding").

    c.      **State court jurisdiction over claims brought pursuant to 47 U.S.C § 207 is not clearly incompatible with federal interests.**

    Where, as here, the statutory language and legislative history are insufficient to overcome the strong presumption of concurrent state court jurisdiction, the court may consider whether there is clear incompatibility between state court jurisdiction and the federal interests underlying the statute to determine whether exclusive federal jurisdiction is appropriate. Specifically, the court may consider (1) the desirability of uniform interpretation; (2) the expertise of federal judges in federal law; and (3) the assumed greater hospitality of federal courts to peculiarly federal claims. *See Tafflin*, 493 U.S. at 464; *Gulf Offshore*, 453 U.S. at 483-84. These factors, however, must be analyzed in light of the broad, overarching presumption of concurrent state court jurisdiction. Nothing in the underlying policies of the Communications Act suggests that the exercise of state court jurisdiction in this case would be clearly incompatible with these or any other federal interests.

    First, state court jurisdiction over claims brought pursuant to 47 U.S.C. § 207 would not undermine the uniformity of the federal law. As with any federal question over which state courts have concurrent jurisdiction, federal courts would retain primary authority for the interpretation of the federal law and state courts would "be guided by federal court interpretations of the [Communications Act], just as federal courts sitting in diversity are guided by state court interpretations of state law." *Tafflin*, 493 U.S. at 465. Thus, lawsuits brought in state court pursuant to 47 U.S.C. § 207 are not state law challenges to the companies' service agreements, but federal law challenges which happen to be brought in state courts. The Supreme Court can review and correct any erroneous interpretations of federal law regardless of whether the decision comes from a federal court or a state court. *See id.*; *Pan Am. Petroleum Corp. v. Superior Court*, 366 U.S. 656, 665 (1961). Thus, while the simultaneous interpretation of a

single federal law in multiple jurisdictions always creates a risk of jurisdictional variations, such inconsistency is a function of the American judicial system and is made no more likely by the exercise of state court jurisdiction.[5] *Tafflin*, 493 U.S. at 465; *Charles Dowd Box Co.*, 368 U.S. at 514 (noting "diversities and conflicts may occur, no less among the courts of the eleven federal circuits, than among the courts of the several States").

Second, the mere fact that claims pursuant to 47 U.S.C. § 207 arise under federal law and are governed by federal law is not sufficient to divest state courts of their presumptive concurrent jurisdiction. *See, e.g., Yellow Freight*, 494 U.S. at 826 (holding state courts have concurrent jurisdiction over claims arising under Title VII). While federal courts may have greater experience in applying federal law, this greater experience is not alone sufficient to preclude the exercise of state court jurisdiction. *Id.; see also Great W. Sugar Co.*, 661 P.2d at 690 (holding "state courts are competent to interpret [interstate] tariffs as a question of law"). Indeed, to hold otherwise would be to ignore the fundamental principle that the existence of a federal question does not create exclusive federal jurisdiction. *See Yellow Freight*, 494 U.S. at 826; *Gulf Offshore*, 453 U.S. at 478 n.4 ("Permitting state courts to entertain federal causes of action facilitates the enforcement of federal rights."); *Charles Dowd Box Co.*, 368 U.S. at 507 ("[N]othing in the concept of our federal system prevents state courts from enforcing rights created by federal law.").

---

[5] In addition, where a particular issue or claim requires a greater degree of uniformity or specialized expertise, a primary jurisdiction referral to the FCC remains an available option in state court, just as it would in federal court. *See TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1238-39 (10th Cir. 2007); *Public Serv. Co. of Colo. v. Mile Hi Cable Partners L.P.*, 995 P.2d 310, 312 (Colo. Ct. App. 1999); *see also Jenkins v. Entergy Corp.*, 187 S.W.3d 785, 800 (Tex. Ct. App. 2006) (distinguishing the primary jurisdiction doctrine from the exclusive jurisdiction doctrine).

As the Supreme Court has recognized, exclusive federal-court jurisdiction over a cause of action generally is unnecessary to protect the parties. *Gulf Offshore*, 453 U.S. at 484 n.12. The plaintiff may choose the available forum it prefers, and the defendant may remove the case if it could have been brought originally in a federal court. *Id.* Here, Plaintiffs could have removed the Colorado proceeding to federal court, *see Yellow Freight*, 494 U.S. at 826, but did not do so. Having failed to take advantage of this avenue which was indisputably available, Plaintiffs cannot now plausibly contend that Qwest's federal claims are beyond the realm of state court expertise. *See id.* (noting "state courts are just as able as federal courts to adjudicate Title VII claims"); *Tafflin*, 493 U.S. at 465 (explaining Court had "full faith in the ability of state courts to handle the complexities of civil RICO actions"); *US Sprint Commc'ns Co.*, 401 S.E.2d at 575 (holding state courts have jurisdiction to decide claims arising under Section 207 of the Communications Act).

Finally, claims brought pursuant to 47 U.S.C. § 207 are not so "peculiarly federal" as to oust state courts of their concurrent jurisdiction. A majority of courts hold that there is no complete federal preemption of interstate telecommunications claims and state courts retain jurisdiction to decide state law claims which relate directly or indirectly to the field of interstate telecommunications. *Trevino v. Southwestern Bell Tel. Co., L.P.* 2005 WL 2346950, at *4 (S.D. Tex. Sept. 26, 2005) (collecting cases); *see also Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 486 (2d Cir. 1998) (federal common law does not completely preempt state law claims in the area of interstate telecommunications); 47 U.S.C. § 414 ("Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."). Thus, there is no

reason to conclude that claims brought pursuant to 47 U.S.C. § 207 are so "peculiarly federal" as to invoke the assumption that such claims would be met with greater hospitality in federal courts.

In the Colorado proceeding, Qwest does not seek to challenge or modify the terms of Plaintiffs' federal tariffs, but rather to enforce the terms of the tariffs and, correspondingly, to enforce the federal law. Likewise, Plaintiffs do not seek to challenge any federal law. Thus, the Colorado court's exercise of jurisdiction over the parties' federal claims would serve to further, not to undermine, the federal interests underlying the Communications Act. Because courts have consistently held claims for violations of the Communication Act may be subject to arbitration, "it would be anomalous to rule that state courts are incompetent to adjudicate" the same claims. *Tafflin*, 493 U.S. at 466. Moreover, Plaintiffs acknowledge that the Colorado court has the authority to interpret the provisions of their interstate tariffs for purposes of resolving their counterclaims. It would be more than mildly perplexing to conclude that a state court may interpret and apply Plaintiffs' interstate tariffs in the context of Plaintiffs' claims, but is precluded from interpreting and applying these same provisions for purposes of Qwest's claims raised in its defense. Indeed, such a holding would be contrary to established law. *Cf. Pan Am. Petroleum Corp.*, 366 U.S. at 664-65 (holding that exclusive jurisdiction under a federal statute does not preclude state court jurisdiction of defenses based thereon); *Gulf Offshore*, 453 U.S. at 484 n.12 (exclusive federal jurisdiction will not prevent a state court from deciding a federal question collaterally even if it would not have subject-matter jurisdiction over a case raising the question directly). Therefore, the Colorado court's exercise of jurisdiction over the claims at issue in this litigation is not clearly incompatible with the federal interests underlying the Communications Act.

6. **Plaintiffs' federal complaint is reactive.**

In addition to the factors discussed above, "the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation." *Moses H. Cone*, 460 U.S. at 17 n.20; *see also Tyrer*, 456 F.3d at 754 (listing "the vexatious or contrived nature of the federal claim" as a relevant factor in the *Colorado River* analysis); *Fox*, 16 F.3d at 1082 (listing "the vexatious or reactive nature of either the federal or the state action"). Here, Plaintiffs' filing of a complaint in this Court eighteen months after the state proceeding had commenced and within a few months of trial appears to be simply an attempt to muddle the issues and proceedings. Prior to the filing of their complaint in this Court, Plaintiffs asserted identical claims in the Colorado proceeding and voluntarily chose to litigate these claims in that forum as counterclaims to Qwest's state court action. It was only as the Colorado proceeding neared completion, and after Plaintiffs' expert testified that he could not support Plaintiffs' position that their federal charges were within the scope of their federal tariff or in compliance with the FCC's Eighth Report and Order, that Plaintiffs chose to assert their claims in this Court. In such a situation, Plaintiffs' unnecessary duplication of the ongoing state proceeding is, under the most generous reading, "reactive" within the meaning of the *Moses H. Cone*. The reactive nature of Plaintiffs' conduct in filing this complaint further supports a stay of this federal proceeding.

## CONCLUSION

Contrary to Plaintiffs' unsubstantiated assertion in their complaint, the claims that are at issue in this litigation are not subject to the exclusive jurisdiction of the federal district courts and the FCC. Thus, the Colorado proceeding is "an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone*, 460 U.S. at 28. Indeed, by

Plaintiffs' own concession, the court has jurisdiction over its counterclaims in the Colorado proceeding which are identical to those claims Plaintiffs now assert in this Court. Because the state court is a proper forum for resolution of this dispute and because the Colorado proceeding was ongoing for eighteen months prior to the commencement of the federal action, this Court should stay this federal proceeding in deference to the ongoing Colorado proceeding.

For the reasons set forth in this Motion, Qwest respectfully requests that this Court stay this litigation pending resolution of the parallel Colorado proceeding.

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.

Of Counsel:
Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, 22nd Floor
Denver, CO   80202-4437
Telephone:  303-223-1100

Dated:  January 22, 2008

One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Attorneys for Defendant
Qwest Communications Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2008, I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Richard L. Horwitz
Potter Anderson & Corroon, LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
P. O. Box 951
Wilmington, DE   19899-0951

Jeffrey L. Moyer (#3309)
moyer@rlf.com

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

HYPERCUBE, LLC and KMC DATA, LLC )
)
            Plaintiffs, )
)
   v. )   CASE NO.: 07-822
)
QWEST COMMUNICATIONS )
CORPORATION, )
)
            Defendant. )

**DECLARATION OF AMY L. BENSON**

I, Amy L. Benson, of full age, hereby declare as follows:

1. I am a partner at Brownstein Hyatt Farber Schreck, LLP, which represents Qwest Communications Corporation ("Qwest") in this action and in a parallel proceeding that is pending as *Qwest Communications Corporation v. HyperCube, LLC, et al.*, Civil Action No. 06CV6404, in the District Court for the City and County of Denver, Colorado (the "Colorado proceeding"). I make this Declaration in support of Defendant's Motion to Transfer Venue to the District of Colorado ("Motion to Transfer") and in support of Defendant's Motion to Stay Federal Proceedings Pending Resolution of Parallel State Court Action ("Motion to Stay").

2. Qwest filed its action in the Colorado proceeding on June 12, 2006 after Plaintiffs threatened to block Qwest's calls if Qwest did not immediately pay all outstanding charges. That action is pending in the Colorado District Court for the City and County of Denver, Colorado as Civil Action No. 06CV6404.

3. On April 16, 2007, Qwest filed a motion to amend its amended complaint in the Colorado proceeding. Qwest attached a copy of its Second Amended Complaint to its

Motion. Plaintiffs opposed Qwest's Motion. On August 24, 2007, the Colorado court granted Qwest's Motion.

  4. Attached as Exhibit 2 to the Motion to Transfer and as Exhibit 5 to the Motion to Stay is a true and correct copy of the Second Amended Complaint filed in the Colorado proceeding.

  5. Attached as Exhibit 3 to the Motion to Transfer and as Exhibit 4 to the Motion to Stay is a true and correct copy of the Plaintiffs' Answer and Second Amended Counterclaims filed in the Colorado Proceeding.

  6. Attached as Exhibit 8 to the Motion to Stay is a true and correct copy of the Plaintiffs' Opposition to Qwest's Motion to Extend the Trial Date Answer filed in the Colorado proceeding.

  7. Discovery in the Colorado proceeding is well advanced. At the time this Complaint was filed, discovery in the Colorado proceeding was closed and expert reports had been provided. Discovery has been reopened and is now scheduled to be completed by April 20, 2008. The Colorado proceeding is set for trial on June 9, 2008.

  8. Attached as Exhibit 5 to the Motion to Transfer is a true and correct copy of the witness lists filed by Plaintiffs and Qwest in the Colorado proceeding. As set forth on those lists, the parties identified a total of 22 witnesses. Six witnesses are located in Colorado. Two of the Colorado based witnesses, William Argall and Teresa Reddan, are former employees of Qwest and therefore would need to be subpoenaed to testify if they were unwilling to voluntarily appear. The remaining witnesses are in Connecticut, Georgia, Kansas, Ohio, New York, Texas, and Utah.

9. The parties identified their exhibits in the Colorado proceeding. Because Plaintiffs' claims in Delaware are identical to those asserted in their counterclaims in Colorado proceeding, exhibits from that proceeding will also likely be used as exhibits in this proceeding. Qwest's exhibits and the documents it has collected and produced in discovery in the Colorado proceeding are located in Denver, Colorado.

I hereby declare under penalty of perjury that all of the statements made by me herein are true and correct.

Dated:  January 22, 2008

Amy L. Benson

# EXHIBIT 2



**HyperCube**
3200 W. Pleasant Run Road
Suite 260
Lancaster, Texas 75146

May 23, 2006

Qwest Communications Corporation
Attn: William M. Argall

Dear William Argall,

Hypercube received a dispute letter from Tom Pruss at the Teoco Corporation on May 22, 2006 stating that Teoco has an agreement with Qwest Communications Corporation ("QCC") to process, audit and pay access charges to Hypercube and was authorized to file the dispute on behalf of QCC.

Hypercube denies the disputes filed by Teoco on behalf of QCC for the reasons stated below:

**1. LPCS/Past Balances from December 2004 until November 2005** – Hypercube entered into an Asset Purchase Agreement and Management Agreement on November 15, 2005 with KMC for the purchase of KMC Data LLC and does not have a copy of the November 18, 2005 Release and Settlement agreement that is cited in the letter and is unable to validate QCC's claims that it is due a credit. If QCC provides Hypercube a copy of documentation that it believes demonstrates it is due a credit, Hypercube will review the documentation to determine if a credit is due.

**2. Overbilling for Switched Access Usage: wireless Originating 8XX** – As requested, Teresa Davenport provided Marie Niziolek and Albert Wonga copies of KMC Data LLC's intrastate tariffs for California, Georgia, Florida, Washington & Colorado on March 14, 2006. Hypercube has been billing QCC per KMC Data LLC's interstate and intrastate tariffs. Consequently, QCC's dispute of intrastate charges is denied and the outstanding balances are past due.

Hypercube's records show that QCC has not paid $541,695.89 in outstanding usage charges and $32,036.63 in late payment charges for bills rendered through April 22. Hypercube expects payment of all outstanding charges that are past due by close of business Friday May 26, 2006 or Hypercube will suspend service to Qwest as permitted by its interstate and intrastate tariffs (i.e. Section 2.5.3 A of KMC Data LLC's California Access Tariff).

Sincerely,

James Mertz
Vice President of Government Affairs

QHYPE0067122

# EXHIBIT 3

00001

1  DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO
   Case No. 06CV2404
2  _____

3  DEPOSITION OF:  JAMES MERTZ - October 30, 2007

   _____
4
   QWEST COMMUNICATIONS CORPORATION,
5
   Plaintiff and Counterclaim-Defendant,
6  vs.
   HYPERCUBE, LLC,
7
   Defendant,
8
   KMC DATA, LLC,
9
   Defendant and Counterclaim-Plaintiff.
10 _____

11      PURSUANT TO NOTICE, the deposition of JAMES
   MERTZ was taken on behalf of the Plaintiffs at 5605
12 Glenridge Drive, Suite 900, Atlanta, Georgia 30342, on
   October 30, 2007, at 9:08 a.m., before Karen F.
13 Gifford, Registered Professional Reporter within
   Georgia.
14
              A P P E A R A N C E S
15
   For the Plaintiff and
16 Counterclaim-Defendant:  AMY L. BENSON, ESQ.
                 Brownstein Hyatt Farber
17                Schreck, P.C.
                 410 Seventeenth Street
18                Suite 2200
                 Denver, Colorado  80202
19
   For the Defendant and
20 Counterclaim-Plaintiff:  KY KIRBY, ESQ.
                 Bingham McCutchen LLP
21                2020 K Street, NW
                 Washington, DC  20006
22

23

24

25

**Mertz, James - Oct. 30, 2007 NC..txt**                    **Page 1**

00118

1 they were interstate calls.

2 Q. Was that a decision that you made, to rebill

3 those calls as interstate calls?

4 A. No.

5 Q. Who made that?

6 A. Clay Myers.

7 Q. So, Mr. Mertz, you knew that KMC Data had

8 taken calls that it had billed as intrastate calls and

9 rebilled them as interstate calls in or around the

10 summer or fall of 2006?

11 A. I knew that it backed out the minutes

12 associated with those intrastate calls and that it

13 planned on rebilling those as interstate, yes.

14 Q. And you knew that it did rebill those as

15 interstate the fall of 2006; correct?

16 A. Yes.

17 MS. BENSON: Let's go ahead and mark this.

18 (Document marked as Exhibit-9.)

19 BY MS. BENSON:

20 Q. Mr. Mertz, you have before you the deposition

21 that you gave on June 5, 2007. You recall testifying

22 at that deposition; correct?

23 A. Yes, I do.

24 Q. Did you review your transcript after that

25 deposition?

00132

1  not go through the typical billing system. In other

2  words, would not go through the rating tables. It

3  would be put in as a credit or an adjustment.

4    Q.  And you knew that for states in which KMC

5  Data had no tariff you were rating them, the parameter

6  used to rate them was the PIU being set at a hundred

7  percent; correct?

8    A.  For states where there were no intrastate

9  tariffs and if the PIU was set at a hundred percent,

10  then the interstate rate would be used.

11    Q.  And so the determination of what rate was

12  going to be used in those states where you had no

13  tariff was the PIU factor.  That's how it was

14  determined; correct?

15    A.  Well, yes.  In every -- what happens with all

16  usage it comes through for particular state, the first

17  thing that is done is a PIU is applied to it.  And

18  then after that, then rates will be applied based upon

19  the PIU.

20    Q.  And for states in which you had no tariff the

21  billing parameter that decided the rate to be applied

22  was the PIU factor; correct?

23    A.  That's what I said.

24    Q.  Okay.  And it was you who decided to apply

25  the, or Hypercube decided to apply the hundred percent

00133

1  PIU factor; correct?

2    A.  Yes.

3    Q.  By the way, this morning I was asking you

4  about why you didn't file tariffs in certain states,

5  and you told me you didn't file tariffs in Arizona and

6  Colorado and Washington. Well, let me back up.

7        You indicated that one reason why you didn't

8  file tariffs was because they were in Qwest states;

9  correct?

10   A.  Correct.

11   Q.  Where Qwest Corporation was the ILEC;

12  correct?

13   A.  Correct

14   Q.  There's a number of other states where you

15  have MTSOs that you take wireless calls from that you

16  had no state tariffs; correct?

17   A.  Yes.

18   Q.  Let's go head and mark -- you know what, I

19  forgot. I was going to ask this question. At the

20  time you affirmed these interrogatory answers had you

21  discussed with counsel the fact that these calls were

22  rebilled as interstate calls?

23       MS. KIRBY:  I'm going to object to the

24  question as calling for disclosure of privileged

25  information, one way or the other. Whether he

# EXHIBIT 4

| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO 1437 Bannock Street Denver, Colorado 80202 | EFILED Document CO Denver County District Court 2nd JD Filing Date: Sep 10 2007 5:49PM MDT Filing ID: 16257421 Review Clerk: Charmaine Bright |
|---|---|
| QWEST COMMUNICATIONS CORPORATION, Plaintiff, v. HYPERCUBE, LLC and KMC DATA, LLC Defendants. | ▲ COURT USE ONLY ▲ |
| Attorneys for Defendants Hypercube, LLC and KMC Data, LLC: Richard L. Fanyo, #7238 David W. Furgason, #2122 Dufford & Brown, P.C. 1700 Broadway, Suite 2100 Denver, Colorado 80290-2101 Telephone: (303) 861-8013 Facsimile: (303) 832-3804 E-mail: rfanyo@duffordbrown.com dfurgason@duffordbrown.com | Case Number: 06-CV-6404 Courtroom 19 |

## ANSWER, COUNTERCLAIM AND JURY DEMAND TO SECOND AMENDED COMPLAINT

HyperCube, LLC ("HyperCube) and KMC Data, LLC ("KMC Data"), through undersigned counsel, hereby submit their Answer, Counterclaim and Jury Demand to Qwest Communications Corp.'s ("QCC's") Second Amended Complaint and state as follows:

### Introduction

1.    HyperCube and KMC deny the allegations in paragraph 1 of the Second Amended Complaint.

2.    HyperCube and KMC Data admit that HyperCube's wholly-owned subsidiary, KMC Data, is a telecommunications carrier. HyperCube and KMC Data deny the remaining allegations in paragraph 2 of the Second Amended Complaint.

3.    HyperCube and KMC Data admit that, on behalf of KMC Data, HyperCube began billing QCC access charges for wireless toll-free calls in November 2005. HyperCube and KMC Data deny the remaining allegations in paragraph 3 of the Second Amended Complaint.

{00337674.1}

4.    HyperCube and KMC Data admit that, on behalf of KMC Data, HyperCube has billed QCC a common trunk port and a multiplexing charge under KMC Data's interstate tariff. HyperCube and KMC deny the remaining allegations in paragraph 4 of the Second Amended Complaint.

5.    Paragraph 5 contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 5 of the Second Amended Complaint.

## Parties

6.    HyperCube and KMC Data admit the allegations in paragraph 6 of the Second Amended Complaint.

7.    HyperCube and KMC Data admit the allegations in paragraph 7 of the Second Amended Complaint.

8.    HyperCube and KMC Data admit the allegations in paragraph 8 of the Second Amended Complaint, except deny that KMC Data's principal place of business is in Bedminster, New Jersey.

9.    HyperCube and KMC Data admit the allegations in paragraph 9 of the Second Amended Complaint.

## Jurisdiction And Venue

10.    HyperCube and KMC Data do not contest jurisdiction.

11.    HyperCube and KMC Data do not contest venue.

## General Allegations

12.    HyperCube and KMC Data admit the allegations in paragraph 12 of the Second Amended Complaint.

13.    HyperCube and KMC Data admit the allegations in the first sentence of paragraph 13 and deny the allegations in the second sentence of paragraph 13 of the Second Amended Complaint.

14.    HyperCube and KMC Data admit the allegations in paragraph 14 of the Second Amended Complaint, except deny that HyperCube is a corporation.

## Wireless Originated Toll Free Calls

15.    HyperCube and KMC Data admit the allegations in paragraph 15 of the Second Amended Complaint.

16.    HyperCube and KMC Data admit the allegations of the first sentence in paragraph 16 subject to the qualification identified below.  HyperCube and KMC Data admit the allegations

in the second sentence in paragraph 16 to the extent it describes the various kinds of carriers that may be considered "originating carriers" in connection with a toll-free call. HyperCube and KMC Data deny the first and second sentences in paragraph 16 to the extent they allege or suggest that only one carrier can be considered an originating carrier for purposes of access services in connection with a toll-free call.

17.    HyperCube and KMC Data lack sufficient information to form a belief as to the truth of the allegation that the routing described in the first sentence of this paragraph is "typical," aver that there are other methods of routing that do not involve an ILEC and therefore deny the first sentence in paragraph 17. HyperCube and KMC Data admit, on information and belief, that the method in which QCC purportedly handles a wireless 8XX call once it receives the call is as described in the second sentence in paragraph 17. HyperCube and KMC Data lack sufficient information to form a belief as to the truth of the allegation in the third sentence in paragraph 17 that the diagram depicted is a simplified diagram of a "typical" call transfer from a wireless caller, aver that there are other methods of routing that do not involve an ILEC and therefore deny the third sentence in paragraph 17.

18.    HyperCube and KMC Data admit that when a call originates on a landline telephone, QCC is required to pay access charges to other carriers that are involved in the transmission of the call and that those charges may include "end office" charges and "tandem" charges. HyperCube and KMC Data admit, on information and belief, that if the ILEC is involved in transferring the landline call to QCC, then a tandem charge is incurred by QCC. HyperCube and KMC Data lack sufficient information to form a belief as to the truth of the allegation that a tandem charge is generally a small fraction of the end office charge and therefore deny the allegations in the third sentence of paragraph 18.

19.    With respect to the first sentence in paragraph 19, HyperCube and KMC Data admit that state and federal tariffs, filed with state public utilities commissions and the Federal Communications Commission, respectively, may contain definitions of access charges, including end office and tandem charges, but deny that the referenced tariffs are the exclusive sources for definitions of access charges, including end office and tandem charges. HyperCube and KMC Data admit that interstate calls are calls that span more than one state and that intrastate calls are calls that originate and terminate in the same state. The remaining allegations of the second and third sentences in paragraph 15 contain conclusions of law to which no response is required, but to the extent they contain factual allegations or a response is otherwise required, they are denied.

20.    This first sentence in paragraph 20 contains conclusions of law to which no response is required, but to the extent it contains factual allegations or a response otherwise is required it is denied. HyperCube and KMC Data deny the allegations in the second, third and fourth sentences of this paragraph.

21.    HyperCube and KMC Data admit only that they have entered into revenue sharing agreements with certain entities, including wireless carriers, and that under those agreements wireless carriers may receive a portion of the revenue KMC Data earns by providing services in connection with wireless 8XX calls destined to QCC's or other IXC's toll-free customers. HyperCube and KMC Data deny all remaining allegations in paragraph 21 of the Amended Complaint.

22.    HyperCube and KMC Data admit only that wireless 8XX calls delivered by KMC Data to QCC may travel call paths like those depicted in the diagrams in paragraph 22. HyperCube and KMC Data deny all other allegations in paragraph 22.

23.    HyperCube and KMC Data admit that the allegations in paragraph 23 purport to describe the call paths in the two diagrams depicted in paragraph 22.

24.    HyperCube and KMC Data deny all allegations in paragraph 24.

25.    HyperCube and KMC Data admit, on information and belief, only that other CLECs have delivered wireless 8XX calls to QCC and have charged QCC originating access charges for doing so.  HyperCube and KMC Data deny all remaining allegations in paragraph 25.

26.    HyperCube and KMC Data deny that the FCC has ever called the delivery of wireless 8XX calls by CLECs to IXCs an "insertion scheme" that the FCC has in any way characterized a CLEC's provision of access services in connection with wireless calls as somehow wrongful or unlawful or that the FCC has ever ruled that a wireless toll-free call must be delivered by the wireless carrier to an ILEC.  HyperCube and KMC Data state that the FCC's Order speaks for itself and that the quotations selected by QCC do not portray the FCC's full ruling or the full state of the law.  HyperCube and KMC Data deny the implication in paragraph 26's allegations that the referenced FCC decision applies to intrastate access charges. HyperCube and KMC Data deny all other allegations in paragraph 26.

27.    HyperCube and KMC Data admit that new rules were adopted by the FCC effective June 2004 regarding CLEC interstate access charges.  One rule adopted requires CLECs delivering interstate wireless 8XX calls to IXCs to charge the IXC for only the originating access elements provided for the delivery of such calls whereas prior to the FCC Order a CLEC could charge a single tariffed benchmark rate that applied regardless of how many access elements the CLEC provided.  HyperCube and KMC Data deny that tandem switching and transport are the only services provided when a CLEC delivers an interstate  wireless 8XX call to an IXC.  HyperCube and KMC Data deny all other allegations in paragraph 27, including the implication that the new rule has any application to CLEC charges for the delivery of intrastate wireless 8XX calls.

28.    HyperCube and KMC Data state that the FCC's Order, including Orders other than those cited by QCC, speak for themselves and that QCC's selected quotations and descriptions do not portray the full state of the law.  HyperCube and KMC Data deny the implication of these allegations that the referenced FCC decision applies to intrastate access charges.  HyperCube and KMC Data deny all other allegations in paragraph 28.

29.    HyperCube and KMC Data deny the allegations of paragraph 29.

## The Tariff Structure

30.    HyperCube and KMC Data admit that KMC Data may file and has filed federal and state tariffs containing the terms governing the provision of some of its services, but deny that KMC Data is required to do so in all instances.  HyperCube and KMC Data admit that KMC Data's tariffs, when applicable to the service provided to a party, contain the terms that govern

the provision of its services. HyperCube and KMC Data otherwise deny the allegations in paragraph 30.

31.     HyperCube and KMC Data admit that QCC has no separate written agreement with them regarding KMC's provision of access services to QCC in connection with wireless 8XX calls and deny all other allegations in paragraph 31 of the Second Amended Complaint.

### HyperCube's Billing to QCC Under KMC Data's Prior Intrastate Tariffs

32.     HyperCube and KMC Data admit the allegations in paragraph 32 with the qualification that HyperCube began billing for KMC Data's services in November 2005 in the states identified in paragraph 32, but that credits were issued for all intrastate billing for Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, South Carolina, Tennessee, Utah, Virginia and Wisconsin in August 2006.

33.     HyperCube and KMC Data admit that QCC questioned the charges and that HyperCube represented that the charges were billed pursuant to KMC Data's interstate and intrastate tariffs.

34.     HyperCube and KMC Data admit that QCC asked HyperCube to identify the provisions of the state tariffs on which the intrastate charges were based and that HyperCube initially provided to QCC copies of KMC Data's publicly-filed tariffs for California, Colorado, Florida, Georgia, and Washington in March of 2006 and aver that, in July 2006, HyperCube also provided to QCC copies of KMC Data's publicly-filed tariffs in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas and Washington. HyperCube and KMC Data admit that HyperCube did not provide to QCC copies of tariffs for Alabama, Arizona, Kentucky, Minnesota, North Carolina, New Jersey, Oregon, South Carolina, Utah, and Wisconsin and aver that QCC received credits for billing for services in those states. HyperCube and KMC Data deny all other allegations in paragraph 34.

35.     HyperCube and KMC Data admit that QCC sent a letter dated May 22, 2006 disputing the charges for KMC Data's services to QCC and claiming that the charges were not within the scope of HyperCube's state tariffs. HyperCube and KMC Data deny all other allegations in paragraph 35, including the allegation that the charges were improper.

36.     HyperCube and KMC Data admit that Mr. Mertz sent a letter to QCC dated May 23, 2006 advising that KMC Data's service to QCC would be suspended as permitted by its interstate and intrastate tariffs if QCC did not pay for the services that had been rendered to it since November of 2005. HyperCube and KMC Data aver that the letter speaks for itself. HyperCube and KMC Data admit that Mr. Mertz confirmed to Mr. Hansen that service would be suspended if payment was not made. HyperCube and KMC Data deny the suggestion that "blocking" the transmission of wireless 8XX calls to QCC customers over KMC Data's facilities constitutes action beyond service suspension.

37.     HyperCube and KMC Data admit that QCC made the $100,000 and $371,130 payments alleged in paragraph 37, admit on information and belief that QCC made these partial payments to defer service suspension while discussions to resolve the dispute were underway, admit that HyperCube advised QCC that service would not be suspended until June 5, 2006 as a

{00337674.1}

result of QCC's first partial payment of $100,000, and admit that, on June 6, 2006, HyperCube again notified QCC that service would be suspended for continuing nonpayment. HyperCube and KMC Data deny that QCC made either of its two partial payments to KMC Data as a result of HyperCube's statements regarding billing per KMC Data's interstate and intrastate tariffs or to avoid the allegedly "disastrous impact of HyperCube's threatened call blocking."

38.    HyperCube and KMC Data admit the allegations in paragraph 38 of the Second Amended Complaint.

39.    HyperCube and KMC Data admit the allegations in paragraph 39 of the Second Amended Complaint.

40.    HyperCube and KMC Data admit the allegations in paragraph 40 of the Amended Complaint.

41.    HyperCube and KMC Data admit that Mr. Mertz did not provide KMC Data tariffs to QCC for Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, South Carolina, Tennessee, and Utah.

42.    HyperCube and KMC Data admit that Mr. Mertz sent Mr. Hansen an e-mail on August 2, 2006 advising that intrastate billing in certain states listed in the e-mail would be backed out of the bills to QCC and aver that the e-mail speaks for itself.

43.    HyperCube and KMC Data admit that QCC was issued a credit for access charges from November 2005 through August 2006 for KMC Data's intrastate access services to QCC in Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, South Carolina, Tennessee, Utah, Virginia and Washington.

44.    HyperCube and KMC Data admit that interest was not refunded to QCC and aver that QCC never made payments on the bills for which it was issued credits. HyperCube and KMC Data further admit that QCC has not been given a refund of the partial payments it made for intrastate access charges in the states where QCC admits KMC Data had filed tariffs. HyperCube and KMC Data deny the remaining allegations in paragraph 44.

45.    HyperCube and KMC Data deny the allegations in paragraph 45 of the Second Amended Complaint.

46.    HyperCube and KMC Data deny the allegations in paragraph 46 of the Second Amended Complaint.

47.    HyperCube and KMC Data admit that wireless callers do not subscribe to KMC Data's local exchange services and deny all other allegations in paragraph 47 of the Second Amended Complaint.

48.    HyperCube and KMC Data deny the allegation in the first sentence in paragraph 48. HyperCube and KMC Data admit that KMC Data filed amended tariffs in certain states and filed new tariffs in other states in August and September of 2006. All other allegations of paragraph 48 are denied.

49.    HyperCube admits that it is billing QCC for intrastate calls in states where it has not filed a replacement tariff including Colorado and Washington. HyperCube and KMC Data deny all remaining allegations in paragraph 49 of the Second Amended Complaint.

50.    HyperCube and KMC Data admit the allegations in paragraph 50 of the Second Amended Complaint.

51.    HyperCube and KMC Data admit that on July 28, 2006, Steven Hansen emailed James Mertz regarding the Shared (Common) Trunk Port charge and the Multiplexing charge and deny the remaining allegations of paragraph 51 of the Second Amended Complaint.

52.    HyperCube and KMC Data admit the first sentence of paragraph 52. HyperCube and KMC Data admit that TEOCO sent a similar dispute notice on a couple of other occasions, but deny that it sent a similar notice each month after November 2006. HyperCube and KMC Data deny the remaining allegations of paragraph 52 of the Second Amended Complaint.

53.    HyperCube and KMC Data aver that KMC Data's tariffs speak for themselves and deny all allegations of paragraph 53.

54.    HyperCube and KMC Data deny the allegations of paragraph 54.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Under Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq. – HyperCube and KMC Data)

55.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-54 of the Second Amended Complaint.

56.    In response to paragraph 56, HyperCube and KMC Data admit that KMC Data transmits to QCC wireless 8XX calls to QCC customers and that, on behalf of KMC Data, HyperCube bills QCC intrastate and interstate access charges for those intrastate and interstate calls for which KMC Data has provided access services to QCC.

57.    HyperCube and KMC Data admit that QCC has been billed for access services and deny all other the allegations in paragraph 57 of the Second Amended Complaint.

58.    HyperCube and KMC Data admit that KMC Data's interstate access tariff includes a charge for a Common Trunk Port service and Multiplexing service and that QCC has been billed for these services. HyperCube and KMC Data deny the remaining allegations of paragraph 58.

59.    Paragraph 59 contains conclusions of law to which no response is required.

60.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 60.

61.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 61.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment – HyperCube)

62.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-61 of the Second Amended Complaint.

63.    HyperCube and KMC Data deny the allegations in paragraph 63 of the Second Amended Complaint.

64.    In response to paragraph 64, HyperCube and KMC Data admit that QCC has not paid KMC Data the vast majority of the charges for the interstate and intrastate access services that QCC received.  HyperCube and KMC Data otherwise deny the allegations of this paragraph, including the characterization of KMC Data's charges as "improper."

65.    HyperCube and KMC Data deny the allegations in paragraph 65 of the Second Amended Complaint.

66.    HyperCube and KMC Data deny the allegations in paragraph 66 of the Second Amended Complaint.

## THIRD CLAIM FOR RELIEF
### (Money Had and Received - HyperCube)

67.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-66 of the Second Amended Complaint.

68.    HyperCube and KMC Data deny the allegations in paragraph 68 of the Second Amended Complaint.

69.    HyperCube and KMC Data deny the allegations in paragraph 69 of the Second Amended Complaint.

70.    HyperCube and KMC Data deny the allegations in paragraph 70 of the Second Amended Complaint.

71.    HyperCube and KMC Data deny the allegations in paragraph 71 of the Second Amended Complaint.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – HyperCube and KMC Data)

72.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-71 of the Second Amended Complaint.

73.    HyperCube and KMC Data admit that KMC Data's tariffs describe the scope of the services it provides when those tariffs cover a particular service.  HyperCube and KMC Data deny the remaining  allegations in paragraph 73.

74.    HyperCube and KMC Data deny the allegations in paragraph 74 of the Second Amended Complaint.

75.    HyperCube and KMC Data deny the allegations in paragraph 75 of the Second Amended Complaint.

76.    HyperCube and KMC Data admit that HyperCube has billed QCC for the Common Trunk Port service and Multiplexing service under KMC Data's interstate access tariff. HyperCube and KMC Data deny the remaining allegations in paragraph 76 of the Second Amended Complaint.

77.    HyperCube and KMC Data deny the allegations in paragraph 77 of the Second Amended Complaint.

78.    HyperCube and KMC Data deny the allegations in paragraph 78 of the Second Amended Complaint.

## FIFTH CLAIM FOR RELIEF
### (Breach of Federal Tariff Obligation and Communications Act – HyperCube and KMC Data)

79.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-78 of the Second Amended Complaint.

80.    HyperCube and KMC Data deny the allegations in paragraph 80 of the Second Amended Complaint.

81.    HyperCube and KMC Data deny the allegations in paragraph 81 of the Second Amended Complaint.

82.    HyperCube and KMC Data deny the allegations in paragraph 82 of the Second Amended Complaint.

83.    Paragraph 83 contains conclusions of law to which no response is required.

84.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 84.

85.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 85.

## SIXTH CLAIM FOR RELIEF
### (Fraud – HyperCube and KMC Data)

86.    This claim is the subject of a motion to dismiss and no answer is therefore required.

{00337674 1}

87.    This claim is the subject of a motion to dismiss and no answer is therefore required.

88.    This claim is the subject of a motion to dismiss and no answer is therefore required.

89.    This claim is the subject of a motion to dismiss and no answer is therefore required.

90.    This claim is the subject of a motion to dismiss and no answer is therefore required.

91.    This claim is the subject of a motion to dismiss and no answer is therefore required.

## SEVENTH CLAIM FOR RELIEF
### (Breach of State Public Utilities Statutes – KMC Data)

92.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-91 of the Second Amended Complaint.

93.    HyperCube and KMC Data admit the allegations in paragraph 93 of the Second Amended Complaint.

94.    HyperCube and KMC Data admit the allegations in paragraph 94 of the Second Amended Complaint.

95.    HyperCube and KMC Data admit that QCC has been charged access charges for KMC Data's services in connection with Colorado calls. To the extent those services are addressed in and covered by KMC Data's Colorado tariff, HyperCube and KMC Data admit that the tariff contain binding and enforceable terms and conditions between QCC and KMC Data, but deny that KMC Data must provide services for free if those services are not covered in KMC Data's Colorado tariff.

96.    HyperCube and KMC Data deny the allegations in paragraph 96 of the Second Amended Complaint.

97.    HyperCube and KMC Data deny the allegations in paragraph 97 of the Second Amended Complaint.

98.    HyperCube and KMC Data deny the allegations in paragraph 98 of the Second Amended Complaint.

99.    HyperCube and KMC Data deny the allegations in paragraph 99 of the Second Amended Complaint, aver that Col. Rev. Stat. § 40-15-113 speaks for itself and aver that QCC has not only accepted and therefore authorized the charges, but that it procured an order requiring KMC Data to continue providing the services which action constitutes confirmation of its authorization for the charges.

100.    HyperCube and KMC Data deny that they have violated other state public utilities statutes.

## EIGHTH CLAIM FOR RELIEF
### (Preliminary Injunctive Relief Under Col. R. Civ. P. 65 –
### HyperCube and KMC Data)

101.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-100 of the Second Amended Complaint.

102.    HyperCube and KMC Data deny the allegations in paragraph 102 of the Second Amended Complaint and aver that to the extent charges were erroneously billed, those charges, which were never paid, were credited back to QCC .

103.    HyperCube and KMC Data admit that, on behalf of KMC Data, HyperCube previously notified QCC that KMC Data's service to QCC would be suspended unless QCC remedied its continuing nonpayment for those services. HyperCube and KMC Data deny that KMC Data's charges to QCC were improper , deny that QCC currently is under a suspension notice and deny all other allegations of paragraph 103.

104.    HyperCube and KMC Data admit that KMC Data is the telecommunications carrier in the states where service would have been suspended to QCC because of its nonpayment and admit that KMC Data's approval is necessary to suspend service to a customer such as QCC. HyperCube and KMC Data deny all other allegations of this paragraph, including those characterizing service suspension for nonpayment as "blocking" or "active blocking."

105.    HyperCube and KMC Data deny the allegations in paragraph 105 of the Second Amended Complaint.

106.    HyperCube and KMC Data deny the allegations in paragraph 106 of the Second Amended Complaint.

107.    HyperCube and KMC Data deny the allegations in paragraph 107 of the Second Amended Complaint.

108.    HyperCube and KMC Data deny the allegations in paragraph 108 of the Second Amended Complaint.

109.    HyperCube and KMC Data deny the allegations in paragraph 109 of the Second Amended Complaint.

110.    HyperCube and KMC Data deny the allegations in paragraph 110 of the Second Amended Complaint.

111.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 111.

112.    HyperCube and KMC Data deny all allegations of the Second Amended Complaint not expressly admitted herein.

### PRAYER FOR RELIEF

HyperCube and KMC Data deny that QCC is entitled to the requested relief.

### AFFIRMATIVE DEFENSES

1.     QCC has failed to state a claim upon which relief can be granted.

2.     QCC's claims are barred, in whole or in part, by the doctrine of unclean hands.

3.     QCC's claims are barred, in whole or in part, by the doctrines of setoff and recoupment.

4.     QCC's claims are barred by the filed rate doctrine applicable to intrastate and interstate tariffs.

5.     QCC's claims are barred, in whole or in part, by the existence of express or implied contracts, including contracts implied pursuant to the Constructive Ordering Doctrine.

6.     QCC's claims are barred, in whole or in part, by the doctrines of unjust enrichment and quantum meruit.

7.     QCC's claims are barred, in whole or in part, pursuant to an open account between the parties.

8.     QCC's claims are barred, in whole or in part, for failure to exhaust its administrative remedies in that QCC has not challenged the validity or reasonableness of the charges for access services rendered under KMC Data's intrastate tariffs before the appropriate state regulatory body.

9.     QCC's claims fail for lack of subject matter jurisdiction.

10.    QCC's claims are barred on the grounds of primary jurisdiction.

**WHEREFORE**, HyperCube and KMC Data request the following relief:

1.     That the Second Amended Complaint against HyperCube and KMC Data be dismissed and QCC recover nothing from HyperCube or KMC Data;

2.     That QCC be ordered to pay HyperCube's and KMC Data's costs and attorneys' fees to the extent provided by law; and

3.     That the Court order such other relief in favor of HyperCube and KMC Data as it deems proper and just.

## COUNTERCLAIM

Counterclaim-Plaintiff, KMC Data, LLC ("KMC Data"), for its causes of action against Counterclaim-Defendant, Qwest Communications Corp. ("QCC") states:

## PARTIES

1.     KMC Data is a Delaware limited liability corporation with its principal place of business in Texas that is in the business of, among other things, providing interstate and intrastate switched access service to various customers, including interexchange ("IXC") carriers (commonly referred to as "long-distance carriers").

2.     QCC is a Delaware corporation with its primary place of business in Denver, Colorado. QCC is an IXC providing long distance telephone services, including toll free services, to customers throughout the United States.

## JURISDICTION AND VENUE

3.     This court has jurisdiction over this action because QCC resides in Colorado and QCC and KMC Data transact business in Colorado.

4.     Venue is proper in this District pursuant to Colo. R. Civ. P. 98(c).

## BACKGROUND FACTS

5.     The interstate and intrastate access services provided by KMC (together, "access services") enable an IXC to originate or terminate long distance calls to end user customers using the local network facilities of the Public Switched Telephone Network ("PSTN"). As a Competitive Local Exchange Carrier ("CLEC"), KMC Data competes for business with QCC's Incumbent Local Exchange Carrier ("ILEC") affiliate, Qwest Corporation.

6.     When a wireless phone customer calls an IXC's wire-line customer, the wireless carrier must connect to the public switched network at some point so the call can be sent to the wire-line customer.

7.     KMC Data does business with wireless carriers and allows them to connect to its local facilities. During the period relevant to this counterclaim, to foster connection by wireless carriers to its facilities, KMC Data has offered to share with wireless carriers a percentage of certain revenues KMC Data earns from third parties as a result of servicing wireless toll-free calls that are destined to customers of those third parties. Incentives of this nature are commonplace in the industry and not just with respect to wireless carriers' connectivity to the PSTN.

8.     When wireless customers' toll-free calls (calls that are placed to telephone numbers beginning with an 8XX area code or "8XX Traffic") are routed through the facilities of KMC Data, KMC Data provides access services – including switching, transport -- and database

{00337674.1}

13

query services to the IXC that is being paid by its customers to provide the toll-free service to those customers.

9.      When KMC Data provides access and database query services in connection with a call made from a wireless telephone, the call is routed from the wireless carrier's Mobile Telecommunications Switching Office ("MTSO") across a KMC Data facility (a KMC Data trunk) which connects the wireless carrier's MTSO to KMC Data's Class 4/5 switch.

10.     While the call is in the switch, KMC Data performs switching and routing functions and additional services, such as running a query of the national 8XX telephone number database to determine where the call should be routed. Once the database returns information regarding the IXC whose 8XX customer has been called, KMC Data's switch performs the necessary routing to deliver the call to the IXC's facilities. In the case of wireless toll-free calls to QCC's customers, between November 2005 and July 2006, when Qwest discontinued its provision to KMC Data of leased dedicated access lines, KMC Data's switch routed the call directly to QCC via dedicated connections between KMC Data's switch and QCC's switch. KMC Data bore the facilities expense of the direct connections between it and QCC and charged QCC for the access and database query services it provided to QCC in connection with the wireless toll-free calls. Since July of 2006, KMC Data has delivered wireless 8XX calls to QCC's customers to QCC at the ILEC tandem because QCC has refused to lease to KMC Data the dedicated access lines over which KMC Data previously had delivered those calls to QCC.

11.     KMC Data is entitled to bill and to collect access and database query charges for the services it provides to QCC in connection with the completion of intrastate and interstate calls from the customers of wireless carriers to QCC's toll-free service customers.

### QCC's FAILURE TO PAY FOR ACCESS SERVICES

12.     To the extent that KMC Data's intrastate access and database query services are regulated, they are regulated by the public utility commission or service commission in each state in which it operates. KMC Data's interstate access services are regulated by the Federal Communications Commission ("FCC").

13.     To the extent covered by tariffs, KMC Data's intrastate and interstate access and database query charges to QCC for services in connection with wireless 8XX calls are determined by and set forth in tariffs and price lists filed by KMC Data with (and approved by) the appropriate governing commissions in the states in which KMC Data does business and the FCC, respectively. If the service provided is not covered or governed by these tariffs, then charges are determined by express or implied contract or principles of quantum meruit, open account and/or unjust enrichment.

14.     Each month since November 2005, on KMC Data's behalf, its parent company, Hypercube, LLC, which provides billing and management services to KMC Data, has billed QCC for interstate access and database query services and, when provided by KMC Data, for intrastate access and database query services in Alabama, California, Colorado, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New

Mexico, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Washington, West Virginia, Wisconsin.

15.    Since November 2005, QCC has received, accepted, and benefited from KMC Data's access and database query services in connection with wireless calls bound for QCC's toll-free customers. QCC accepted the calls that KMC Data delivered to it over the dedicated facilities between them, delivered those calls to the customers to which QCC had assigned the toll-free numbers and charged its customers for those calls.

16.    At all times relevant hereto, QCC has had actual and constructive notice of KMC Data's access and database query charges for wireless 8XX Traffic and has continued to receive, use and benefit from KMC Data's access and database query services in connection with wireless 8XX Traffic.

17.    Commencing with KMC Data's bill for services rendered during November 2005, QCC began withholding payment for access services provided to QCC in connection with wireless toll-free calls, which calls have been accepted by Qwest in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington. In addition, since September 2006 QCC also has withheld payment for access services provided to QCC in connection with wireless toll-free calls in Alabama, Kentucky, Massachusetts, New Jersey, South Carolina, Tennessee, Wisconsin and West Virginia. QCC also has withheld payment on KMC Data's database query charges.

18.    QCC has purported to justify taking KMC Data's access and database query services for wireless 8XX Traffic without payment on the basis of QCC's incorrect interpretation of an Order of the Federal Communications Commission ("FCC") issued in 2004 with respect to interstate access charges for such calls. However, the FCC does not regulate KMC Data's intrastate access and database query services and rates and the FCC's Orders do not apply to intrastate service and rates. Moreover, the FCC Order does not support QCC's withholding of payment for KMC Data's interstate services provided to QCC, including database queries, multiplexing and common trunk port.

19.    Although QCC has refused to pay KMC Data's charges for its access and database query services in connection with wireless 8XX Traffic and has claimed in its complaint that KMC Data's services are of no benefit to it, QCC also has claimed that it would suffer "irreparable harm" if KMC Data stopped providing those services to it. Thus, by its own assertions, KMC Data's access and database query services in connection with wireless 8XX Traffic are highly valuable to QCC.

20.    QCC has refused to pay roughly $10,763,122 in KMC Data's charges to QCC for access and database query services in connection with wireless 8XX Traffic. The amount overdue from QCC for KMC Data's services represents services provided during the months of November 2005 through July 2007. The amount due from QCC to KMC Data continues to grow each month as KMC Data continues to provide these services to QCC, which services QCC insists it must have, but for which it refuses to pay.

21.    QCC's refusal to pay these charges and associated late fees is without legal justification or excuse.

## COUNT ONE
### (Breach of Intrastate and Interstate Tariffs)

22.    KMC Data re-alleges and incorporates the allegations of paragraphs 1 through 21 above.

23.    At all times since and including November 2005, QCC has received, accepted, and benefited from KMC Data's provision of access and database query services to QCC in connection with wireless calls to QCC's toll-free customers.

24.    By accepting these access and database query services which were offered by KMC Data pursuant to its state and federal tariffs, QCC has agreed and is required by law to pay KMC Data the tariffed rates for the services provided.

25.    At all times relevant to this lawsuit, QCC has continued, and to this day continues, to accept and benefit from these access and database query services provided by KMC Data and, indeed, insists that KMC Data continue to provide these services without interruption.

26.    QCC continues to refuse to pay the access charges and database query fees due under the tariffs and appropriately billed by KMC Data for the services that KMC Data rendered.

27.    QCC has at all times relevant to this action had the ability to decline to accept these access and database query services from KMC Data and to so inform its customers. QCC not only has failed and refused to do so but has instead demanded KMC Data's uninterrupted provision of those services.

28.    QCC has failed to pay amounts due and owing to KMC Data without legal justification or excuse, and in breach of its legal obligations imposed by its acceptance of access and database query services pursuant to the tariffs.

29.    By failing to pay charges and associated late fees for tariffed access services and database queries rendered by KMC Data, QCC has breached the tariffs.

30.    KMC Data has been damaged by QCC's purposeful breaches of the tariffs, in an amount to be proved at trial and which continues to increase daily, which includes access charges and database query fees for wireless 8XX Traffic at the tariffed rates, late fees, interest, and attorneys fees and expenses.

## COUNT TWO
### (Breach of Implied Contract)

31.    KMC Data re-alleges and incorporates the allegations contained in paragraphs 1 through 30, above.

32.    At all times relevant hereto, KMC Data has performed access services and database queries for QCC in connection with wireless 8XX Traffic.

33.    At all times relevant hereto, QCC has known that KMC Data was performing these services and expected to be paid for it.

34.    At all times relevant hereto, QCC has accepted those services, delivered the calls to its customers and charged them for it.

35.    At all times relevant hereto, QCC has known the rates that KMC Data charged for these services.

36.    QCC has insisted that KMC Data continue to provide these services without interruption and has claimed that it would be irreparably harmed if KMC Data stopped doing so.

37.    In the alternative to Count I, by taking, using and benefiting from those services, and by insisting on uninterrupted provision of those services, QCC entered into an implied contract with KMC Data to pay KMC Data at the rates that QCC knew were charged by KMC Data for those services.

38.    Despite its receipt, acceptance, use and insistence on KMC Data's services, QCC has failed to pay KMC Data for its services. It would be inequitable for QCC to retain the benefit of KMC Data's services without payment of its value.

39.    KMC Data has been damaged by QCC's purposeful breaches of the implied contract between them, in an amount to be proved at trial and which continues to increase daily, which includes access and database query charges for wireless 8XX Traffic at the rates QCC knew that KMC Data charged, late fees, interest, and attorneys fees and expenses.

### COUNT THREE
### (Action on Open Account)

40.    KMC Data re-alleges and incorporates the allegations contained in paragraphs 1 through 39, above.

41.    In the alternative to Counts I and II, QCC has created an open account by receiving, accepting, and benefiting from the access services and database queries offered and provided by KMC Data in connection with wireless toll free calls to QCC customers. At all times, QCC was aware of KMC Data's provision of these services, the amount of its charges for these services and has insisted on KMC Data's uninterrupted provision of these services to it.

42.    The open account includes all access and database query charges and associated late fees billed by KMC Data but not paid by QCC from November 2005 through the date of trial.

43.    KMC Data has been damaged by QCC's failure to pay the charges accrued on the open account in an amount to be proven at trial.

## COUNT FOUR
### (Quantum Meruit)

44.    KMC Data re-alleges and incorporates the allegations contained in paragraphs 1 through 43 above.

45.    Since November 2005, KMC Data has provided to QCC access and database query services accepted by QCC in states including California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington.  KMC Data also has provided to QCC  access services and database query services accepted by QCC in Alabama, Kentucky, Massachusetts, New Jersey, South Carolina, Tennessee, Wisconsin and West Virginia.

46.    QCC has at all times relevant to this action had the ability to decline to accept access and database query services from KMC Data in connection with wireless 8XX Traffic and to so inform its customers.  QCC not only has failed and refused to do so but has demanded the uninterrupted provision of those services by KMC Data by seeking a temporary restraining order against suspension of those services as a consequence of QCC's nonpayment for the services. QCC has to date continued to accept these services provided by KMC Data and to forward the toll-free calls to its customers, who have paid QCC to be able to receive the calls.

47.    At all times during which QCC has received, accepted, and benefited from KMC Data's access and database query services for QCC-bound wireless 8XX Traffic, QCC had actual or constructive notice of KMC Data's charges for said services, and the fact that KMC Data was not a volunteer, but expected to be paid at the applicable rates.

48.    By accepting these services provided by KMC Data with knowledge that it was not a volunteer, if there is no express or implied contract between KMC Data and QCC for the payment of such charges, QCC is bound to pay the fair market value of those services under the doctrine of quantum meruit.  KMC Data has been damaged in an amount to be proven at trial as a consequence of QCC's failure to pay the fair market value for the services it received.

## COUNT FIVE
### (Unjust Enrichment)

49.    KMC Data re-alleges and incorporates the allegations in paragraphs 1 through 48 above.

50.    By its provision of access and database query services to QCC, KMC Data conferred a benefit on QCC at KMC Data's expense and to KMC Data's detriment.

51.    QCC knew that it would, and intended to, receive a benefit from the access and database query services provided to it by KMC Data.

{00337674.1}

18

52.    QCC accepted and retained that benefit under circumstances which make it inequitable for there to be no return payment to KMC Data for the value of the access and database query services it provided to QCC.

53.    In the alternative to Counts One through Four above, there is no remedy at law that can appropriately address KMC Data's claim.

54.    KMC Data has been damaged by QCC's unjust enrichment in an amount equal to the value of the services that QCC received from KMC Data and from which QCC benefited.

## COUNT SIX
### (Declaratory Judgment)

55.    KMC Data re- alleges and incorporates the allegations contained in paragraphs 1 through 54 above.

56.    A present, actionable and justiciable controversy exists with respect to the legal rights between the parties, including the rights and obligations of KMC Data and QCC thereunder. Litigation between the parties is extant and unavoidable.

57.    QCC's refusal to pay access and database query charges in connection with wireless phone calls to its toll-free customers, its refusal to pay associated late fees and its allegations that KMC Data is engaged in wrongdoing by billing access and database query charges for wireless 8XX calls are ongoing and repeated practices.

58.    On information and belief, absent a declaratory judgment, QCC will continue its wrongful practices of refusing to pay access and database query charges and late fees for these services that QCC insists on, receives and accepts in the future and from which it benefits.

59.    It would be unduly burdensome and inefficient for KMC Data to bring new actions for damages each time QCC wrongfully refuses to pay an invoice.

60.    Accordingly, KMC Data is entitled to a declaratory judgment and such further relief based upon said declaratory judgment as the Court deems proper, pursuant to Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq., determining that:

a.    QCC has breached the express and implied contracts between it and KMC Data by refusing and failing to pay access and database query charges and associated late fees billed by KMC Data for those services provided by KMC Data in connection with wireless toll-free calls.

b.    KMC Data has been damaged by QCC's breach of the contracts; and

c.    QCC is contractually obligated to make timely payment of these charges and late fees as said charges become due.

{00337674 1}

19

## REQUEST FOR RELIEF

**WHEREFORE,** KMC Data prays that this Court:

a.    Award KMC Data damages for QCC's breaches of the tariffs, in an amount to be proved at trial;

b.    Award KMC Data damages for QCC's breaches of implied contract, in an amount to be proved at trial;

c.    Alternatively, award KMC Data all sums due under QCC's open account in an amount to be proved at trial;

d.    Further in the alternative, award KMC Data damages against QCC in the amount of the just and fair value of KMC Data's services pursuant to the doctrine of quantum meruit;

e.    Award KMC Data damages against QCC for its unjust enrichment in an amount to be proven at trial;

f.    Issue a declaratory judgment that KMC Data is lawfully permitted to bill for KMC Data's access and database query services to QCC in connection with wireless 8XX calls to QCC customers; that QCC is obligated to pay all of KMC Data's invoices for said services, including any late fees billed, in a timely manner and such further relief based upon said judgment as the Court deems proper;

g.    Award KMC Data late payment charges as permitted by its tariffs and/or pre- and post-judgment interest;

h.    Tax the costs, fees and expenses of this action to QCC, including the reasonable attorneys' fees and expert witness fees of HyperCube and KMC Data to the extent permitted by law and KMC Data's tariffs; and

i.    Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

KMC Data and HyperCube request a trial by jury on all issues so triable.


DATED:  September 10, 2007.

DUFFORD & BROWN, P.C.

*Original signature on file with the offices of Dufford &
Brown, P.C.*

s/ Richard L. Fanyo
Richard L. Fanyo, #7238
David W. Furgason, #2122
Dufford & Brown, P.C.
1700 Broadway, Suite 2100
Denver, Colorado 80290
Tel. No. (303) 861-8013
Fax No. (303) 832-3804
E-mail: rfanyo@duffordbrown.com
dfurgason@duffordbrown.com


Ky E. Kirby
Jonathan S. Frankel
Scott Woods
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
(202) 373-6000

**ATTORNEYS FOR HYPERCUBE, LLC
AND KMC DATA, LLC**

{00337674.1}

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2007, a true and correct copy of the foregoing **ANSWER, COUNTERCLAIM AND JURY DEMAND TO SECOND AMENDED COMPLAINT** was served via Lexis Nexis File and Serve upon the following:

Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
417 Seventeenth Street, Suite 2200
Denver, CO  80202-4437

*Original signature on file with the offices of Dufford & Brown, P.C.*


*s/ Carol A. Larsen Cook*
Carol A. Larsen Cook

# EXHIBIT 5

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202<br><br>QWEST COMMUNICATIONS CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>HYPERCUBE, LLC and KMC DATA, LLC,<br><br>Defendants. | |
| | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff Qwest Communications Corporation:<br><br>Timothy R. Beyer, #12168<br>Amy L. Benson, #15894<br>Lauren E. Schmidt, #37002<br>BROWNSTEIN HYATT FARBER SCHRECK, P.C.<br>410 Seventeenth Street, Suite 2200<br>Denver, Colorado 80202-4437<br>Phone Number: (303) 223-1100<br>FAX Number: (303) 223-1111<br>E-mail:tbeyer@bhfs.com<br>      abenson@bhfs.com<br>      lschmidt@bhfs.com | Case Number: 06cv6404<br><br>Div:<br>Ctrm.: 19 |

| |
|---|
| **SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Qwest Communications Corporation ("QCC"), through its counsel, Brownstein Hyatt Farber Schreck, P.C., states the following for its Second Amended Complaint against Defendants HyperCube, LLC ("HyperCube") and KMC Data, LLC ("KMC Data"):

## INTRODUCTION

1.     This case arises from HyperCube's improper charges to QCC for intrastate and interstate toll-free calls placed by wireless customers to QCC customers.

2.      HyperCube's wholly owned subsidiary, KMC Data, is a telecommunications carrier. However, to QCC's knowledge, HyperCube and KMC Data do not originate or terminate wireless calls. Instead, KMC Data places itself in the call path of wireless callers in order to generate access charges paid by interexchange carriers ("IXCs") like QCC that would not otherwise be owed and then shares the revenue received from the IXCs with the wireless carrier.

3.      HyperCube began billing QCC access charges for intrastate wireless toll-free calls in November of 2005, even though the charges for these calls were either: (1) outside the scope of KMC Data's state tariffs; or (2) in states where KMC Data had no tariff at all. When QCC protested, HyperCube threatened to block the wireless calls to QCC's customers if QCC did not pay for the charges.

4.      HyperCube has also billed QCC for improper charges under KMC Data's federal interstate access tariff. Since approximately November 2005, HyperCube has charged QCC a "common trunk port" charge and a "multiplexing" charge under KMC Data's interstate tariff. KMC Data is not providing either of these services to QCC. In addition, HyperCube has recently billed QCC access for intrastate calls that should have been billed as interstate calls under its tariffs.

5.      QCC seeks the return of the amount paid for these improper charges as well as declaratory and injunctive relief prohibiting HyperCube and KMC Data from continuing their improper conduct.

## PARTIES

6.      QCC is a Delaware corporation with its primary place of business at 1801 California Street, Denver, Colorado, 80202.

7.      HyperCube, LLC is a Delaware limited liability company with its primary place of business at 3200 W. Pleasant Run Road, Suite 260, Lancaster, Texas, 75146. HyperCube is a foreign company licensed to do business in the State of Colorado.

8.      KMC Data, LLC is a Delaware limited liability company with its primary place of business at 1545 Route 206, Bedminster, New Jersey, 07921. KMC Data is a foreign company licensed to do business in the State of Colorado.

9.      KMC Data is a wholly-owned subsidiary of HyperCube.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action because all of the parties transact business in Colorado within the meaning of C.R.S. § 13-1-124(1)(a).

11.      In accordance with Colo. R. Civ. P. 98©, venue is proper in this Court.

## GENERAL ALLEGATIONS

12.    QCC is an IXC. An IXC is a telephone company that provides connections between local exchanges in different geographic areas. IXCs are commonly referred to as "long-distance carriers."

13.    KMC Data is a telecommunications carrier operating in various states including, but not limited to, California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington. Upon QCC's information and belief, KMC Data is primarily, if not exclusively, engaged in the transmission of toll-free telephone calls that are originated by wireless carriers and then sent to KMC Data for the sole purpose of collecting access charges from IXCs like QCC that could not otherwise be collected.

14.    HyperCube is KMC's parent corporation and, among other things, provides management services to KMC Data, including billing and collection.

### Wireless Originated Toll-Free Calls

15.    One of the services that QCC provides to businesses is a toll-free, or "8XX," service. Businesses that purchase this 8XX service from QCC are assigned an "800" or "888" toll-free number that allows their customers to contact the business without incurring a toll charge.

16.    When a caller dials a toll-free number belonging to a business that has purchased the toll-free service from QCC, the call may originate on the network of another telecommunications carrier. Depending on the caller's choice of carriers, the "originating carrier" could be an incumbent local exchange carrier ("ILEC") such as Qwest Corporation, a Competitive Local Exchange Carrier ("CLEC") such as McLeod USA, or a wireless carrier such as Cingular.

17.    Typically, a wireless caller's 8XX call will pass from the originating wireless carrier to the ILEC, who will then transfer the call to QCC's network. QCC takes the call, sends it through its network, and terminates the call to its customer who purchased the 8XX service. A simplified diagram of a typical call transfer from a wireless caller is set forth below.



18.    When the call originates on a landline telephone, QCC is required to pay the carrier that originated the call an originating access charge, which includes compensation for access charges that are commonly referred to as "end office" charges and "tandem" charges. If

the ILEC is also involved in transferring the landline call from the originating carrier, a second access charge, also called a tandem charge, is incurred. The tandem charge is generally a small fraction of the end office charge.

19.    Access charges, including the end office and tandem charges, are defined in a carrier's tariffs filed with the Federal Communications Commission ("FCC") (for interstate calls) and state public utilities commissions (for intrastate calls). Interstate calls are calls that span more than one state and are regulated by the FCC. Intrastate calls are calls that originate and terminate in the same state and are regulated by the individual state's public utilities commission.

20.    The FCC is responsible for the regulation of all wireless telephone rates, including the rates for both interstate and intrastate calls. The FCC prohibits wireless carriers from charging originating access charges to IXCs like QCC unless the carrier and QCC have agreed to these charges in a written contract. Thus, if the caller (also referred to as the "end user") is placing an 8XX call from a wireless phone, the wireless carrier cannot charge an IXC like QCC an access charge for originating the call. This is, in part, because the wireless carrier charges its end user caller directly for all costs associated with originating and terminating long-distance calls.

21.    Upon QCC's information and belief, in an attempt to collect access charges for wireless calls that could not otherwise be collected, HyperCube and/or KMC Data entered into revenue-sharing agreements with wireless carriers. Under these agreements, the wireless carriers deliver their end users' 8XX wireless calls to KMC Data, rather than directly to QCC or the ILEC. By doing so, KMC Data unnecessarily inserts itself into the call path in order to create access charges that the wireless carrier is prohibited from assessing. HyperCube and/or KMC Data then shares with the wireless carrier the revenue they receive from the access charges HyperCube bills to QCC for these 8XX calls.

22.    Simplified diagrams showing how KMC Data unnecessarily insert itself into the call path to obtain these access charges are set forth below. The new call path may look like:



or

23.     In the first call path, the call is transferred from KMC Data's switch to the ILEC switch to QCC.  In the second call path, the call is transferred from KMC Data's switch directly to QCC over dedicated lines.

24.     There is no technical reason for a wireless carrier to deliver wireless-originated 8XX calls directed to QCC customers to KMC Data.  Rather, wireless carriers enter into contracts to deliver their wireless-originated 8XX calls to KMC Data so that HyperCube, on behalf of KMC Data, can collect fees from QCC that it otherwise could not collect.

25.     From as early as 1998 through approximately 2004, several CLECs, including affiliates of KMC Data, inserted themselves into the wireless call path as described above and charged IXCs the full originating access rate for these calls.  In other words, these CLECs charged for the wireless calls as if the calls originated from a landline phone, and billed the IXCs for the full originating access charge.

26.     The FCC addressed this "insertion" scheme in the context of interstate wireless-originated 8XX calls in May of 2004.  It held that a carrier inserting itself into the wireless call path could charge the IXC only for the services it performed.  Eighth Report and Order In re Access Charge Reform (the "Eighth Report and Order"), 19 FCC Rcd. 9,108 (May 18, 2004).  In the Eighth Report and Order, the FCC found that "the benchmark rates [*i.e.*, full originating access charges] that the CLECs had been charging were proper "only when a competitive LEC provides an IXC [such as QCC] with access to the competitive LEC's own end-users [*i.e.*, landline customers]."  Because it was the wireless carrier and not the CLEC that originated the call, the services actually provided by the CLEC for these calls represented only a small fraction of the originating access charges previously charged by the CLECs.

27.     Prospectively, therefore, carriers who transmitted interstate wireless calls originated by wireless carriers were limited to collecting for the services actually provided by the carrier in switching the call (*i.e.*, tandem switching and transport) and could not collect for originating the call (*i.e.*, the end office charges, which was the bulk of what they had been charging).

28.     In addition, the FCC reconfirmed in the Eighth Report and Order that at all times, a CLEC's charges to an IXC must be in compliance with and supported by its tariff.  Retrospectively, the FCC held that a CLEC's benchmark (*i.e.*, full originating access) rate for wireless-originated calls was proper only so long as "the carrier serving the end-user did not also charge the IXC and the CLEC's charges were otherwise in compliance with and supported by its tariff."  19 FCC Rcd. 9, 108, ¶ 18 (emphasis added).

29.    In this case, HyperCube (on behalf of KMC Data) is charging QCC the full originating access rate for intrastate 8XX toll free calls even though KMC Data is not originating the calls and the FCC has prohibited these charges for interstate calls.

### The Tariff Structure

30.    As a provider of switched access services, KMC Data files federal and state tariffs containing the terms that govern the provision of its services. In general, absent a separate agreement between carriers, a carrier is permitted to charge for only those services defined in its tariff.

31.    QCC has no separate agreement with KMC Data or HyperCube and, accordingly, KMC Data's federal and state tariffs are the sole contracts between KMC Data and QCC for the provision of switched access services.

### HyperCube's Billings to QCC Under KMC Data's Prior Intrastate Tariffs

32.    Beginning in November of 2005, HyperCube began billing QCC for originating access services for wireless-originated 8XX inter and intrastate calls. HyperCube included charges for intrastate wireless-originated 8XX calls from states including, but not limited to: Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Washington and Wisconsin.

33.    When QCC questioned these charges, HyperCube consistently, and on multiple occasions, represented to QCC that HyperCube was billing QCC for access charges for wireless-originated 8XX calls under KMC Data's state and federal tariffs.

34.    In approximately March 2006, QCC asked HyperCube to identify the provisions of each state tariff that supported HyperCube's charges for wireless-originated 8XX intrastate calls. HyperCube refused to do so. Instead of identifying the specific tariff provisions supporting these charges, HyperCube provided QCC with copies of KMC Data's state tariffs for California, Colorado, Florida, Georgia, and Washington. These tariffs did not cover the charges billed to QCC for wireless originated toll-free intrastate calls. In addition, HyperCube did not provide any tariffs for the other states where HyperCube was billing QCC for wireless-originated 8XX traffic, including, but not limited to, Alabama, Arizona, Illinois, Kentucky, Michigan, Minnesota, Missouri, North Carolina, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, and Wisconsin.

35.    On May 22, 2006, QCC sent HyperCube a formal notice of dispute challenging HyperCube's improper access charges for intrastate wireless-originated 8XX calls. In this May 22, 2006 letter, QCC notified HyperCube that these charges were not within the scope of HyperCube's (*i.e.*, KMC Data's) state tariffs.

36.    On May 23, 2006, James Mertz, Vice President of Government Affairs for HyperCube, sent QCC a letter denying QCC's dispute. In the letter, HyperCube threatened to suspend service to QCC if QCC did not pay all outstanding charges for HyperCube's wireless-originated 8XX calls by May 26, 2006. Specifically, this letter stated:

> "Hypercube has been billing QCC per KMC Data LLC's interstate and
> intrastate tariffs. Consequently, QCC's dispute of intrastate charges is
> denied and the outstanding balances are past due....Hypercube expects
> payment of all outstanding charges that are past due by close of business
> Friday May 26, 2006 or Hypercube will suspend service to QCC as
> permitted by its interstate and intrastate tariffs (*i.e.* Section 2.5.3 A of
> KMC Data LLC's California Access Tariff)."

Mr. Mertz subsequently confirmed to Steve Hansen (QCC's Vice President of Carrier
Relations for QCC) that not only would HyperCube "suspend" service to QCC, it would actively
block the transmission of the wireless calls to QCC's 8XX customers.

37.    As a result of HyperCube's statements and to avoid the disastrous impact of
HyperCube's threatened call blocking, QCC made a partial payment to HyperCube of $100,000.
In return, HyperCube agreed not to suspend QCC's services until at least June 5, 2006. In a
telephone conversation between QCC and HyperCube on June 6, 2006, HyperCube reasserted its
threat to suspend service to QCC and QCC's customers if QCC did not pay HyperCube for all
improper intrastate access charges. In response to HyperCube's second threat to block QCC's
calls, QCC made another payment to HyperCube of $371,130.

38.    QCC thereafter filed a motion for a temporary restraining order which was
entered via stipulation of the parties on June 15, 2006 (the "TRO"). While the TRO was in effect
and in accordance with its terms, QCC paid HyperCube for interstate access charges but
withheld payment for intrastate access charges. The TRO was dissolved by stipulation of the
parties on January 17, 2007.

### HyperCube Billed QCC for Charges in States Where KMC Data Had No Tariffs

39.    In July 2006, Steve Hansen, Vice President of Carrier Relations for QCC, emailed
Mr. Mertz and asked him to provide the tariffs that supported HyperCube's charges to QCC for
wireless-originated 8XX calls, as HyperCube had agreed to do in conjunction with the TRO.

40.    In response to Mr. Hansen's request, Mr. Mertz provided Mr. Hansen with KMC
Data's intrastate tariffs for California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri,
New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington.

41.    However, Mr. Mertz did not (because he could not) provide tariffs for numerous
other states where HyperCube was billing QCC for wireless-originated 8XX traffic, including,
but not limited to, Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New
Mexico, North Carolina, South Carolina, Tennessee, and Utah.

42.    Instead, on August 2, 2006, Mr. Mertz sent Mr. Hansen a return e-mail that said,
simply:

> "The intrastate billing in the states listed below will be backed out on the
> August invoice."

43.    Following Mr. Mertz's August 2, 2006 e-mail, HyperCube ultimately issued QCC a credit for the access charges from November 2005 – August 2006 in states where KMC Data had been unable to provide tariffs.

44.    However, HyperCube has not refunded interest to QCC for the funds it improperly invoiced and held to QCC's detriment. Nor has it refunded the charges paid by QCC for services provided in states where KMC Data had filed tariffs. HyperCube has refused to do so, even though as set forth below, the charges billed by HyperCube for intrastate calls are not within the scope of KMC Data's state tariffs.

### HyperCube Billed QCC for Services That Were Not Within the Scope of KMC Data's Intrastate Tariffs

45.    In those states where KMC Data originally filed tariffs (including, but not limited to, those tariffs for California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington), HyperCube's access charges to QCC for wireless-originated 8XX calls were not within the scope of the state tariffs.

46.    KMC Data's prior state tariffs allowed KMC Data to bill QCC for Switched Access Services only when the end user (*i.e.*, the person making the telephone call) subscribed to KMC Data's local exchange services (*i.e.*, was KMC Data's customer).

47.    Wireless callers do not subscribe to KMC Data's local exchange services and the access charges billed to QCC for these calls were not within the scope of its state tariffs. Therefore, contrary to what was permitted by KMC Data's prior state tariffs, HyperCube billed QCC access charges at the full originating access rate for wireless-originated 8XX calls, *i.e.*, calls originated not by KMC Data's customers, but by the customers of various wireless carriers.

48.    Following QCC's protests, KMC Data subsequently withdrew most of its state tariffs and replaced them with new tariffs that purported to cover the calls at issue. However, HyperCube's charges to QCC remain outside the language of the new tariffs and are therefore improper as a matter of law.

49.    In addition, HyperCube is, to this day, billing QCC for intrastate calls in states where it has not filed a replacement tariff, including (but not limited to) Colorado and Washington. These charges are not within the scope of any state tariff and have been improperly charged to QCC.

### HyperCube Billed QCC for Services That Are Not Within the Scope of KMC Data's Interstate Tariff

50.    Since approximately November 2005, HyperCube has billed QCC under KMC Data's interstate tariff for a "Shared (Common) Trunk Port" service and a "Multiplexing" service.

51.    On July 28, 2006, Steve Hansen, Vice President of Carrier Relations for QCC, emailed James Mertz, Vice President of Government Affairs for HyperCube, and asked Mr. Mertz to explain the Shared (Common) Trunk Port charge and the Multiplexing charge.

Although Mr. Mertz indicated HyperCube would prepare a response to these questions, HyperCube never responded.

52.    On November 6, 2006, QCC's billing vendor, TEOCO, sent HyperCube a dispute notice asking HyperCube to explain the Shared (Common) Trunk Port and Multiplexing charges and to provide a diagram of its network that justified these charges. TEOCO sent HyperCube a similar dispute notice each month thereafter. HyperCube did not provide a satisfactory response.

53.    Upon QCC's information and belief, KMC Data does not provide QCC with the Shared (Common) Trunk Port and Multiplexing services that are defined in KMC Data's interstate tariff. According to KMC Data's interstate tariff, the Common Trunk Port service "provides for termination of Common Transport trunk facilities." The Multiplexing service "provides the capability of channelizing Switched Transport facilities to individual services that require a lower capacity or bandwidth." These services are not provided to QCC by KMC Data and the charges are improper as a matter of law.

54.    In addition, HyperCube has recently billed QCC access for intrastate calls that should have been billed as interstate calls under its tariffs.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Under Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq.— HyperCube and KMC Data)

55.    QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 54 of this Second Amended Complaint.

56.    As alleged herein, KMC Data transmits intrastate and interstate wireless-originated 8XX calls to QCC customers and HyperCube bills QCC access charges for these calls.

57.    KMC Data's current and former state tariffs, including, but not limited to (1) former state tariffs filed in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington and (2) current state tariffs in Alabama, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Mississippi, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin do not cover the access charges HyperCube billed QCC for wireless-originated 8XX calls. Nevertheless, HyperCube billed QCC for these charges.

58.    KMC Data's interstate access tariff includes a charge for a Common Trunk Port service and a Multiplexing service. KMC Data is not providing QCC with either of these services. Nevertheless, HyperCube billed and continues to bill QCC for these charges.

59.    A present, actionable, and justiciable controversy exists with respect to the legal rights and obligations of QCC, on the one hand, and HyperCube and KMC Data, on the other hand, for the intrastate charges billed by HyperCube to QCC.

60.    Accordingly, QCC requests declaratory judgment from this Court that (i) HyperCube billed QCC for intrastate access charges for wireless-originated 8XX calls in

violation of its KMC Data's state tariffs; (ii) QCC is entitled to a return of all intrastate access charges paid to HyperCube for wireless-originated 8XX calls; and (iii) QCC is entitled to retain all withheld payments for HyperCube's improper intrastate access charges for wireless-originated 8XX calls.

61.     QCC also requests declaratory judgment from this Court that (i) HyperCube billed QCC for interstate access charges for the Common Trunk Port service and Multiplexing service when KMC Data was not providing QCC with these services; (ii) QCC is entitled to a return of all interstate access charges paid to HyperCube for the Common Trunk Port service and Multiplexing service; and (iii) QCC is entitled to retain all withheld payments for HyperCube' improper interstate charges for the Common Trunk Port service and Multiplexing service.

**SECOND CLAIM FOR RELIEF**
**(Unjust Enrichment – HyperCube)**

62.     QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 61 of this Second Amended Complaint.

63.     From November 2005 through February 2007, HyperCube billed QCC approximately $6.15 million in improper intrastate and interstate access charges for wireless-originated 8XX calls.

64.     From November 2005 through February 2007, QCC withheld partial payment on HyperCube's improper intrastate and interstate access charges for wireless-originated 8XX calls.[1]  However, QCC paid HyperCube approximately $1.97 million in improper access charges for wireless-originated 8XX calls during this period.

65.     HyperCube received the benefit of the approximately $1.97 million paid by QCC, even though HyperCube billed QCC under non-existent tariffs, and the KMC Data tariffs that did or do exist do not permit HyperCube to collect such charges from QCC.

66.     It would be unjust to allow HyperCube to retain these ill-gotten gains. HyperCube should not be rewarded for violating KMC Data's filed tariffs, and as a matter of equity, HyperCube should be required to disgorge these improperly obtained sums.

**THIRD CLAIM FOR RELIEF**
**(Money Had and Received – HyperCube)**

67.     QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 66 of this Second Amended Complaint.

68.     As alleged herein, between November 2005 and February 2007, QCC paid HyperCube approximately $1.97 million in improper access charges for wireless-originated intrastate and interstate 8XX calls.

---

[1] Following entry of the TRO on June 15, 2006, QCC withheld payment on 100% of HyperCube's improper intrastate charges.

69.    HyperCube therefore has money that belongs to QCC, which in equity and good conscience should be returned to QCC.

70.    HyperCube is not entitled to retain payments made by QCC for improper access charges, and HyperCube should not be permitted to unjustly enrich itself through these payments at QCC's expense.

71.    QCC is entitled to the return of all money paid to HyperCube for access charges for wireless-originated 8XX calls billed outside the scope of KMC Data's state and federal tariffs.

### FOURTH CLAIM FOR RELIEF
#### (Breach of Contract – Hypercube and KMC Data)

72.    QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 71 of this Second Amended Complaint.

73.    As alleged herein, KMC Data files tariffs describing the scope of the services it provides.  In general, absent a separate agreement between carriers, a carrier is permitted to charge for only those services defined in its tariff.

74.    KMC Data's current and former filed state tariffs, including, but not limited to (1) former state tariffs in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington and (2) current state tariffs in Alabama, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Lousiana, Massachusetts, Michigan, Mississippi, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin do not cover the charges HyperCube billed QCC for wireless-originated 8XX calls. Nevertheless, HyperCube billed QCC for these charges.

75.    HyperCube's charges to QCC for services not within the scope of KMC Data's state tariffs constitute a breach of contract.

76.    As alleged herein, HyperCube is also billing QCC for the Common Trunk Port service and Multiplexing service under KMC Data's interstate tariff.  KMC Data is not providing these services to QCC.

77.    HyperCube's charges to QCC for services that KMC Data is not providing under its interstate tariff constitute a breach of contract.

78.    QCC has suffered damages as a result of HyperCube's breaches of KMC Data's intrastate and interstate tariffs in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
#### (Breach of Federal Tariff Obligation and Communications Act –
#### HyperCube and KMC Data)

79. QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 78 of this Second Amended Complaint.

80. From November 2005 through February 2007, HyperCube has charged QCC approximately $1.77 million in improper Common Trunk Port charges and Multiplexing charges under KMC Data's federal interstate tariff. QCC has paid HyperCube approximately $1.57 million of these charges.

81. KMC Data is not providing QCC with the Common Trunk Port service or Multiplexing service that is described in KMC Data's interstate tariff.

82. The collection of charges for interstate services that KMC Data is not providing violates section 203 of the Communications Act (47 U.S.C. § 203).

83. Defendants' practices are also unjust, unreasonable, and discriminatory — and therefore unlawful — in violation of section 201 of the Communications Act (47 U.S.C. § 201).

84. QCC is entitled to full damages in the amount of the unauthorized charges paid to HyperCube under KMC Data's federal tariff, plus reasonable costs and attorney's fees, under sections 206 and 207 of the Communications Act (47 U.S.C. §§ 206, 207).

85. QCC is further entitled to a declaratory judgment and declaration of rights establishing that Defendants have no right to charge QCC or collect charges from QCC associated with non-tariffed and improper access charges for wireless-originated toll free calls.

### SIXTH CLAIM FOR RELIEF
#### (Fraud – HyperCube and KMC Data)

86. QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 85 of this Second Amended Complaint.

87. Pursuant to a March 9, 2007 Order, the Court dismissed QCC's fraud claims. However, QCC contends this dismissal was in error and has filed a motion for reconsideration. QCC restates its fraud claim to preserve its grounds for appeal.

88. HyperCube falsely represented to QCC that its intrastate access charges were billed "per KMC Data LLC's interstate and intrastate tariffs." These representation were made in a letter dated May 23, 2006 from James Mertz, Vice President of Government Affairs for HyperCube and were also made in oral representations by Mr. Mertz to Mr. Steve Hansen of QCC. In addition, HyperCube and KMC Data failed to disclose to QCC that the state charges billed were not within the scope of KMC Data's state tariffs and included calls in states where KMC Data had failed to file any tariff whatsoever.

89. HyperCube made these false representations with the intent that QCC rely upon them and in order to induce QCC to pay charges to HyperCube that QCC would not otherwise have paid. HyperCube and KMC Data failed to disclose that KMC Data had no tariffs covering these charges in order to induce QCC to pay the money demanded by HyperCube.

90.    QCC reasonably and justifiably relied on HyperCube's false representations and HyperCube's and KMC Data's omissions.

91.    As a direct and proximate result of QCC's reliance on HyperCube's misrepresentations and HyperCube and KMC Data's omissions, QCC has suffered and continues to suffer damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
### (Breach of State Public Utilities Statutes – KMC Data)

92.    QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 91 of this Second Amended Complaint.

93.    KMC Data is a public utility as defined by the Colorado Public Utilities Law, Col. Rev. Stat. §§ 40-1-101 et seq.

94.    KMC Data is a provider of telecommunications services as defined by the Colorado Public Utilities Law, Col. Rev. Stat. §§ 40-1-101 et seq.

95.    As alleged herein, HyperCube billed QCC for access charges pursuant to KMC Data's Colorado tariff. This tariff creates a binding and enforceable contract between KMC and QCC based on the terms in the tariff.

96.    As alleged herein, the access charges billed by HyperCube to QCC were not permitted by KMC Data's Colorado tariff.

97.    KMC Data knowingly and willfully allowed HyperCube to bill QCC access charges for wireless-originated 8XX calls that were not permitted by KMC Data's Colorado tariffs, and therefore were not authorized by QCC.

98.    HyperCube and KMC Data charged QCC for impermissible access charges without QCC's authorization, in violation of Col. Rev. Stat. § 40-15-113.

99.    Under Col. Rev. Stat. § 40-15-113, QCC is not liable for any amounts charged without QCC's authorization.

100.    KMC Data and HyperCube's conduct violates similar state public utilities statutes in states where KMC Data either had no tariff or had a filed tariff that did not authorize access charges to QCC for wireless-originated 8XX calls.

## EIGHTH CLAIM FOR RELIEF
### (Preliminary Injunctive Relief Under Col. R. Civ. P. 65 –
### HyperCube and KMC Data)

101.    QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 100 of this Second Amended Complaint.

102.    As alleged herein, HyperCube has billed QCC access charges for wireless-originated 8XX calls in violation of KMC Data's intrastate and interstate tariffs, and in states where KMC Data has no tariff.

103.    HyperCube has threatened to suspend service to QCC and block QCC's customers from receiving the wireless calls if QCC does not pay HyperCube for all improper intrastate access charges for wireless-originated 8XX calls.

104.    Upon QCC's information and belief, KMC Data, not HyperCube, is the telecommunications carrier in the states where HyperCube has threatened to block toll-free calls to QCC customers. Therefore, KMC Data's approval is required to actively block calls to QCC customers.

105.    Because QCC must pay HyperCube's improper charges or risk HyperCube and/or KMC Data blocking calls to QCC's toll-free (8XX) customers, QCC is in danger of real, immediate, and irreparable harm which may be prevented only by injunctive relief.

106.    QCC's claim against HyperCube and KMC Data has a reasonable probability of success on the merits.

107.    There is no plain, speedy, and adequate remedy at law to prevent the risk of immediate and irreparable harm to QCC.

108.    The granting of a preliminary injunction will not disserve the public interest. Rather, it is against the public interest to allow HyperCube and/or KMC Data to shut down telephone service by blocking calls between wireless telephone customers and QCC's 8XX customers.

109.    The balance of equities in this matter favors an injunction.

110.    A preliminary injunction prohibiting HyperCube and KMC Data from blocking calls to QCC's 8XX customers for failing to pay for intrastate access charges billed by HyperCube to QCC will preserve the status quo pending a trial on the merits.

111.    Accordingly, QCC requests preliminary injunctive relief prohibiting HyperCube and KMC Data from blocking calls to QCC's toll-free (8XX) customers for failing to pay intrastate access charges billed by HyperCube to QCC.

### PRAYER FOR RELIEF

WHEREFORE, QCC prays for the following relief:

A.    Entry of judgment in favor of QCC, and against HyperCube and KMC Data, on QCC's claims, in an amount to be determined at trial;

B.    Declaratory judgment in QCC's favor in accordance with Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq. that (A)(i) HyperCube billed QCC for intrastate access charges for wireless-originated 8XX calls in violation of its KMC Data's state tariffs; (ii) QCC is

entitled to a return of all intrastate access charges paid to HyperCube for wireless-originated 8XX calls; and (iii) QCC is entitled to retain all withheld payments for HyperCube's improper intrastate access charges for wireless-originated 8XX calls; and (B) (i) HyperCube billed QCC for interstate access charges for the Common Trunk Port service and Multiplexing service when KMC Data was not providing QCC with these services; (ii) QCC is entitled to a return of all interstate access charges paid to HyperCube for the Common Trunk Port service and Multiplexing service; and (iii) QCC is entitled to retain all withheld payments for HyperCube' improper interstate charges for the Common Trunk Port service and Multiplexing service.

C.      Preliminary injunctive relief under Col. R. Civ. P. 65 prohibiting HyperCube and KMC Data from blocking calls to QCC's toll-free (8XX) customers for failing to pay for intrastate access charges billed by HyperCube to QCC during the relevant period of time;

D.      Permanent injunctive relief under Col. R. Civ. P. 65 prohibiting HyperCube and KMC Data from billing QCC for charges that are not within the scope of KMC Data's filed tariffs or pursuant to an agreement between QCC and HyperCube and/or KMC Data;

E.      Pre- and post-judgment interest;

F.      Attorney's fees, costs and expenses, including expert witness fees; and

G.      Any other relief that this Court deems just and proper.

## JURY DEMAND

QCC requests a trial by jury on all issues so triable.

| Dated: April 16th, 2007. | |
|---|---|
| | BROWNSTEIN HYATT FARBER SCHRECK, P.C. |
| | By:<br><br>*S/ original signature of Amy L. Benson on file*<br>Timothy R. Beyer, #12168<br>Amy L. Benson, #15894<br>Lauren E. Schmidt, #37002<br>Twenty-Second Floor<br>410 Seventeenth Street<br>Denver, Colorado  80202-4437<br>303.223.1100<br><br>ATTORNEYS FOR QWEST COMMUNICATIONS CORPORATION |

PLAINTIFF'S ADDRESS:
1801 California Street

Denver, CO 80202

EXHIBIT 6

6

00001

1     IN THE DISTRICT COURT, CITY AND COUNTY OF

2         DENVER, COLORADO

3 - - - - - - - - - - - - - - x

4 QWEST COMMUNICATIONS    :

5 CORPORATION,        :

6 Plaintiff and      :

7 Counterclaim Defendant,  :

8    v.       : Case Number:

9 HYPERCUBE, LLC,     : 06cv6404

10 Defendant, and    :

11 KMC DATA, LLC,     :

12 Defendant and    :

13 Counterclaim Plaintiff.  :

14 - - - - - - - - - - - - - - x

15       Wednesday, November 28, 2007

16       Washington, D.C.

17

18    Deposition of GARY J. BALL, commencing at

19 8:27 a.m., held at the offices of Bingham McCutchen,

20 2020 K Street, N.W., Washington, D.C., before Keith

21 Wilkerson, a notary public in and for the District

22 of Columbia.

00094

1  think it's at the very back.  If you would turn to

2  page 18 of your report, Mr. Ball.

3    A.  Yes, I see that now.

4    Q.  Has that refreshed your recollection?  Are

5  you offering any opinion on trunk port charges

6  under the interstate tariff?

7    A.  I think my opinion is that I understand they

8  are billing it under the tariff, and I understand

9  that they're providing a port service.

10    Q.  So you are offering the opinion that KMC

11  Data is providing tandem switch port service to

12  Qwest as part of its provision of wireless

13  originated calls?

14    A.  Yes.

15    Q.  Do you also have an opinion that KMC Data is

16  appropriately billing Qwest for tandem switch port

17  for both interstate and intrastate services?

18    A.  I was not asked to review the tariff

19  provisions.

20    Q.  Mr. Ball, isn't it true that your report

21  says that KMC Data's appropriately billing Qwest

22  for tandem switch ports for both interstate and

00109

1    Q. Is there a difference between common trunk

2  ports and tandem switch ports?

3    A. There may be.

4    Q. Do you have any opinion as to whether KMC

5  Data is appropriately billing Qwest for common

6  trunk ports?

7    A. Well, to the extent what they're billing on

8  the invoice is what I understand to be the trunk

9  port connecting the KMC switch to the facilities

10  leading to Qwest, then they're appropriately

11  billing it because they're providing a service and

12  Qwest is receiving value for that service. I'm

13  not sure in terms of the context of what you just

14  showed me

15    Q. So you don't know if what is being billed to

16  Qwest is being billed pursuant to its interstate

17  tariffs?

18    A. That's correct.

19    Q. And you don't know whether what is being

20  billed to Qwest is being billed pursuant to its

21  intrastate tariffs?

22        MR. LAMANCUSA: Objection. Vague.

# EXHIBIT 7

7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 07-822 |
| | ) | |
| QWEST COMMUNICATIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF DEREK CANFIELD IN SUPPORT OF DEFENDANT'S MOTION**
**TO TRANSFER PROCEEDING TO COLORADO PURSUANT TO 28 U.S.C. § 1404**

I, Derek Canfield, of full age, hereby declare as follows:

1.    I am the Senior Team Lead within Audit Services for TEOCO. TEOCO is a billing vendor for Qwest Communications Corporation ("Qwest"). TEOCO is responsible for, among other things, the review and processing of invoices from Competitive Local Exchange Carriers ("CLECs") to Qwest for switched access services. Specifically, I lead a group of cost auditors who are responsible for validating the accuracy of switched access charges billed to our clients.

2.    From May 2006 through the present, I have been primarily responsible for auditing and processing Plaintiff HyperCube, LLC's ("HyperCube's") monthly invoices to Qwest. I was involved in Qwest's dispute with HyperCube on a supervisory level prior to May 2006. HyperCube bills Qwest for interstate and intrastate access charges for wireless-originated toll free ("8XX") calls. HyperCube's invoices are for access services charged by HyperCube's wholly-owned subsidiary, Plaintiff KMC Data, LLC ("KMC Data").

3.    Under TEOCO's contract with Qwest, my duties include reviewing, auditing, and processing HyperCube's monthly access charge bills to Qwest. I am also responsible for collecting and analyzing HyperCube's billing data, including but not limited to issues such as the volume of minutes billed; the rate charged; and the jurisdiction billed (*i.e.*, the originating state billed and whether a call is interstate or intrastate).

4.    The Plaintiffs have billed Qwest for over 1.5 billion minutes of calls from November 2005 through the present.

5.    The Plaintiffs have not invoiced Qwest for any interstate calls originating in Delaware.

I hereby declare under penalty of perjury that all of the statements made by me herein are true and correct.

_____
Derek Canfield

Dated: January 22, 2008.