## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-822-GMS |
| | ) | |
| QWEST COMMUNICATIONS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO TRANSFER PROCEEDING TO COLORADO PURSUANT TO 28 U.S.C. § 1404

Of Counsel:
Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, 22nd Floor
Denver, CO  80202-4437
Telephone:  303-223-1100

Dated:  January 22, 2008

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Attorneys for Defendant
Qwest Communications Corporation

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

NATURE OF THE CASE AND STAGE OF THE PROCEEDING ................................1

SUMMARY OF ARGUMENT ..............................................................................1

STATEMENT OF FACTS ....................................................................................2

ARGUMENT ....................................................................................................6

    I.    THIS ACTION COULD HAVE BEEN BROUGHT IN THE
        DISTRICT OF COLORADO .............................................................6

    II.    ON BALANCE, THE LITIGATION WILL MORE
        CONVENIENTLY PROCEED IN COLORADO ..........................................6

        A.    The Required Showing of Inconvenience is Not High ..............................7

        B.    The Private Interests Weigh Heavily in Favor of the Transfer ................7

        C.    The Public Interests Weigh Heavily in Favor of the Transfer ................8

CONCLUSION .................................................................................................10

i

## TABLE OF AUTHORITIES

### CASES

*AT&T Corp. v. FCC,*
349 F.3d 692 (D.C. Cir. 2003) ................................................................................3

*Affymetrix, Inc. v. Synteni, Inc.,*
28 F. Supp. 2d 192 (D. Del. 1998) ......................................................................7, 8

*In re Access Charge Reform,*
19 F.C.C.R. 9108 (F.C.C. 2004) .............................................................................4

*ITC DeltaCom Commc'ns, Inc. v. U.S. LEC Corp.,*
2004 WL 3709999 (N.D. Ga. Mar. 15, 2004) .........................................................4

*Jumara v. State Farm Ins. Co.,*
55 F.3d 873 (3d Cir. 1995) ..................................................................................6, 7

*Kirk v. Spur Distrib. Co.,*
95 F. Supp. 428 (D. Del. 1950) ...............................................................................9

*MCI Worldcom Network Servs., Inc. v Paetec Commc'ns, Inc.,*
2005 WL 2145499 (E.D. Va. Aug. 31, 2005)
*aff'd,* 2006 WL 3026293 (4th Cir. Oct. 25, 2006) .............................................3, 4

*Motorola, Inc. v. PC-Tel, Inc.,*
58 F. Supp. 2d 349 (D. Del. 1999) ...........................................................................8

*In re Sprint PCS & AT&T Corp. Declaratory Ruling Regarding CMRS Access Charges,*
17 F.C.C.R. 13192 (F.C.C. 2002), petition for review dismissed, *AT&T Corp. v. F.C.C.,* 349 F.3d 692 (D.C. Cir. 2003) ...........................................................3

*Tracy v. Consol. Rail Corp.,*
723 F. Supp. 1051 (D. Del. 1989) ..........................................................................9

*United Indus. Corp. v. Gira,*
204 F. Supp. 410 (D. Del. 1961) .............................................................................9

### FEDERAL STATUTES

28 U.S.C. § 1391 .....................................................................................................6

28 U.S.C. § 1404(a) .................................................................................................6

## NATURE OF THE CASE AND STAGE OF THE PROCEEDING

This is a parallel proceeding. Plaintiffs HyperCube, LLC ("HyperCube") and KMC Data, LLC ("KMC Data") commenced this action on December 17, 2007. The complaint seeks payment of certain access charges for the transmission of interstate telephone calls originated by wireless phone companies and sent to Qwest Communications Corporation ("Qwest") by KMC Data. The claims asserted by Plaintiffs here are identical to counterclaims asserted by Plaintiffs in a lawsuit pending in Colorado state court (the "Colorado proceeding"). The Colorado proceeding has been pending for nineteen months and is set for trial on June 9, 2008.

Qwest requests that this case be transferred to the District of Colorado pursuant to 28 U.S.C. § 1404. Qwest is also simultaneously filing a motion to stay this proceeding pending resolution of the Colorado proceeding and a motion to dismiss Plaintiffs' II, III, IV and V claims for relief for implied contract, open account, unjust enrichment and quantum meruit on the ground that these claims are barred by the filed tariff doctrine. Qwest requests that the motion to stay and the motion to dismiss be considered by this Court only if it determines that the case should not be transferred to Colorado.

## SUMMARY OF ARGUMENT

For the convenience of the parties and witnesses and in the interests of justice, this case should be transferred to the District Court of Colorado. Although the parties are incorporated in Delaware, neither Plaintiffs nor Qwest has its principal place of business in Delaware; the conduct at issue did not arise in Delaware; and the witnesses and documents are not located here. In fact, of the 1.5 billion minutes of wireless phone calls invoiced by Plaintiffs to Qwest, Plaintiffs have not invoiced Qwest for a single interstate call originating in Delaware.

The interests of justice also require that the action be transferred to the District of Colorado. The District of Colorado is well suited to handle the litigation. The identical claims are already being litigated in a state court proceeding in Colorado that has been pending for nineteen months and is scheduled for trial on June 9, 2008. Assuming this case is not stayed, transferring the case to Colorado will allow the parties to litigate the parallel proceedings in one central geographic location. In addition, the documents are in Colorado, almost a third of the witnesses are located in Colorado, and the average time to disposition of cases in Colorado is almost half of that in Delaware. As set forth herein, the public and private interests tip the balance of convenience strongly in favor of transfer.

## STATEMENT OF FACTS

Qwest is a long distance company that transmits telephone calls originated by customers of other phone companies to a point where the call can be transferred to the called party's local phone company. *See* Compl., ¶ 3. Qwest's principal place of business is in Denver, Colorado. *Id.*

Plaintiff KMC Data is a competitive local exchange carrier or "CLEC." Compl., ¶ 1. KMC Data's parent, HyperCube, LLC, provides management services to KMC Data, including billing services. *Id.*, ¶ 2. Plaintiffs are Delaware limited liability companies with their principal place of business in Lancaster, Texas. *Id.*, ¶¶ 1, 2.

Plaintiffs allege in the Complaint that they are in the business of providing interstate and intrastate switched access service to long distance companies. Compl., ¶ 2. At issue in this dispute are the access charges billed by Plaintiffs for interstate toll free calls originated by wireless phone customers but delivered to Qwest by KMC Data.

2

Access charges (also called switched access charges) are charges that long distance carriers like Qwest pay to local exchange carriers or competitive local exchange carriers for the origination and termination of long distance calls.   *See* Compl., ¶ 7; *MCI Worldcom Network Servs., Inc. v Paetec Commc'ns, Inc.*, 2005 WL 2145499, at *1 (E.D. Va. Aug. 31, 2005), *aff'd,* 2006 WL 3026293 (4th Cir. Oct. 25, 2006).  Access charges are typically defined by tariff and are intended to compensate the local exchange carrier for the use of its network. *See* Compl. ¶¶ 7, 15.  If the call is an <u>inter</u>state call, the access charges are defined by the local exchange carrier's <u>inter</u>state access tariff, which is filed with the Federal Communications Commission ("FCC").  *Id.*, ¶ 15.  If the call is an <u>intra</u>state call, the access charges are defined by the local exchange carrier's <u>intra</u>state access tariffs, which are filed with individual states' public utilities commissions. *See Paetec Commc'ns,* 2005 WL 2145499, at *1.

In November 2005, Plaintiffs began billing Qwest access charges for toll free calls originated by wireless companies.  Compl., ¶ 16.  The callers are customers of wireless carriers. Under FCC rules, wireless companies are not allowed to charge access charges for the origination or termination of wireless calls.  *In re Sprint PCS & AT&T Corp. Declaratory Ruling Regarding CMRS Access Charges*, 17 F.C.C.R. 13192 (F.C.C. 2002), *petitions for review dismissed, AT&T Corp. v. F.C.C.*, 349 F.3d 692 (D.C. Cir. 2003).  Diving through a regulatory loophole, instead of handing their calls off directly to Qwest and other long distance companies, certain wireless companies instead hand them off to Plaintiffs and other wireline CLECs who then deliver them to Qwest and other long distance companies.  While FCC regulations prohibit the wireless companies from charging for originating toll free calls, Plaintiffs side-step the regulations by placing themselves in the call path in order to generate access charges that would not otherwise be owed.  *See* Compl., ¶ 9.  Plaintiffs then kick back a portion of the access charge

revenue generated from the long distance carrier to the wireless carrier. *See id.* In May 2004, the FCC largely closed this loophole for interstate calls. *In re Access Charge Reform*, 19 F.C.C.R. 9108 (F.C.C. 2004) ("Eighth Report and Order"). However, Plaintiffs continue to pursue this scheme for intrastate calls and in addition are billing Qwest interstate charges that are not within the scope of their FCC tariff or in compliance with the Eighth Report and Order. *Although Plaintiffs have billed Qwest for over 1.5 billion minutes of calls, Plaintiffs have not invoiced Qwest for a single interstate call originating in Delaware.* Ex. 1 (Declaration of Derek Canfield).

At issue in this and the Colorado state proceeding is whether the charges Plaintiffs claim Qwest owes are within the scope of their filed tariffs.[1] Qwest filed an action in Colorado state court on June 12, 2006 after Plaintiffs threatened to block Qwest's calls if Qwest did not immediately pay all outstanding charges. The Colorado proceeding is pending in the Colorado District Court for the City and County of Denver, Colorado, as Civil Action No. 06-CV-6404.

Plaintiffs could have removed the Colorado proceeding to federal court when Qwest amended its complaint to assert improper charges under Plaintiffs' interstate tariff. *See* Ex. 2 (Second Am. Compl., Colorado proceeding).[2] Plaintiffs chose not to do so. Instead, Plaintiffs filed counterclaims in the Colorado proceeding seeking payment for the billed access charges.

---

[1] All tariffs, including access tariffs, must clearly identify each of the services offered and the associated rates, terms and conditions. *Eighth Report and Order*, 19 F.C.C.R. 9108, ¶18. Absent an express contractual agreement to pay (and none is claimed here), the terms of applicable tariffs determine whether there is an obligation to pay for call origination or termination. *E.g.*, *Paetec Commc'ns*, 2005 WL 2145499, at *4 (granting summary judgment to long distance company on CLEC claim for payment of wireless originated toll-free call access charges that were not within the scope of the CLEC's tariffs); *ITC DeltaCom Commc'ns, Inc. v. U.S. LEC Corp.*, 2004 WL 3709999, at *1 (N.D. Ga. Mar. 15, 2004) (vacated by stipulation of parties but cited with approval in Eighth Report and Order, n.62).

[2] The Colorado state court adopted Qwest's Second Amended Complaint on August 24, 2007.

4

Ex. 3 (Answer and Second Am. Countercls., Colorado proceeding); *see also* Compl., ¶ 25 ("KMC Data counterclaimed against [Qwest in the Colorado proceeding]...alleging breach of intrastate and interstate tariffs, breach of implied contract, action on open account, quantum meruit, unjust enrichment and declaratory judgment."). Plaintiffs' counterclaims in the Colorado proceeding relating to their interstate access charges are *identical* to the claims asserted by Plaintiffs here. *Compare* Complaint and Ex. 3 at Second Am. Countercls.

The Colorado proceeding is in its final pre-trial stages and trial is scheduled for June 9, 2008. In fact, both Plaintiffs and Qwest have identified their preliminary witnesses and exhibits. Not a single witness is located in Delaware. Ex. 4 (Declaration of Amy Benson, ¶ 7); Ex. 5 (Witness lists). Of the 22 witnesses identified by the parties, Colorado is home to six witnesses and has the most witnesses located in any one state. *Id.* Two of the Colorado based witnesses, William Argall and Teresa Reddan, are former employees of Qwest and therefore would need to be subpoenaed to testify if they were unwilling to voluntarily appear. The remaining witnesses are in Connecticut, Georgia, Kansas, Ohio, New York, Texas, and Utah. *Id.*

Because Plaintiffs' claims in Delaware are identical to those asserted in their counterclaims in Colorado proceeding, documents from that proceeding will also be the key documents here. Those documents are not located in Delaware. Qwest's documents are located in Denver, Colorado. Ex. 4, ¶ 8. Qwest believes that Plaintiffs also have, or will have, a set of the exhibits at issue in the Colorado proceeding at the office of their Colorado counsel which is located in Denver, Colorado.

## ARGUMENT

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice," the court may transfer a civil action "to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). Qwest, as the movant, bears the burden of establishing the need for the transfer. *E.g. Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).

## I.    THIS ACTION COULD HAVE BEEN BROUGHT IN THE DISTRICT OF COLORADO.

Section 1404(a) allows this Court to transfer a civil action to a district "where it might have been brought." 28 U.S.C. § 1404(a). This action could have been brought in the District of Colorado. Qwest has its principal place of business in Colorado and is subject to personal jurisdiction in Colorado. *See* 28 U.S.C. § 1391. Indeed, the very same claims made here are already pending in the Colorado proceeding.

## II.    ON BALANCE, THE LITIGATION WILL MORE CONVENIENTLY PROCEED IN COLORADO.

It is well established that when considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara,* 55 F.3d at 879. This inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. *Id.* at 875, 879. Private interests include the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; and the location of books and records, to the extent that they could not be produced in the alternative forum. *Id.* at 879. Public interests include "[t]he enforceability of the judgment; practical considerations that

6

could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id.* at 879-80 (citations omitted). This list is merely illustrative and by no means exclusive. *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 197 (D. Del. 1998).

### A.    The Required Showing of Inconvenience is Not High.

This Court has previously determined that the first three private factors weigh on how high the required showing must be. *Affymetrix*, 28 F. Supp. 2d at 197. As stated by this Court in *Affymetrix*, under the balancing test inherent in any transfer analysis, the weaker the connection between the forum and either the plaintiff or the lawsuit, the greater the ability of a defendant to show sufficient inconvenience to warrant transfer. *Id.* at 199. Here, Plaintiffs did not file in their home state of Texas and other than being incorporated in Delaware, Plaintiffs have little connection with Delaware. To Qwest's knowledge, Plaintiffs have no employees located in Delaware and have no telephone switching equipment in Delaware. Nor is the lawsuit connected with Delaware. Plaintiffs' invoices do not contain charges for Delaware-originated calls.

In addition, Plaintiffs initially chose to assert and litigate the claims made here in the Colorado proceeding. Thus, the connection with Delaware is weak. *Id.* at 200.

### B.    The Private Interests Weigh Heavily in Favor of the Transfer.

In the subsequent balance of convenience analysis, this Court puts aside the fact that Plaintiffs selected Delaware as a forum and explores whether Plaintiffs offer any substantive reasons indicating whether the convenience of Delaware even approaches the inconvenience which trial in Delaware will impose on Qwest and its witnesses. *Affymetrix*, 28 F. Supp. 2d at 200. For the reasons explained below, it does not.

7

In balancing the convenience of the Delaware forum, this Court first considers private interests, which include (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the location of the records and other documents. *Id.* These factors support a transfer to Colorado.

Colorado is clearly the most convenient forum. The parties have no Delaware-based personnel and the parties are already litigating the claims at issue in Colorado. Absent a stay of the federal proceedings, the parties will have to litigate parallel actions in two jurisdictions. Doing so in the District of Colorado will allow the parties to litigate in one geographic location instead of in forums located 1500 miles apart. Accordingly, it will reduce the overall level of inconvenience for both parties. It will also reduce the level of inconvenience for witnesses. Colorado is the state with the most witnesses and two of the witnesses are former employees of Qwest who must be subpoenaed if they will not appear voluntarily. Ex. 4, ¶ 7. In addition, the documents and records are already located in Colorado. *Id.* The parties have identified their preliminary exhibits in the Colorado proceedings. *Id.* Qwest's exhibits are located in Colorado and Qwest believes it is likely that Plaintiffs also have a set of these exhibits in Colorado. *Id.*

## C.  The Public Interests Weigh Heavily in Favor of the Transfer.

Although the public interests include the enforceability of the judgment and the public policies of the fora, this Court has determined that only the remaining three interests (the relative administrative difficulty in the two fora resulting from court congestion; practical considerations that could make the trial easy, expeditious, or inexpensive; and the local interest in deciding local controversies at home) bear upon the "balance of convenience" factors. *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 359 (D. Del. 1999). Here, again, the three factors favor a transfer to Colorado.

First, on average, the time from filing to disposition of a civil action is almost twice as long in Delaware as it is in Colorado (16.8 months for Delaware versus 8.8 months for Colorado). Ex. 6. Although the time to trial is slightly longer in Colorado than in Delaware (32 months versus 26 months), because the vast majority of civil cases are resolved without trial, the time to disposition should bear more heavily on the analysis.

Second, practical considerations also weigh heavily in favor of Colorado. First – as previously stated – Colorado is the geographic location of the ongoing parallel proceeding. The interests of justice favor transferring a case to a jurisdiction where related matters are pending. *See Tracy v. Consol. Rail Corp.*, 723 F. Supp. 1051, 1052 (D. Del. 1989) (noting that the interests of justice favor transfer to a jurisdiction where related matters are pending).[3] Second, by filing in Delaware, the parties had to retain new local counsel not involved in the Colorado proceeding. Qwest has retained Richards, Layton & Finger, P.A. Plaintiffs have retained Potter Anderson & Corroon LLP. Neither counsel is involved in the Colorado proceedings. And although Plaintiffs' counsel in the Colorado proceeding[4] have not yet sought admission to the Court in this case, they are listed as "of counsel" on the Delaware complaint. Thus, if this Court transfers the case to Colorado, it will eliminate the expense of Delaware counsel for both parties.

Finally, Colorado has more of a local interest in deciding these claims. Plaintiffs seek payment of access charges from Qwest that Qwest believes are not owed. Colorado is the home

---

[3] In *Tracy*, the parallel proceeding was in the transferee court. However, two earlier Delaware cases have recognized the efficiency to be achieved even if the parallel proceeding is in state court. *United Indus. Corp. v. Gira*, 204 F. Supp. 410, 1413 (D. Del. 1961) (noting cogent and sound reasons to retaining the case in Delaware in light of related proceeding in the Delaware Chancery court); *Kirk v. Spur Distrib. Co.*, 95 F. Supp. 428, 429 (D. Del. 1950) (noting that prior pending parallel state court proceeding affected convenience for witness and parties).

[4] Plaintiffs are represented by Bingham McCutchen LLP from Washington, D.C. in the Colorado proceeding. Plaintiffs have a Denver based firm, Dufford & Brown, P.C., as local counsel in Colorado. *See* Ex. 3.

9

to Qwest and its employees. Colorado has more of an interest in ensuring that charges billed to Qwest are appropriate.

## CONCLUSION

This case should be transferred to the District of Colorado. Plaintiffs' choice of forum is accorded little weight. Plaintiffs did not file in their home state of Texas. In addition, this is a parallel proceeding filed eighteen months after Qwest filed its action in Colorado and months after Plaintiffs asserted as counterclaims in the Colorado action the identical claims Plaintiffs bring here. Moreover, Delaware has no connection to the dispute. None of the interstate charges were billed for calls originating in Delaware, none of the witnesses are located in Delaware, and none of the parties has any substantial presence in Delaware. Indeed, Colorado offers a much more convenient forum. It is home to the parallel proceeding, a number of witnesses, and the key documents. Thus, the transfer will reduce the costs to all parties involved in this litigation. Accordingly, Qwest respectfully requests that this case be transferred to the District of Colorado.

Of Counsel:
Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, 22nd Floor
Denver, CO  80202-4437
Telephone:  303-223-1100

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Attorneys for Defendant
Qwest Communications Corporation

10

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2008, I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Richard L. Horwitz
Potter Anderson & Corroon, LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
P. O. Box 951
Wilmington, DE   19899-0951

Jeffrey L. Moyer (#3309)
moyer@rlf.com

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 07-822 |
| | ) | |
| QWEST COMMUNICATIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF DEREK CANFIELD IN SUPPORT OF DEFENDANT'S MOTION
TO TRANSFER PROCEEDING TO COLORADO PURSUANT TO 28 U.S.C. § 1404**

I, Derek Canfield, of full age, hereby declare as follows:

1.     I am the Senior Team Lead within Audit Services for TEOCO. TEOCO is a billing vendor for Qwest Communications Corporation ("Qwest"). TEOCO is responsible for, among other things, the review and processing of invoices from Competitive Local Exchange Carriers ("CLECs") to Qwest for switched access services. Specifically, I lead a group of cost auditors who are responsible for validating the accuracy of switched access charges billed to our clients.

2.     From May 2006 through the present, I have been primarily responsible for auditing and processing Plaintiff HyperCube, LLC's ("HyperCube's") monthly invoices to Qwest. I was involved in Qwest's dispute with HyperCube on a supervisory level prior to May 2006. HyperCube bills Qwest for interstate and intrastate access charges for wireless-originated toll free ("8XX") calls. HyperCube's invoices are for access services charged by HyperCube's wholly-owned subsidiary, Plaintiff KMC Data, LLC ("KMC Data").

3.    Under TEOCO's contract with Qwest, my duties include reviewing, auditing, and processing HyperCube's monthly access charge bills to Qwest. I am also responsible for collecting and analyzing HyperCube's billing data, including but not limited to issues such as the volume of minutes billed; the rate charged; and the jurisdiction billed (*i.e.*, the originating state billed and whether a call is interstate or intrastate).

4.    The Plaintiffs have billed Qwest for over 1.5 billion minutes of calls from November 2005 through the present.

5.    The Plaintiffs have not invoiced Qwest for any interstate calls originating in Delaware.


I hereby declare under penalty of perjury that all of the statements made by me herein are true and correct.


_____
Derek Canfield

Dated:  January 22, 2008.

# EXHIBIT 2

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202<br><br>QWEST COMMUNICATIONS CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>HYPERCUBE, LLC and KMC DATA, LLC,<br><br>Defendants. | |
| | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff Qwest Communications Corporation:<br><br>Timothy R. Beyer, #12168<br>Amy L. Benson, #15894<br>Lauren E. Schmidt, #37002<br>BROWNSTEIN HYATT FARBER SCHRECK, P.C.<br>410 Seventeenth Street, Suite 2200<br>Denver, Colorado 80202-4437<br>Phone Number: (303) 223-1100<br>FAX Number: (303) 223-1111<br>E-mail:tbeyer@bhfs.com<br>     abenson@bhfs.com<br>     lschmidt@bhfs.com | Case Number: 06cv6404<br><br>Div:<br>Ctrm: 19 |
| **SECOND AMENDED COMPLAINT AND JURY DEMAND** | |

Plaintiff Qwest Communications Corporation ("QCC"), through its counsel, Brownstein Hyatt Farber Schreck, P.C., states the following for its Second Amended Complaint against Defendants HyperCube, LLC ("HyperCube") and KMC Data, LLC ("KMC Data"):

## <u>INTRODUCTION</u>

1. This case arises from HyperCube's improper charges to QCC for intrastate and interstate toll-free calls placed by wireless customers to QCC customers.

2.     HyperCube's wholly owned subsidiary, KMC Data, is a telecommunications carrier. However, to QCC's knowledge, HyperCube and KMC Data do not originate or terminate wireless calls. Instead, KMC Data places itself in the call path of wireless callers in order to generate access charges paid by interexchange carriers ("IXCs") like QCC that would not otherwise be owed and then shares the revenue received from the IXCs with the wireless carrier.

3.     HyperCube began billing QCC access charges for intrastate wireless toll-free calls in November of 2005, even though the charges for these calls were either: (1) outside the scope of KMC Data's state tariffs; or (2) in states where KMC Data had no tariff at all. When QCC protested, HyperCube threatened to block the wireless calls to QCC's customers if QCC did not pay for the charges.

4.     HyperCube has also billed QCC for improper charges under KMC Data's federal interstate access tariff. Since approximately November 2005, HyperCube has charged QCC a "common trunk port" charge and a "multiplexing" charge under KMC Data's interstate tariff. KMC Data is not providing either of these services to QCC. In addition, HyperCube has recently billed QCC access for intrastate calls that should have been billed as interstate calls under its tariffs.

5.     QCC seeks the return of the amount paid for these improper charges as well as declaratory and injunctive relief prohibiting HyperCube and KMC Data from continuing their improper conduct.

## PARTIES

6.     QCC is a Delaware corporation with its primary place of business at 1801 California Street, Denver, Colorado, 80202.

7.     HyperCube, LLC is a Delaware limited liability company with its primary place of business at 3200 W. Pleasant Run Road, Suite 260, Lancaster, Texas, 75146. HyperCube is a foreign company licensed to do business in the State of Colorado.

8.     KMC Data, LLC is a Delaware limited liability company with its primary place of business at 1545 Route 206, Bedminster, New Jersey, 07921. KMC Data is a foreign company licensed to do business in the State of Colorado.

9.     KMC Data is a wholly-owned subsidiary of HyperCube.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action because all of the parties transact business in Colorado within the meaning of C.R.S. § 13-1-124(1)(a).

11.     In accordance with Colo. R. Civ. P. 98©, venue is proper in this Court.

5408\276\1042422.4

## GENERAL ALLEGATIONS

12.     QCC is an IXC. An IXC is a telephone company that provides connections between local exchanges in different geographic areas. IXCs are commonly referred to as "long-distance carriers."

13.     KMC Data is a telecommunications carrier operating in various states including, but not limited to, California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington. Upon QCC's information and belief, KMC Data is primarily, if not exclusively, engaged in the transmission of toll-free telephone calls that are originated by wireless carriers and then sent to KMC Data for the sole purpose of collecting access charges from IXCs like QCC that could not otherwise be collected.

14.     HyperCube is KMC's parent corporation and, among other things, provides management services to KMC Data, including billing and collection.

### Wireless Originated Toll-Free Calls

15.     One of the services that QCC provides to businesses is a toll-free, or "8XX," service. Businesses that purchase this 8XX service from QCC are assigned an "800" or "888" toll-free number that allows their customers to contact the business without incurring a toll charge.

16.     When a caller dials a toll-free number belonging to a business that has purchased the toll-free service from QCC, the call may originate on the network of another telecommunications carrier. Depending on the caller's choice of carriers, the "originating carrier" could be an incumbent local exchange carrier ("ILEC") such as Qwest Corporation, a Competitive Local Exchange Carrier ("CLEC") such as McLeod USA, or a wireless carrier such as Cingular.

17.     Typically, a wireless caller's 8XX call will pass from the originating wireless carrier to the ILEC, who will then transfer the call to QCC's network. QCC takes the call, sends it through its network, and terminates the call to its customer who purchased the 8XX service. A simplified diagram of a typical call transfer from a wireless caller is set forth below.



5408\276\1042422.4

18.    When the call originates on a landline telephone, QCC is required to pay the carrier that originated the call an originating access charge, which includes compensation for access charges that are commonly referred to as "end office" charges and "tandem" charges. If the ILEC is also involved in transferring the landline call from the originating carrier, a second access charge, also called a tandem charge, is incurred. The tandem charge is generally a small fraction of the end office charge.

19.    Access charges, including the end office and tandem charges, are defined in a carrier's tariffs filed with the Federal Communications Commission ("FCC") (for interstate calls) and state public utilities commissions (for intrastate calls). Interstate calls are calls that span more than one state and are regulated by the FCC. Intrastate calls are calls that originate and terminate in the same state and are regulated by the individual state's public utilities commission.

20.    The FCC is responsible for the regulation of all wireless telephone rates, including the rates for both interstate and intrastate calls. The FCC prohibits wireless carriers from charging originating access charges to IXCs like QCC unless the carrier and QCC have agreed to these charges in a written contract. Thus, if the caller (also referred to as the "end user") is placing an 8XX call from a wireless phone, the wireless carrier cannot charge an IXC like QCC an access charge for originating the call. This is, in part, because the wireless carrier charges its end user caller directly for all costs associated with originating and terminating long-distance calls.

21.    Upon QCC's information and belief, in an attempt to collect access charges for wireless calls that could not otherwise be collected, HyperCube and/or KMC Data entered into revenue-sharing agreements with wireless carriers. Under these agreements, the wireless carriers deliver their end users' 8XX wireless calls to KMC Data, rather than directly to QCC or the ILEC. By doing so, KMC Data unnecessarily inserts itself into the call path in order to create access charges that the wireless carrier is prohibited from assessing. HyperCube and/or KMC Data then shares with the wireless carrier the revenue they receive from the access charges HyperCube bills to QCC for these 8XX calls.

22.    Simplified diagrams showing how KMC Data unnecessarily insert itself into the call path to obtain these access charges are set forth below. The new call path may look like:



or



23    In the first call path, the call is transferred from KMC Data's switch to the ILEC switch to QCC. In the second call path, the call is transferred from KMC Data's switch directly to QCC over dedicated lines.

24.    There is no technical reason for a wireless carrier to deliver wireless-originated 8XX calls directed to QCC customers to KMC Data. Rather, wireless carriers enter into contracts to deliver their wireless-originated 8XX calls to KMC Data so that HyperCube, on behalf of KMC Data, can collect fees from QCC that it otherwise could not collect.

25.    From as early as 1998 through approximately 2004, several CLECs, including affiliates of KMC Data, inserted themselves into the wireless call path as described above and charged IXCs the full originating access rate for these calls. In other words, these CLECs charged for the wireless calls as if the calls originated from a landline phone, and billed the IXCs for the full originating access charge.

26.    The FCC addressed this "insertion" scheme in the context of interstate wireless-originated 8XX calls in May of 2004. It held that a carrier inserting itself into the wireless call path could charge the IXC only for the services it performed. Eighth Report and Order In re Access Charge Reform (the "Eighth Report and Order"), 19 FCC Rcd. 9,108 (May 18, 2004). In the Eighth Report and Order, the FCC found that "the benchmark rates [i.e., full originating access charges] that the CLECs had been charging were proper "only when a competitive LEC provides an IXC [such as QCC] with access to the competitive LEC's own end-users [i.e., landline customers]." Because it was the wireless carrier and not the CLEC that originated the call, the services actually provided by the CLEC for these calls represented only a small fraction of the originating access charges previously charged by the CLECs.

27.    Prospectively, therefore, carriers who transmitted interstate wireless calls originated by wireless carriers were limited to collecting for the services actually provided by the carrier in switching the call (i.e., tandem switching and transport) and could not collect for originating the call (i.e., the end office charges, which was the bulk of what they had been charging).

5

28. In addition, the FCC reconfirmed in the Eighth Report and Order that at all times, a CLEC's charges to an IXC must be in compliance with and supported by its tariff. Retrospectively, the FCC held that a CLEC's benchmark (*i.e.*, full originating access) rate for wireless-originated calls was proper only so long as "the carrier serving the end-user did not also charge the IXC and the CLEC's charges were otherwise in compliance with and supported by its tariff." 19 FCC Rcd. 9, 108, ¶ 18 (emphasis added).

29. In this case, HyperCube (on behalf of KMC Data) is charging QCC the full originating access rate for intrastate 8XX toll free calls even though KMC Data is not originating the calls and the FCC has prohibited these charges for interstate calls.

## The Tariff Structure

30. As a provider of switched access services, KMC Data files federal and state tariffs containing the terms that govern the provision of its services. In general, absent a separate agreement between carriers, a carrier is permitted to charge for only those services defined in its tariff.

31. QCC has no separate agreement with KMC Data or HyperCube and, accordingly, KMC Data's federal and state tariffs are the sole contracts between KMC Data and QCC for the provision of switched access services.

## HyperCube's Billings to QCC Under KMC Data's Prior Intrastate Tariffs

32. Beginning in November of 2005, HyperCube began billing QCC for originating access services for wireless-originated 8XX inter and intrastate calls. HyperCube included charges for intrastate wireless-originated 8XX calls from states including, but not limited to: Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Washington and Wisconsin.

33. When QCC questioned these charges, HyperCube consistently, and on multiple occasions, represented to QCC that HyperCube was billing QCC for access charges for wireless-originated 8XX calls under KMC Data's state and federal tariffs.

34. In approximately March 2006, QCC asked HyperCube to identify the provisions of each state tariff that supported HyperCube's charges for wireless-originated 8XX intrastate calls. HyperCube refused to do so. Instead of identifying the specific tariff provisions supporting these charges, HyperCube provided QCC with copies of KMC Data's state tariffs for California, Colorado, Florida, Georgia, and Washington. These tariffs did not cover the charges billed to QCC for wireless originated toll-free intrastate calls. In addition, HyperCube did not provide any tariffs for the other states where HyperCube was billing QCC for wireless-originated 8XX traffic, including, but not limited to, Alabama, Arizona, Illinois, Kentucky, Michigan, Minnesota, Missouri, North Carolina, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, and Wisconsin.

6

35.     On May 22, 2006, QCC sent HyperCube a formal notice of dispute challenging HyperCube's improper access charges for intrastate wireless-originated 8XX calls. In this May 22, 2006 letter, QCC notified HyperCube that these charges were not within the scope of HyperCube's (*i e*, KMC Data's) state tariffs

36.     On May 23, 2006, James Mertz, Vice President of Government Affairs for HyperCube, sent QCC a letter denying QCC's dispute. In the letter, HyperCube threatened to suspend service to QCC if QCC did not pay all outstanding charges for HyperCube's wireless-originated 8XX calls by May 26, 2006  Specifically, this letter stated:

> "Hypercube has been billing QCC per KMC Data LLC's interstate and intrastate tariffs. Consequently, QCC's dispute of intrastate charges is denied and the outstanding balances are past due. Hypercube expects payment of all outstanding charges that are past due by close of business Friday May 26, 2006 or Hypercube will suspend service to QCC as permitted by its interstate and intrastate tariffs (*i.e* Section 2.5.3 A of KMC Data LLC's California Access Tariff) "

Mr  Mertz subsequently confirmed to Steve Hansen (QCC's Vice President of Carrier Relations for QCC) that not only would HyperCube "suspend" service to QCC, it would actively block the transmission of the wireless calls to QCC's 8XX customers

37.     As a result of HyperCube's statements and to avoid the disastrous impact of HyperCube's threatened call blocking, QCC made a partial payment to HyperCube of $100,000. In return, HyperCube agreed not to suspend QCC's services until at least June 5, 2006  In a telephone conversation between QCC and HyperCube on June 6, 2006, HyperCube reasserted its threat to suspend service to QCC and QCC's customers if QCC did not pay HyperCube for all improper intrastate access charges. In response to HyperCube's second threat to block QCC's calls, QCC made another payment to HyperCube of $371,130.

38.     QCC thereafter filed a motion for a temporary restraining order which was entered via stipulation of the parties on June 15, 2006 (the "TRO").  While the TRO was in effect and in accordance with its terms, QCC paid HyperCube for interstate access charges but withheld payment for intrastate access charges  The TRO was dissolved by stipulation of the parties on January 17, 2007.

### HyperCube Billed QCC for Charges in States Where KMC Data Had No Tariffs

39.     In July 2006, Steve Hansen, Vice President of Carrier Relations for QCC, emailed Mr  Mertz and asked him to provide the tariffs that supported HyperCube's charges to QCC for wireless-originated 8XX calls, as HyperCube had agreed to do in conjunction with the TRO.

40.     In response to Mr. Hansen's request, Mr. Mertz provided Mr. Hansen with KMC Data's intrastate tariffs for California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington

41.    However, Mr. Mertz did not (because he could not) provide tariffs for numerous other states where HyperCube was billing QCC for wireless-originated 8XX traffic, including, but not limited to, Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, South Carolina, Tennessee, and Utah.

42.    Instead, on August 2, 2006, Mr. Mertz sent Mr. Hansen a return e-mail that said, simply:

> "The intrastate billing in the states listed below will be backed out on the August invoice."

43.    Following Mr. Mertz's August 2, 2006 e-mail, HyperCube ultimately issued QCC a credit for the access charges from November 2005 – August 2006 in states where KMC Data had been unable to provide tariffs.

44.    However, HyperCube has not refunded interest to QCC for the funds it improperly invoiced and held to QCC's detriment. Nor has it refunded the charges paid by QCC for services provided in states where KMC Data had filed tariffs. HyperCube has refused to do so, even though as set forth below, the charges billed by HyperCube for intrastate calls are not within the scope of KMC Data's state tariffs.

### HyperCube Billed QCC for Services That Were Not Within the Scope of KMC Data's Intrastate Tariffs

45.    In those states where KMC Data originally filed tariffs (including, but not limited to, those tariffs for California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington), HyperCube's access charges to QCC for wireless-originated 8XX calls were not within the scope of the state tariffs.

46.    KMC Data's prior state tariffs allowed KMC Data to bill QCC for Switched Access Services only when the end user (*i.e.*, the person making the telephone call) subscribed to KMC Data's local exchange services (*i.e.*, was KMC Data's customer).

47.    Wireless callers do not subscribe to KMC Data's local exchange services and the access charges billed to QCC for these calls were not within the scope of its state tariffs. Therefore, contrary to what was permitted by KMC Data's prior state tariffs, HyperCube billed QCC access charges at the full originating access rate for wireless-originated 8XX calls, *i.e.*, calls originated not by KMC Data's customers, but by the customers of various wireless carriers.

48.    Following QCC's protests, KMC Data subsequently withdrew most of its state tariffs and replaced them with new tariffs that purported to cover the calls at issue. However, HyperCube's charges to QCC remain outside the language of the new tariffs and are therefore improper as a matter of law.

49.    In addition, HyperCube is, to this day, billing QCC for intrastate calls in states where it has not filed a replacement tariff, including (but not limited to) Colorado and Washington. These charges are not within the scope of any state tariff and have been improperly charged to QCC.

### HyperCube Billed QCC for Services That Are Not Within the Scope of KMC Data's Interstate Tariff

50.    Since approximately November 2005, HyperCube has billed QCC under KMC Data's interstate tariff for a "Shared (Common) Trunk Port" service and a "Multiplexing" service.

51.    On July 28, 2006, Steve Hansen, Vice President of Carrier Relations for QCC, emailed James Mertz, Vice President of Government Affairs for HyperCube, and asked Mr. Mertz to explain the Shared (Common) Trunk Port charge and the Multiplexing charge. Although Mr. Mertz indicated HyperCube would prepare a response to these questions, HyperCube never responded.

52.    On November 6, 2006, QCC's billing vendor, TEOCO, sent HyperCube a dispute notice asking HyperCube to explain the Shared (Common) Trunk Port and Multiplexing charges and to provide a diagram of its network that justified these charges. TEOCO sent HyperCube a similar dispute notice each month thereafter. HyperCube did not provide a satisfactory response.

53.    Upon QCC's information and belief, KMC Data does not provide QCC with the Shared (Common) Trunk Port and Multiplexing services that are defined in KMC Data's interstate tariff. According to KMC Data's interstate tariff, the Common Trunk Port service "provides for termination of Common Transport trunk facilities." The Multiplexing service "provides the capability of channelizing Switched Transport facilities to individual services that require a lower capacity or bandwidth." These services are not provided to QCC by KMC Data and the charges are improper as a matter of law.

54.    In addition, HyperCube has recently billed QCC access for intrastate calls that should have been billed as interstate calls under its tariffs.

### FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Under Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq.— HyperCube and KMC Data)

55.    QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 54 of this Second Amended Complaint.

56.    As alleged herein, KMC Data transmits intrastate and interstate wireless-originated 8XX calls to QCC customers and HyperCube bills QCC access charges for these calls.

57.    KMC Data's current and former state tariffs, including, but not limited to (1) former state tariffs filed in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington and (2) current state tariffs in Alabama, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Mississippi, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin do not cover the access charges HyperCube billed QCC for wireless-originated 8XX calls.  Nevertheless, HyperCube billed QCC for these charges.

58.    KMC Data's interstate access tariff includes a charge for a Common Trunk Port service and a Multiplexing service.  KMC Data is not providing QCC with either of these services.  Nevertheless, HyperCube billed and continues to bill QCC for these charges.

59.    A present, actionable, and justiciable controversy exists with respect to the legal rights and obligations of QCC, on the one hand, and HyperCube and KMC Data, on the other hand, for the intrastate charges billed by HyperCube to QCC.

60.    Accordingly, QCC requests declaratory judgment from this Court that (i) HyperCube billed QCC for intrastate access charges for wireless-originated 8XX calls in violation of its KMC Data's state tariffs; (ii) QCC is entitled to a return of all intrastate access charges paid to HyperCube for wireless-originated 8XX calls, and (iii) QCC is entitled to retain all withheld payments for HyperCube's improper intrastate access charges for wireless-originated 8XX calls.

61.    QCC also requests declaratory judgment from this Court that (i) HyperCube billed QCC for interstate access charges for the Common Trunk Port service and Multiplexing service when KMC Data was not providing QCC with these services; (ii) QCC is entitled to a return of all interstate access charges paid to HyperCube for the Common Trunk Port service and Multiplexing service; and (iii) QCC is entitled to retain all withheld payments for HyperCube' improper interstate charges for the Common Trunk Port service and Multiplexing service.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment – HyperCube)

62.    QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 61 of this Second Amended Complaint.

63.    From November 2005 through February 2007, HyperCube billed QCC approximately $6.15 million in improper intrastate and interstate access charges for wireless-originated 8XX calls.

64.     From November 2005 through February 2007, QCC withheld partial payment on HyperCube's improper intrastate and interstate access charges for wireless-originated 8XX calls [1]  However, QCC paid HyperCube approximately $1.97 million in improper access charges for wireless-originated 8XX calls during this period.

65.     HyperCube received the benefit of the approximately $1.97 million paid by QCC, even though HyperCube billed QCC under non-existent tariffs, and the KMC Data tariffs that did or do exist do not permit HyperCube to collect such charges from QCC.

66.     It would be unjust to allow HyperCube to retain these ill-gotten gains. HyperCube should not be rewarded for violating KMC Data's filed tariffs, and as a matter of equity, HyperCube should be required to disgorge these improperly obtained sums.

### THIRD CLAIM FOR RELIEF
### (Money Had and Received – HyperCube)

67.     QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 66 of this Second Amended Complaint.

68.     As alleged herein, between November 2005 and February 2007, QCC paid HyperCube approximately $1.97 million in improper access charges for wireless-originated intrastate and interstate 8XX calls.

69.     HyperCube therefore has money that belongs to QCC, which in equity and good conscience should be returned to QCC.

70.     HyperCube is not entitled to retain payments made by QCC for improper access charges, and HyperCube should not be permitted to unjustly enrich itself through these payments at QCC's expense.

71.     QCC is entitled to the return of all money paid to HyperCube for access charges for wireless-originated 8XX calls billed outside the scope of KMC Data's state and federal tariffs.

### FOURTH CLAIM FOR RELIEF
### (Breach of Contract – Hypercube and KMC Data)

72.     QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 71 of this Second Amended Complaint.

73.     As alleged herein, KMC Data files tariffs describing the scope of the services it provides. In general, absent a separate agreement between carriers, a carrier is permitted to charge for only those services defined in its tariff.

---

[1] Following entry of the TRO on June 15, 2006, QCC withheld payment on 100% of HyperCube's improper intrastate charges.

11

74. KMC Data's current and former filed state tariffs, including, but not limited to (1) former state tariffs in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington and (2) current state tariffs in Alabama, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Lousiana, Massachusetts, Michigan, Mississippi, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin do not cover the charges HyperCube billed QCC for wireless-originated 8XX calls. Nevertheless, HyperCube billed QCC for these charges.

75. HyperCube's charges to QCC for services not within the scope of KMC Data's state tariffs constitute a breach of contract.

76. As alleged herein, HyperCube is also billing QCC for the Common Trunk Port service and Multiplexing service under KMC Data's interstate tariff. KMC Data is not providing these services to QCC.

77. HyperCube's charges to QCC for services that KMC Data is not providing under its interstate tariff constitute a breach of contract.

78. QCC has suffered damages as a result of HyperCube's breaches of KMC Data's intrastate and interstate tariffs in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of Federal Tariff Obligation and Communications Act – HyperCube and KMC Data)

79. QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 78 of this Second Amended Complaint.

80. From November 2005 through February 2007, HyperCube has charged QCC approximately $1.77 million in improper Common Trunk Port charges and Multiplexing charges under KMC Data's federal interstate tariff. QCC has paid HyperCube approximately $1.57 million of these charges.

81. KMC Data is not providing QCC with the Common Trunk Port service or Multiplexing service that is described in KMC Data's interstate tariff.

82. The collection of charges for interstate services that KMC Data is not providing violates section 203 of the Communications Act (47 U.S.C. § 203).

83. Defendants' practices are also unjust, unreasonable, and discriminatory — and therefore unlawful — in violation of section 201 of the Communications Act (47 U.S.C. § 201).

12

84.     QCC is entitled to full damages in the amount of the unauthorized charges paid to HyperCube under KMC Data's federal tariff, plus reasonable costs and attorney's fees, under sections 206 and 207 of the Communications Act (47 U.S.C. §§ 206, 207)

85.     QCC is further entitled to a declaratory judgment and declaration of rights establishing that Defendants have no right to charge QCC or collect charges from QCC associated with non-tariffed and improper access charges for wireless-originated toll free calls.

## SIXTH CLAIM FOR RELIEF
### (Fraud – HyperCube and KMC Data)

86.     QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 85 of this Second Amended Complaint

87.     Pursuant to a March 9, 2007 Order, the Court dismissed QCC's fraud claims. However, QCC contends this dismissal was in error and has filed a motion for reconsideration. QCC restates its fraud claim to preserve its grounds for appeal.

88.     HyperCube falsely represented to QCC that its intrastate access charges were billed "per KMC Data LLC's interstate and intrastate tariffs." These representation were made in a letter dated May 23, 2006 from James Mertz, Vice President of Government Affairs for HyperCube and were also made in oral representations by Mr. Mertz to Mr. Steve Hansen of QCC. In addition, HyperCube and KMC Data failed to disclose to QCC that the state charges billed were not within the scope of KMC Data's state tariffs and included calls in states where KMC Data had failed to file any tariff whatsoever.

89.     HyperCube made these false representations with the intent that QCC rely upon them and in order to induce QCC to pay charges to HyperCube that QCC would not otherwise have paid. HyperCube and KMC Data failed to disclose that KMC Data had no tariffs covering these charges in order to induce QCC to pay the money demanded by HyperCube.

90.     QCC reasonably and justifiably relied on HyperCube's false representations and HyperCube's and KMC Data's omissions.

91.     As a direct and proximate result of QCC's reliance on HyperCube's misrepresentations and HyperCube and KMC Data's omissions, QCC has suffered and continues to suffer damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
### (Breach of State Public Utilities Statutes – KMC Data)

92.     QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 91 of this Second Amended Complaint.

13

'

93. KMC Data is a public utility as defined by the Colorado Public Utilities Law, Col. Rev. Stat. §§ 40-1-101 et seq.

94. KMC Data is a provider of telecommunications services as defined by the Colorado Public Utilities Law, Col. Rev. Stat. §§ 40-1-101 et seq

95. As alleged herein, HyperCube billed QCC for access charges pursuant to KMC Data's Colorado tariff. This tariff creates a binding and enforceable contract between KMC and QCC based on the terms in the tariff.

96. As alleged herein, the access charges billed by HyperCube to QCC were not permitted by KMC Data's Colorado tariff

97. KMC Data knowingly and willfully allowed HyperCube to bill QCC access charges for wireless-originated 8XX calls that were not permitted by KMC Data's Colorado tariffs, and therefore were not authorized by QCC

98. HyperCube and KMC Data charged QCC for impermissible access charges without QCC's authorization, in violation of Col. Rev. Stat. § 40-15-113.

99. Under Col. Rev. Stat. § 40-15-113, QCC is not liable for any amounts charged without QCC's authorization

100. KMC Data and HyperCube's conduct violates similar state public utilities statutes in states where KMC Data either had no tariff or had a filed tariff that did not authorize access charges to QCC for wireless-originated 8XX calls

## EIGHTH CLAIM FOR RELIEF
### (Preliminary Injunctive Relief Under Col. R. Civ. P. 65 -- HyperCube and KMC Data)

101. QCC incorporates by reference and realleges the allegations of Paragraphs 1 through 100 of this Second Amended Complaint.

102. As alleged herein, HyperCube has billed QCC access charges for wireless-originated 8XX calls in violation of KMC Data's intrastate and interstate tariffs, and in states where KMC Data has no tariff.

103. HyperCube has threatened to suspend service to QCC and block QCC's customers from receiving the wireless calls if QCC does not pay HyperCube for all improper intrastate access charges for wireless-originated 8XX calls.

104. Upon QCC's information and belief, KMC Data, not HyperCube, is the telecommunications carrier in the states where HyperCube has threatened to block toll-free calls

14

to QCC customers. Therefore, KMC Data's approval is required to actively block calls to QCC customers.

105. Because QCC must pay HyperCube's improper charges or risk HyperCube and/or KMC Data blocking calls to QCC's toll-free (8XX) customers, QCC is in danger of real, immediate, and irreparable harm which may be prevented only by injunctive relief.

106. QCC's claim against HyperCube and KMC Data has a reasonable probability of success on the merits.

107. There is no plain, speedy, and adequate remedy at law to prevent the risk of immediate and irreparable harm to QCC.

108. The granting of a preliminary injunction will not disserve the public interest. Rather, it is against the public interest to allow HyperCube and/or KMC Data to shut down telephone service by blocking calls between wireless telephone customers and QCC's 8XX customers.

109. The balance of equities in this matter favors an injunction.

110. A preliminary injunction prohibiting HyperCube and KMC Data from blocking calls to QCC's 8XX customers for failing to pay for intrastate access charges billed by HyperCube to QCC will preserve the status quo pending a trial on the merits.

111. Accordingly, QCC requests preliminary injunctive relief prohibiting HyperCube and KMC Data from blocking calls to QCC's toll-free (8XX) customers for failing to pay intrastate access charges billed by HyperCube to QCC.

**PRAYER FOR RELIEF**

WHEREFORE, QCC prays for the following relief:

A. Entry of judgment in favor of QCC, and against HyperCube and KMC Data, on QCC's claims, in an amount to be determined at trial;

B. Declaratory judgment in QCC's favor in accordance with Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq. that (A)(i) HyperCube billed QCC for intrastate access charges for wireless-originated 8XX calls in violation of its KMC Data's state tariffs; (ii) QCC is entitled to a return of all intrastate access charges paid to HyperCube for wireless-originated 8XX calls; and (iii) QCC is entitled to retain all withheld payments for HyperCube's improper intrastate access charges for wireless-originated 8XX calls; and (B) (i) HyperCube billed QCC for interstate access charges for the Common Trunk Port service and Multiplexing service when KMC Data was not providing QCC with these services; (ii) QCC is entitled to a return of all interstate access charges paid to HyperCube for the Common Trunk Port service and

15

Multiplexing service; and (iii) QCC is entitled to retain all withheld payments for HyperCube' improper interstate charges for the Common Trunk Port service and Multiplexing service

C.      Preliminary injunctive relief under Col. R. Civ. P. 65 prohibiting HyperCube and KMC Data from blocking calls to QCC's toll-free (8XX) customers for failing to pay for intrastate access charges billed by HyperCube to QCC during the relevant period of time;

D.      Permanent injunctive relief under Col. R. Civ. P. 65 prohibiting HyperCube and KMC Data from billing QCC for charges that are not within the scope of KMC Data's filed tariffs or pursuant to an agreement between QCC and HyperCube and/or KMC Data;

E.      Pre- and post-judgment interest;

F.      Attorney's fees, costs and expenses, including expert witness fees; and

G.      Any other relief that this Court deems just and proper.

## JURY DEMAND

QCC requests a trial by jury on all issues so triable.

| Dated:  April 16th, 2007. | |
|---|---|
| | BROWNSTEIN HYATT FARBER SCHRECK, P.C. |
| | By: |
| | *S/ original signature of Amy L. Benson on file* |
| | Timothy R. Beyer, #12168 |
| | Amy L. Benson, #15894 |
| | Lauren E. Schmidt, #37002 |
| | Twenty-Second Floor |
| | 410 Seventeenth Street |
| | Denver, Colorado  80202-4437 |
| | 303.223.1100 |
| | ATTORNEYS FOR QWEST COMMUNICATIONS CORPORATION |

PLAINTIFF'S ADDRESS:
1801 California Street
Denver, CO 80202
5408\276\1042422.5

16

# EXHIBIT 3

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | |
| QWEST COMMUNICATIONS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>HYPERCUBE, LLC and KMC DATA, LLC<br><br>Defendants. | ▲ COURT USE ONLY ▲ |
| Attorneys for Defendants Hypercube, LLC and KMC Data, LLC:<br><br>Richard L. Fanyo, #7238<br>David W. Furgason, #2122<br>Dufford & Brown, P.C.<br>1700 Broadway, Suite 2100<br>Denver, Colorado 80290-2101<br>Telephone: (303) 861-8013<br>Facsimile: (303) 832-3804<br>E-mail: rfanyo@duffordbrown.com<br>    dfurgason@duffordbrown.com | Case Number: 06-CV-6404<br><br>Courtroom 19 |

**ANSWER, COUNTERCLAIM AND JURY DEMAND TO SECOND AMENDED COMPLAINT**

HyperCube, LLC ("HyperCube) and KMC Data, LLC ("KMC Data"), through undersigned counsel, hereby submit their Answer, Counterclaim and Jury Demand to Qwest Communications Corp.'s ("QCC's") Second Amended Complaint and state as follows:

### Introduction

1.     HyperCube and KMC deny the allegations in paragraph 1 of the Second Amended Complaint.

2.     HyperCube and KMC Data admit that HyperCube's wholly-owned subsidiary, KMC Data, is a telecommunications carrier. HyperCube and KMC Data deny the remaining allegations in paragraph 2 of the Second Amended Complaint.

3.     HyperCube and KMC Data admit that, on behalf of KMC Data, HyperCube began billing QCC access charges for wireless toll-free calls in November 2005. HyperCube and KMC Data deny the remaining allegations in paragraph 3 of the Second Amended Complaint.

4.      HyperCube and KMC Data admit that, on behalf of KMC Data, HyperCube has billed QCC a common trunk port and a multiplexing charge under KMC Data's interstate tariff. HyperCube and KMC deny the remaining allegations in paragraph 4 of the Second Amended Complaint.

5.      Paragraph 5 contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 5 of the Second Amended Complaint.

<u>**Parties**</u>

6.      HyperCube and KMC Data admit the allegations in paragraph 6 of the Second Amended Complaint.

7.      HyperCube and KMC Data admit the allegations in paragraph 7 of the Second Amended Complaint.

8.      HyperCube and KMC Data admit the allegations in paragraph 8 of the Second Amended Complaint, except deny that KMC Data's principal place of business is in Bedminster, New Jersey.

9.      HyperCube and KMC Data admit the allegations in paragraph 9 of the Second Amended Complaint.

<u>**Jurisdiction And Venue**</u>

10.     HyperCube and KMC Data do not contest jurisdiction.

11.     HyperCube and KMC Data do not contest venue.

<u>**General Allegations**</u>

12.     HyperCube and KMC Data admit the allegations in paragraph 12 of the Second Amended Complaint.

13.     HyperCube and KMC Data admit the allegations in the first sentence of paragraph 13 and deny the allegations in the second sentence of paragraph 13 of the Second Amended Complaint.

14.     HyperCube and KMC Data admit the allegations in paragraph 14 of the Second Amended Complaint, except deny that HyperCube is a corporation.

<u>**Wireless Originated Toll Free Calls**</u>

15.     HyperCube and KMC Data admit the allegations in paragraph 15 of the Second Amended Complaint.

16.     HyperCube and KMC Data admit the allegations of the first sentence in paragraph 16 subject to the qualification identified below.  HyperCube and KMC Data admit the allegations

in the second sentence in paragraph 16 to the extent it describes the various kinds of carriers that may be considered "originating carriers" in connection with a toll-free call. HyperCube and KMC Data deny the first and second sentences in paragraph 16 to the extent they allege or suggest that only one carrier can be considered an originating carrier for purposes of access services in connection with a toll-free call.

17. HyperCube and KMC Data lack sufficient information to form a belief as to the truth of the allegation that the routing described in the first sentence of this paragraph is "typical," aver that there are other methods of routing that do not involve an ILEC and therefore deny the first sentence in paragraph 17. HyperCube and KMC Data admit, on information and belief, that the method in which QCC purportedly handles a wireless 8XX call once it receives the call is as described in the second sentence in paragraph 17. HyperCube and KMC Data lack sufficient information to form a belief as to the truth of the allegation in the third sentence in paragraph 17 that the diagram depicted is a simplified diagram of a "typical" call transfer from a wireless caller, aver that there are other methods of routing that do not involve an ILEC and therefore deny the third sentence in paragraph 17.

18. HyperCube and KMC Data admit that when a call originates on a landline telephone, QCC is required to pay access charges to other carriers that are involved in the transmission of the call and that those charges may include "end office" charges and "tandem" charges. HyperCube and KMC Data admit, on information and belief, that if the ILEC is involved in transferring the landline call to QCC, then a tandem charge is incurred by QCC. HyperCube and KMC Data lack sufficient information to form a belief as to the truth of the allegation that a tandem charge is generally a small fraction of the end office charge and therefore deny the allegations in the third sentence of paragraph 18.

19. With respect to the first sentence in paragraph 19, HyperCube and KMC Data admit that state and federal tariffs, filed with state public utilities commissions and the Federal Communications Commission, respectively, may contain definitions of access charges, including end office and tandem charges, but deny that the referenced tariffs are the exclusive sources for definitions of access charges, including end office and tandem charges. HyperCube and KMC Data admit that interstate calls are calls that span more than one state and that intrastate calls are calls that originate and terminate in the same state. The remaining allegations of the second and third sentences in paragraph 15 contain conclusions of law to which no response is required, but to the extent they contain factual allegations or a response is otherwise required, they are denied.

20. This first sentence in paragraph 20 contains conclusions of law to which no response is required, but to the extent it contains factual allegations or a response otherwise is required it is denied. HyperCube and KMC Data deny the allegations in the second, third and fourth sentences of this paragraph.

21. HyperCube and KMC Data admit only that they have entered into revenue sharing agreements with certain entities, including wireless carriers, and that under those agreements wireless carriers may receive a portion of the revenue KMC Data earns by providing services in connection with wireless 8XX calls destined to QCC's or other IXC's toll-free customers. HyperCube and KMC Data deny all remaining allegations in paragraph 21 of the Amended Complaint.

22.    HyperCube and KMC Data admit only that wireless 8XX calls delivered by KMC Data to QCC may travel call paths like those depicted in the diagrams in paragraph 22. HyperCube and KMC Data deny all other allegations in paragraph 22.

23.    HyperCube and KMC Data admit that the allegations in paragraph 23 purport to describe the call paths in the two diagrams depicted in paragraph 22.

24.    HyperCube and KMC Data deny all allegations in paragraph 24.

25.    HyperCube and KMC Data admit, on information and belief, only that other CLECs have delivered wireless 8XX calls to QCC and have charged QCC originating access charges for doing so. HyperCube and KMC Data deny all remaining allegations in paragraph 25.

26.    HyperCube and KMC Data deny that the FCC has ever called the delivery of wireless 8XX calls by CLECs to IXCs an "insertion scheme" that the FCC has in any way characterized a CLEC's provision of access services in connection with wireless calls as somehow wrongful or unlawful or that the FCC has ever ruled that a wireless toll-free call must be delivered by the wireless carrier to an ILEC. HyperCube and KMC Data state that the FCC's Order speaks for itself and that the quotations selected by QCC do not portray the FCC's full ruling or the full state of the law. HyperCube and KMC Data deny the implication in paragraph 26's allegations that the referenced FCC decision applies to intrastate access charges. HyperCube and KMC Data deny all other allegations in paragraph 26.

27.    HyperCube and KMC Data admit that new rules were adopted by the FCC effective June 2004 regarding CLEC interstate access charges. One rule adopted requires CLECs delivering interstate wireless 8XX calls to IXCs to charge the IXC for only the originating access elements provided for the delivery of such calls whereas prior to the FCC Order a CLEC could charge a single tariffed benchmark rate that applied regardless of how many access elements the CLEC provided. HyperCube and KMC Data deny that tandem switching and transport are the only services provided when a CLEC delivers an interstate wireless 8XX call to an IXC. HyperCube and KMC Data deny all other allegations in paragraph 27, including the implication that the new rule has any application to CLEC charges for the delivery of intrastate wireless 8XX calls.

28.    HyperCube and KMC Data state that the FCC's Order, including Orders other than those cited by QCC, speak for themselves and that QCC's selected quotations and descriptions do not portray the full state of the law. HyperCube and KMC Data deny the implication of these allegations that the referenced FCC decision applies to intrastate access charges. HyperCube and KMC Data deny all other allegations in paragraph 28.

29.    HyperCube and KMC Data deny the allegations of paragraph 29.

## The Tariff Structure

30.    HyperCube and KMC Data admit that KMC Data may file and has filed federal and state tariffs containing the terms governing the provision of some of its services, but deny that KMC Data is required to do so in all instances. HyperCube and KMC Data admit that KMC Data's tariffs, when applicable to the service provided to a party, contain the terms that govern

the provision of its services. HyperCube and KMC Data otherwise deny the allegations in paragraph 30.

31.    HyperCube and KMC Data admit that QCC has no separate written agreement with them regarding KMC's provision of access services to QCC in connection with wireless 8XX calls and deny all other allegations in paragraph 31 of the Second Amended Complaint.

## HyperCube's Billing to QCC Under KMC Data's Prior Intrastate Tariffs

32.    HyperCube and KMC Data admit the allegations in paragraph 32 with the qualification that HyperCube began billing for KMC Data's services in November 2005 in the states identified in paragraph 32, but that credits were issued for all intrastate billing for Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, South Carolina, Tennessee, Utah, Virginia and Wisconsin in August 2006.

33.    HyperCube and KMC Data admit that QCC questioned the charges and that HyperCube represented that the charges were billed pursuant to KMC Data's interstate and intrastate tariffs.

34.    HyperCube and KMC Data admit that QCC asked HyperCube to identify the provisions of the state tariffs on which the intrastate charges were based and that HyperCube initially provided to QCC copies of KMC Data's publicly-filed tariffs for California, Colorado, Florida, Georgia, and Washington in March of 2006 and aver that, in July 2006, HyperCube also provided to QCC copies of KMC Data's publicly-filed tariffs in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas and Washington. HyperCube and KMC Data admit that HyperCube did not provide to QCC copies of tariffs for Alabama, Arizona, Kentucky, Minnesota, North Carolina, New Jersey, Oregon, South Carolina, Utah, and Wisconsin and aver that QCC received credits for billing for services in those states. HyperCube and KMC Data deny all other allegations in paragraph 34.

35.    HyperCube and KMC Data admit that QCC sent a letter dated May 22, 2006 disputing the charges for KMC Data's services to QCC and claiming that the charges were not within the scope of HyperCube's state tariffs. HyperCube and KMC Data deny all other allegations in paragraph 35, including the allegation that the charges were improper.

36.    HyperCube and KMC Data admit that Mr. Mertz sent a letter to QCC dated May 23, 2006 advising that KMC Data's service to QCC would be suspended as permitted by its interstate and intrastate tariffs if QCC did not pay for the services that had been rendered to it since November of 2005. HyperCube and KMC Data aver that the letter speaks for itself. HyperCube and KMC Data admit that Mr. Mertz confirmed to Mr. Hansen that service would be suspended if payment was not made. HyperCube and KMC Data deny the suggestion that "blocking" the transmission of wireless 8XX calls to QCC customers over KMC Data's facilities constitutes action beyond service suspension.

37.    HyperCube and KMC Data admit that QCC made the $100,000 and $371,130 payments alleged in paragraph 37, admit on information and belief that QCC made these partial payments to defer service suspension while discussions to resolve the dispute were underway, admit that HyperCube advised QCC that service would not be suspended until June 5, 2006 as a

{00337674.1}

result of QCC's first partial payment of $100,000, and admit that, on June 6, 2006, HyperCube again notified QCC that service would be suspended for continuing nonpayment. HyperCube and KMC Data deny that QCC made either of its two partial payments to KMC Data as a result of HyperCube's statements regarding billing per KMC Data's interstate and intrastate tariffs or to avoid the allegedly "disastrous impact of HyperCube's threatened call blocking."

38.    HyperCube and KMC Data admit the allegations in paragraph 38 of the Second Amended Complaint.

39.    HyperCube and KMC Data admit the allegations in paragraph 39 of the Second Amended Complaint.

40.    HyperCube and KMC Data admit the allegations in paragraph 40 of the Amended Complaint.

41.    HyperCube and KMC Data admit that Mr. Mertz did not provide KMC Data tariffs to QCC for Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, South Carolina, Tennessee, and Utah.

42.    HyperCube and KMC Data admit that Mr. Mertz sent Mr. Hansen an e-mail on August 2, 2006 advising that intrastate billing in certain states listed in the e-mail would be backed out of the bills to QCC and aver that the e-mail speaks for itself.

43.    HyperCube and KMC Data admit that QCC was issued a credit for access charges from November 2005 through August 2006 for KMC Data's intrastate access services to QCC in Alabama, Arizona, Kentucky, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, South Carolina, Tennessee, Utah, Virginia and Washington.

44.    HyperCube and KMC Data admit that interest was not refunded to QCC and aver that QCC never made payments on the bills for which it was issued credits. HyperCube and KMC Data further admit that QCC has not been given a refund of the partial payments it made for intrastate access charges in the states where QCC admits KMC Data had filed tariffs. HyperCube and KMC Data deny the remaining allegations in paragraph 44.

45.    HyperCube and KMC Data deny the allegations in paragraph 45 of the Second Amended Complaint.

46.    HyperCube and KMC Data deny the allegations in paragraph 46 of the Second Amended Complaint.

47.    HyperCube and KMC Data admit that wireless callers do not subscribe to KMC Data's local exchange services and deny all other allegations in paragraph 47 of the Second Amended Complaint.

48.    HyperCube and KMC Data deny the allegation in the first sentence in paragraph 48. HyperCube and KMC Data admit that KMC Data filed amended tariffs in certain states and filed new tariffs in other states in August and September of 2006. All other allegations of paragraph 48 are denied.

49.    HyperCube admits that it is billing QCC for intrastate calls in states where it has not filed a replacement tariff including Colorado and Washington. HyperCube and KMC Data deny all remaining allegations in paragraph 49 of the Second Amended Complaint.

50.    HyperCube and KMC Data admit the allegations in paragraph 50 of the Second Amended Complaint.

51.    HyperCube and KMC Data admit that on July 28, 2006, Steven Hansen emailed James Mertz regarding the Shared (Common) Trunk Port charge and the Multiplexing charge and deny the remaining allegations of paragraph 51 of the Second Amended Complaint.

52.    HyperCube and KMC Data admit the first sentence of paragraph 52. HyperCube and KMC Data admit that TEOCO sent a similar dispute notice on a couple of other occasions, but deny that it sent a similar notice each month after November 2006. HyperCube and KMC Data deny the remaining allegations of paragraph 52 of the Second Amended Complaint.

53.    HyperCube and KMC Data aver that KMC Data's tariffs speak for themselves and deny all allegations of paragraph 53.

54.    HyperCube and KMC Data deny the allegations of paragraph 54.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Under Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq. – HyperCube and KMC Data)

55.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-54 of the Second Amended Complaint.

56.    In response to paragraph 56, HyperCube and KMC Data admit that KMC Data transmits to QCC wireless 8XX calls to QCC customers and that, on behalf of KMC Data, HyperCube bills QCC intrastate and interstate access charges for those intrastate and interstate calls for which KMC Data has provided access services to QCC.

57.    HyperCube and KMC Data admit that QCC has been billed for access services and deny all other the allegations in paragraph 57 of the Second Amended Complaint.

58.    HyperCube and KMC Data admit that KMC Data's interstate access tariff includes a charge for a Common Trunk Port service and Multiplexing service and that QCC has been billed for these services. HyperCube and KMC Data deny the remaining allegations of paragraph 58.

59.    Paragraph 59 contains conclusions of law to which no response is required.

60.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 60.

61.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 61.

{00337674.1}

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment - HyperCube)

62.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-61 of the Second Amended Complaint.

63.    HyperCube and KMC Data deny the allegations in paragraph 63 of the Second Amended Complaint.

64.    In response to paragraph 64, HyperCube and KMC Data admit that QCC has not paid KMC Data the vast majority of the charges for the interstate and intrastate access services that QCC received.  HyperCube and KMC Data otherwise deny the allegations of this paragraph, including the characterization of KMC Data's charges as "improper."

65.    HyperCube and KMC Data deny the allegations in paragraph 65 of the Second Amended Complaint.

66.    HyperCube and KMC Data deny the allegations in paragraph 66 of the Second Amended Complaint.

## THIRD CLAIM FOR RELIEF
### (Money Had and Received - HyperCube)

67.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-66 of the Second Amended Complaint.

68.    HyperCube and KMC Data deny the allegations in paragraph 68 of the Second Amended Complaint.

69.    HyperCube and KMC Data deny the allegations in paragraph 69 of the Second Amended Complaint.

70.    HyperCube and KMC Data deny the allegations in paragraph 70 of the Second Amended Complaint.

71.    HyperCube and KMC Data deny the allegations in paragraph 71 of the Second Amended Complaint.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – HyperCube and KMC Data)

72.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-71 of the Second Amended Complaint.

73.    HyperCube and KMC Data admit that KMC Data's tariffs describe the scope of the services it provides when those tariffs cover a particular service.  HyperCube and KMC Data deny the remaining  allegations in paragraph 73.

74.     HyperCube and KMC Data deny the allegations in paragraph 74 of the Second Amended Complaint.

75.     HyperCube and KMC Data deny the allegations in paragraph 75 of the Second Amended Complaint.

76.     HyperCube and KMC Data admit that HyperCube has billed QCC for the Common Trunk Port service and Multiplexing service under KMC Data's interstate access tariff. HyperCube and KMC Data deny the remaining allegations in paragraph 76 of the Second Amended Complaint.

77.     HyperCube and KMC Data deny the allegations in paragraph 77 of the Second Amended Complaint.

78.     HyperCube and KMC Data deny the allegations in paragraph 78 of the Second Amended Complaint.

## FIFTH CLAIM FOR RELIEF
### (Breach of Federal Tariff Obligation and Communications Act - HyperCube and KMC Data)

79.     HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-78 of the Second Amended Complaint.

80.     HyperCube and KMC Data deny the allegations in paragraph 80 of the Second Amended Complaint.

81.     HyperCube and KMC Data deny the allegations in paragraph 81 of the Second Amended Complaint.

82.     HyperCube and KMC Data deny the allegations in paragraph 82 of the Second Amended Complaint.

83.     Paragraph 83 contains conclusions of law to which no response is required.

84.     This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 84.

85.     This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 85.

## SIXTH CLAIM FOR RELIEF
### (Fraud – HyperCube and KMC Data)

86.     This claim is the subject of a motion to dismiss and no answer is therefore required.

87. This claim is the subject of a motion to dismiss and no answer is therefore required.

88. This claim is the subject of a motion to dismiss and no answer is therefore required.

89. This claim is the subject of a motion to dismiss and no answer is therefore required.

90. This claim is the subject of a motion to dismiss and no answer is therefore required.

91. This claim is the subject of a motion to dismiss and no answer is therefore required.

## SEVENTH CLAIM FOR RELIEF
### (Breach of State Public Utilities Statutes – KMC Data)

92. HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-91 of the Second Amended Complaint.

93. HyperCube and KMC Data admit the allegations in paragraph 93 of the Second Amended Complaint.

94. HyperCube and KMC Data admit the allegations in paragraph 94 of the Second Amended Complaint.

95. HyperCube and KMC Data admit that QCC has been charged access charges for KMC Data's services in connection with Colorado calls. To the extent those services are addressed in and covered by KMC Data's Colorado tariff, HyperCube and KMC Data admit that the tariff contain binding and enforceable terms and conditions between QCC and KMC Data, but deny that KMC Data must provide services for free if those services are not covered in KMC Data's Colorado tariff.

96. HyperCube and KMC Data deny the allegations in paragraph 96 of the Second Amended Complaint.

97. HyperCube and KMC Data deny the allegations in paragraph 97 of the Second Amended Complaint.

98. HyperCube and KMC Data deny the allegations in paragraph 98 of the Second Amended Complaint.

99. HyperCube and KMC Data deny the allegations in paragraph 99 of the Second Amended Complaint, aver that Col. Rev. Stat. § 40-15-113 speaks for itself and aver that QCC has not only accepted and therefore authorized the charges, but that it procured an order requiring KMC Data to continue providing the services which action constitutes confirmation of its authorization for the charges.

{00337674.1}

100.    HyperCube and KMC Data deny that they have violated other state public utilities statutes.

## EIGHTH CLAIM FOR RELIEF
### (Preliminary Injunctive Relief Under Col. R. Civ. P. 65 – HyperCube and KMC Data)

101.    HyperCube and KMC Data incorporate by reference as if fully set forth herein their responses to paragraphs 1-100 of the Second Amended Complaint.

102.    HyperCube and KMC Data deny the allegations in paragraph 102 of the Second Amended Complaint and aver that to the extent charges were erroneously billed, those charges, which were never paid, were credited back to QCC .

103.    HyperCube and KMC Data admit that, on behalf of KMC Data, HyperCube previously notified QCC that KMC Data's service to QCC would be suspended unless QCC remedied its continuing nonpayment for those services. HyperCube and KMC Data deny that KMC Data's charges to QCC were improper , deny that QCC currently is under a suspension notice and deny all other allegations of paragraph 103.

104.    HyperCube and KMC Data admit that KMC Data is the telecommunications carrier in the states where service would have been suspended to QCC because of its nonpayment and admit that KMC Data's approval is necessary to suspend service to a customer such as QCC. HyperCube and KMC Data deny all other allegations of this paragraph, including those characterizing service suspension for nonpayment as "blocking" or "active blocking."

105.    HyperCube and KMC Data deny the allegations in paragraph 105 of the Second Amended Complaint.

106.    HyperCube and KMC Data deny the allegations in paragraph 106 of the Second Amended Complaint.

107.    HyperCube and KMC Data deny the allegations in paragraph 107 of the Second Amended Complaint.

108.    HyperCube and KMC Data deny the allegations in paragraph 108 of the Second Amended Complaint.

109.    HyperCube and KMC Data deny the allegations in paragraph 109 of the Second Amended Complaint.

110.    HyperCube and KMC Data deny the allegations in paragraph 110 of the Second Amended Complaint.

111.    This paragraph contains requests for relief to which no response is required. HyperCube and KMC Data deny that QCC is entitled to the relief sought in paragraph 111.

112.    HyperCube and KMC Data deny all allegations of the Second Amended Complaint not expressly admitted herein.

## PRAYER FOR RELIEF

HyperCube and KMC Data deny that QCC is entitled to the requested relief.

## AFFIRMATIVE DEFENSES

1.    QCC has failed to state a claim upon which relief can be granted.

2.    QCC's claims are barred, in whole or in part, by the doctrine of unclean hands.

3.    QCC's claims are barred, in whole or in part, by the doctrines of setoff and recoupment.

4.    QCC's claims are barred by the filed rate doctrine applicable to intrastate and interstate tariffs.

5.    QCC's claims are barred, in whole or in part, by the existence of express or implied contracts, including contracts implied pursuant to the Constructive Ordering Doctrine.

6.    QCC's claims are barred, in whole or in part, by the doctrines of unjust enrichment and quantum meruit.

7.    QCC's claims are barred, in whole or in part, pursuant to an open account between the parties.

8.    QCC's claims are barred, in whole or in part, for failure to exhaust its administrative remedies in that QCC has not challenged the validity or reasonableness of the charges for access services rendered under KMC Data's intrastate tariffs before the appropriate state regulatory body.

9.    QCC's claims fail for lack of subject matter jurisdiction.

10.    QCC's claims are barred on the grounds of primary jurisdiction.

**WHEREFORE,** HyperCube and KMC Data request the following relief:

1.    That the Second Amended Complaint against HyperCube and KMC Data be dismissed and QCC recover nothing from HyperCube or KMC Data;

2.    That QCC be ordered to pay HyperCube's and KMC Data's costs and attorneys' fees to the extent provided by law; and

3.    That the Court order such other relief in favor of HyperCube and KMC Data as it deems proper and just.

{00337674.1}

## COUNTERCLAIM

Counterclaim-Plaintiff, KMC Data, LLC ("KMC Data"), for its causes of action against Counterclaim-Defendant, Qwest Communications Corp. ("QCC") states:

### PARTIES

1.     KMC Data is a Delaware limited liability corporation with its principal place of business in Texas that is in the business of, among other things, providing interstate and intrastate switched access service to various customers, including interexchange ("IXC") carriers (commonly referred to as "long-distance carriers").

2.     QCC is a Delaware corporation with its primary place of business in Denver, Colorado. QCC is an IXC providing long distance telephone services, including toll free services, to customers throughout the United States.

### JURISDICTION AND VENUE

3.     This court has jurisdiction over this action because QCC resides in Colorado and QCC and KMC Data transact business in Colorado.

4.     Venue is proper in this District pursuant to Colo. R. Civ. P. 98(c).

### BACKGROUND FACTS

5.     The interstate and intrastate access services provided by KMC (together, "access services") enable an IXC to originate or terminate long distance calls to end user customers using the local network facilities of the Public Switched Telephone Network ("PSTN"). As a Competitive Local Exchange Carrier ("CLEC"), KMC Data competes for business with QCC's Incumbent Local Exchange Carrier ("ILEC") affiliate, Qwest Corporation.

6.     When a wireless phone customer calls an IXC's wire-line customer, the wireless carrier must connect to the public switched network at some point so the call can be sent to the wire-line customer.

7.     KMC Data does business with wireless carriers and allows them to connect to its local facilities. During the period relevant to this counterclaim, to foster connection by wireless carriers to its facilities, KMC Data has offered to share with wireless carriers a percentage of certain revenues KMC Data earns from third parties as a result of servicing wireless toll-free calls that are destined to customers of those third parties. Incentives of this nature are commonplace in the industry and not just with respect to wireless carriers' connectivity to the PSTN.

8.     When wireless customers' toll-free calls (calls that are placed to telephone numbers beginning with an 8XX area code or "8XX Traffic") are routed through the facilities of KMC Data, KMC Data provides access services – including switching, transport -- and database

query services to the IXC that is being paid by its customers to provide the toll-free service to those customers.

9.     When KMC Data provides access and database query services in connection with a call made from a wireless telephone, the call is routed from the wireless carrier's Mobile Telecommunications Switching Office ("MTSO") across a KMC Data facility (a KMC Data trunk) which connects the wireless carrier's MTSO to KMC Data's Class 4/5 switch.

10.     While the call is in the switch, KMC Data performs switching and routing functions and additional services, such as running a query of the national 8XX telephone number database to determine where the call should be routed. Once the database returns information regarding the IXC whose 8XX customer has been called, KMC Data's switch performs the necessary routing to deliver the call to the IXC's facilities. In the case of wireless toll-free calls to QCC's customers, between November 2005 and July 2006, when Qwest discontinued its provision to KMC Data of leased dedicated access lines, KMC Data's switch routed the call directly to QCC via dedicated connections between KMC Data's switch and QCC's switch. KMC Data bore the facilities expense of the direct connections between it and QCC and charged QCC for the access and database query services it provided to QCC in connection with the wireless toll-free calls. Since July of 2006, KMC Data has delivered wireless 8XX calls to QCC's customers to QCC at the ILEC tandem because QCC has refused to lease to KMC Data the dedicated access lines over which KMC Data previously had delivered those calls to QCC.

11.     KMC Data is entitled to bill and to collect access and database query charges for the services it provides to QCC in connection with the completion of intrastate and interstate calls from the customers of wireless carriers to QCC's toll-free service customers.

## QCC's FAILURE TO PAY FOR ACCESS SERVICES

12.     To the extent that KMC Data's intrastate access and database query services are regulated, they are regulated by the public utility commission or service commission in each state in which it operates. KMC Data's interstate access services are regulated by the Federal Communications Commission ("FCC").

13.     To the extent covered by tariffs, KMC Data's intrastate and interstate access and database query charges to QCC for services in connection with wireless 8XX calls are determined by and set forth in tariffs and price lists filed by KMC Data with (and approved by) the appropriate governing commissions in the states in which KMC Data does business and the FCC, respectively. If the service provided is not covered or governed by these tariffs, then charges are determined by express or implied contract or principles of quantum meruit, open account and/or unjust enrichment.

14.     Each month since November 2005, on KMC Data's behalf, its parent company, Hypercube, LLC, which provides billing and management services to KMC Data, has billed QCC for interstate access and database query services and, when provided by KMC Data, for intrastate access and database query services in Alabama, California, Colorado, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New

Mexico, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Washington, West Virginia, Wisconsin.

15.    Since November 2005, QCC has received, accepted, and benefited from KMC Data's access and database query services in connection with wireless calls bound for QCC's toll-free customers. QCC accepted the calls that KMC Data delivered to it over the dedicated facilities between them, delivered those calls to the customers to which QCC had assigned the toll-free numbers and charged its customers for those calls.

16.    At all times relevant hereto, QCC has had actual and constructive notice of KMC Data's access and database query charges for wireless 8XX Traffic and has continued to receive, use and benefit from KMC Data's access and database query services in connection with wireless 8XX Traffic.

17.    Commencing with KMC Data's bill for services rendered during November 2005, QCC began withholding payment for access services provided to QCC in connection with wireless toll-free calls, which calls have been accepted by Qwest in California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington. In addition, since September 2006 QCC also has withheld payment for access services provided to QCC in connection with wireless toll-free calls in Alabama, Kentucky, Massachusetts, New Jersey, South Carolina, Tennessee, Wisconsin and West Virginia. QCC also has withheld payment on KMC Data's database query charges.

18.    QCC has purported to justify taking KMC Data's access and database query services for wireless 8XX Traffic without payment on the basis of QCC's incorrect interpretation of an Order of the Federal Communications Commission ("FCC") issued in 2004 with respect to interstate access charges for such calls. However, the FCC does not regulate KMC Data's intrastate access and database query services and rates and the FCC's Orders do not apply to intrastate service and rates. Moreover, the FCC Order does not support QCC's withholding of payment for KMC Data's interstate services provided to QCC, including database queries, multiplexing and common trunk port.

19.    Although QCC has refused to pay KMC Data's charges for its access and database query services in connection with wireless 8XX Traffic and has claimed in its complaint that KMC Data's services are of no benefit to it, QCC also has claimed that it would suffer "irreparable harm" if KMC Data stopped providing those services to it. Thus, by its own assertions, KMC Data's access and database query services in connection with wireless 8XX Traffic are highly valuable to QCC.

20.    QCC has refused to pay roughly $10,763,122 in KMC Data's charges to QCC for access and database query services in connection with wireless 8XX Traffic. The amount overdue from QCC for KMC Data's services represents services provided during the months of November 2005 through July 2007. The amount due from QCC to KMC Data continues to grow each month as KMC Data continues to provide these services to QCC, which services QCC insists it must have, but for which it refuses to pay.

21.    QCC's refusal to pay these charges and associated late fees is without legal justification or excuse.

## COUNT ONE
### (Breach of Intrastate and Interstate Tariffs)

22.    KMC Data re-alleges  and incorporates the allegations of paragraphs 1 through 21 above.

23.    At all times since and including November 2005, QCC has received, accepted, and benefited from KMC Data's provision of access and database query services to QCC in connection with wireless calls to QCC's toll-free customers.

24.    By accepting these access and database query services which were offered by KMC Data pursuant to its state and federal tariffs, QCC has agreed and is required by law to pay KMC Data the tariffed rates for the services provided.

25.    At all times relevant to this lawsuit, QCC has continued, and to this day continues, to accept and benefit from these access and database query services provided by KMC Data and, indeed, insists that KMC Data continue to provide these services without interruption.

26.    QCC continues to refuse to pay the access charges and database query fees due under the tariffs and appropriately billed by KMC Data for the services that KMC Data rendered.

27.    QCC has at all times relevant to this action had the ability to decline to accept these access and database query services from KMC Data and to so inform its customers.  QCC not only has failed and refused to do so but has instead demanded KMC Data's uninterrupted provision of those services.

28.    QCC has failed to pay amounts due and owing to KMC Data without legal justification or excuse, and in breach of its legal obligations imposed by its acceptance of access and database query services pursuant to the tariffs.

29.    By failing to pay charges and associated late fees for tariffed access services and database queries rendered by KMC Data, QCC has breached the tariffs.

30.    KMC Data has been damaged by QCC's purposeful breaches of the tariffs, in an amount to be proved at trial and which continues to increase daily, which includes access charges and database query fees for wireless 8XX Traffic at the tariffed rates, late fees, interest, and attorneys fees and expenses.

## COUNT TWO
### (Breach of Implied Contract)

31.    KMC Data re-alleges and incorporates the allegations contained in paragraphs 1 through 30, above.

32.     At all times relevant hereto, KMC Data has performed access services and database queries for QCC in connection with wireless 8XX Traffic.

33.     At all times relevant hereto, QCC has known that KMC Data was performing these services and expected to be paid for it.

34.     At all times relevant hereto, QCC has accepted those services, delivered the calls to its customers and charged them for it.

35.     At all times relevant hereto, QCC has known the rates that KMC Data charged for these services.

36.     QCC has insisted that KMC Data continue to provide these services without interruption and has claimed that it would be irreparably harmed if KMC Data stopped doing so.

37.     In the alternative to Count I, by taking, using and benefiting from those services, and by insisting on uninterrupted provision of those services, QCC entered into an implied contract with KMC Data to pay KMC Data at the rates that QCC knew were charged by KMC Data for those services.

38.     Despite its receipt, acceptance, use and insistence on KMC Data's services, QCC has failed to pay KMC Data for its services.  It would be inequitable for QCC to retain the benefit of KMC Data's services without payment of its value.

39.     KMC Data has been damaged by QCC's purposeful breaches of the implied contract between them, in an amount to be proved at trial and which continues to increase daily, which includes access and database query charges for wireless 8XX Traffic at the rates QCC knew that KMC Data charged, late fees, interest, and attorneys fees and expenses.

## COUNT THREE
### (Action on Open Account)

40.     KMC Data re-alleges and incorporates the allegations contained in paragraphs 1 through 39, above.

41.     In the alternative to Counts I and II, QCC has created an open account by receiving, accepting, and benefiting from the access services and database queries offered and provided by KMC Data in connection with wireless toll free calls to QCC customers.  At all times, QCC was aware of KMC Data's provision of these services, the amount of its charges for these services and has insisted on KMC Data's uninterrupted provision of these services to it.

42.     The open account includes all access and database query charges and associated late fees billed by KMC Data but not paid by QCC from November 2005 through the date of trial.

43.     KMC Data has been damaged by QCC's failure to pay the charges accrued on the open account in an amount to be proven at trial.

## COUNT FOUR
### (Quantum Meruit)

44.    KMC Data re-alleges and incorporates the allegations contained in paragraphs 1 through 43 above.

45.    Since November 2005, KMC Data has provided to QCC access and database query services accepted by QCC in states including California, Colorado, Florida, Georgia, Illinois, Michigan, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Texas, and Washington. KMC Data also has provided to QCC  access services and database query services accepted by QCC in Alabama, Kentucky, Massachusetts, New Jersey, South Carolina, Tennessee, Wisconsin and West Virginia.

46.    QCC has at all times relevant to this action had the ability to decline to accept access and database query services from KMC Data in connection with wireless 8XX Traffic and to so inform its customers. QCC not only has failed and refused to do so but has demanded the uninterrupted provision of those services by KMC Data by seeking a temporary restraining order against suspension of those services as a consequence of QCC's nonpayment for the services. QCC has to date continued to accept these services provided by KMC Data and to forward the toll-free calls to its customers, who have paid QCC to be able to receive the calls.

47.    At all times during which QCC has received, accepted, and benefited from KMC Data's access and database query services for QCC-bound wireless 8XX Traffic, QCC had actual or constructive notice of KMC Data's charges for said services, and the fact that KMC Data was not a volunteer, but expected to be paid at the applicable rates.

48.    By accepting these services provided by KMC Data with knowledge that it was not a volunteer, if there is no express or implied contract between KMC Data and QCC for the payment of such charges, QCC is bound to pay the fair market value of those services under the doctrine of quantum meruit. KMC Data has been damaged in an amount to be proven at trial as a consequence of QCC's failure to pay the fair market value for the services it received.

## COUNT FIVE
### (Unjust Enrichment)

49.    KMC Data re-alleges and incorporates the allegations in paragraphs 1 through 48 above.

50.    By its provision of access and database query services to QCC, KMC Data conferred a benefit on QCC at KMC Data's expense and to KMC Data's detriment.

51.    QCC knew that it would, and intended to, receive a benefit from the access and database query services provided to it by KMC Data.

52.    QCC accepted and retained that benefit under circumstances which make it inequitable for there to be no return payment to KMC Data for the value of the access and database query services it provided to QCC.

53.    In the alternative to Counts One through Four above, there is no remedy at law that can appropriately address KMC Data's claim.

54.    KMC Data has been damaged by QCC's unjust enrichment in an amount equal to the value of the services that QCC received from KMC Data and from which QCC benefited.

## COUNT SIX
### (Declaratory Judgment)

55.    KMC Data re- alleges and incorporates the allegations contained in paragraphs 1 through 54 above.

56.    A present, actionable and justiciable controversy exists with respect to the legal rights between the parties, including the rights and obligations of KMC Data and QCC thereunder.  Litigation between the parties is extant and unavoidable.

57.    QCC's refusal to pay access and database query charges in connection with wireless phone calls to its toll-free customers, its refusal to pay associated late fees and its allegations that KMC Data is engaged in wrongdoing by billing access and database query charges for wireless 8XX calls are ongoing and repeated practices.

58.    On information and belief, absent a declaratory judgment, QCC will continue its wrongful practices of refusing to pay access and database query charges and late fees for these services that QCC insists on, receives and accepts in the future and from which it benefits.

59.    It would be unduly burdensome and inefficient for KMC Data to bring new actions for damages each time QCC wrongfully refuses to pay an invoice.

60.    Accordingly, KMC Data is entitled to a declaratory judgment and such further relief based upon said declaratory judgment as the Court deems proper, pursuant to Col. R. Civ. P. 57 and Col. Rev. Stat. §§ 13-51-101 et seq., determining that:

       a.    QCC has breached the express and implied contracts between it and KMC Data by refusing and failing to pay access and database query charges and associated late fees billed by KMC Data for those services provided by KMC Data in connection with wireless toll-free calls.

       b.    KMC Data has been damaged by QCC's breach of the contracts; and

       c.    QCC is contractually obligated to make timely payment of these charges and late fees as said charges become due.

## REQUEST FOR RELIEF

**WHEREFORE,** KMC Data prays that this Court:

      a.    Award KMC Data damages for QCC's breaches of the tariffs, in an amount to be proved at trial;

      b.    Award KMC Data damages for QCC's breaches of implied contract, in an amount to be proved at trial;

      c.    Alternatively, award KMC Data all sums due under QCC's open account in an amount to be proved at trial;

      d.    Further in the alternative, award KMC Data damages against QCC in the amount of the just and fair value of KMC Data's services pursuant to the doctrine of quantum meruit;

      e.    Award KMC Data damages against QCC for its unjust enrichment in an amount to be proven at trial;

      f.    Issue a declaratory judgment that KMC Data is lawfully permitted to bill for KMC Data's access and database query services to QCC in connection with wireless 8XX calls to QCC customers; that QCC is obligated to pay all of KMC Data's invoices for said services, including any late fees billed, in a timely manner and such further relief based upon said judgment as the Court deems proper;

      g.    Award KMC Data late payment charges as permitted by its tariffs and/or pre- and post-judgment interest;

      h.    Tax the costs, fees and expenses of this action to QCC, including the reasonable attorneys' fees and expert witness fees of HyperCube and KMC Data to the extent permitted by law and KMC Data's tariffs; and

      i.    Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

    KMC Data and HyperCube request a trial by jury on all issues so triable.

DATED: September 10, 2007.

DUFFORD & BROWN, P.C.

*Original signature on file with the offices of Dufford & Brown, P.C*

s/ Richard L. Fanyo
Richard L. Fanyo, #7238
David W. Furgason, #2122
Dufford & Brown, P.C.
1700 Broadway, Suite 2100
Denver, Colorado 80290
Tel. No. (303) 861-8013
Fax No. (303) 832-3804
E-mail: rfanyo@duffordbrown.com
dfurgason@duffordbrown.com

Ky E. Kirby
Jonathan S. Frankel
Scott Woods
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
(202) 373-6000

**ATTORNEYS FOR HYPERCUBE, LLC
AND KMC DATA, LLC**

{00337674.1}

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2007, a true and correct copy of the foregoing **ANSWER, COUNTERCLAIM AND JURY DEMAND TO SECOND AMENDED COMPLAINT** was served via Lexis Nexis File and Serve upon the following:

Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
417 Seventeenth Street, Suite 2200
Denver, CO  80202-4437

*Original signature on file with the offices of Dufford & Brown, P.C.*

*s/ Carol A. Larsen Cook*
Carol A. Larsen Cook

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-822-GMS |
| | ) | |
| QWEST COMMUNICATIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF AMY L. BENSON

I, Amy L. Benson, of full age, hereby declare as follows:

1.  I am a partner at Brownstein Hyatt Farber Schreck, LLP, which represents Qwest Communications Corporation ("Qwest") in this action and in a parallel proceeding that is pending as *Qwest Communications Corporation v. HyperCube, LLC, et al.*, Civil Action No. 06CV6404, in the District Court for the City and County of Denver, Colorado (the "Colorado proceeding"). I make this Declaration in support of Defendant's Motion to Transfer Venue to the District of Colorado ("Motion to Transfer") and in support of Defendant's Motion to Stay Federal Proceedings Pending Resolution of Parallel State Court Action ("Motion to Stay").

2.  Qwest filed its action in the Colorado proceeding on June 12, 2006 after Plaintiffs threatened to block Qwest's calls if Qwest did not immediately pay all outstanding charges. That action is pending in the Colorado District Court for the City and County of Denver, Colorado as Civil Action No. 06CV6404.

3.  On April 16, 2007, Qwest filed a motion to amend its amended complaint in the Colorado proceeding. Qwest attached a copy of its Second Amended Complaint to its

Motion. Plaintiffs opposed Qwest's Motion. On August 24, 2007, the Colorado court granted Qwest's Motion.

4. Attached as Exhibit 2 to the Motion to Transfer and as Exhibit 5 to the Motion to Stay is a true and correct copy of the Second Amended Complaint filed in the Colorado proceeding.

5. Attached as Exhibit 3 to the Motion to Transfer and as Exhibit 4 to the Motion to Stay is a true and correct copy of the Plaintiffs' Answer and Second Amended Counterclaims filed in the Colorado Proceeding.

6. Discovery in the Colorado proceeding is well advanced. At the time this Complaint was filed, discovery in the Colorado proceeding was closed and expert reports had been provided. Discovery has been reopened and is now scheduled to be completed by April 20, 2008. The Colorado proceeding is set for trial on June 9, 2008.

7. Attached as Exhibit 5 to the Motion to Transfer is a true and correct copy of the witness lists filed by Plaintiffs and Qwest in the Colorado proceeding. As set forth on those lists, the parties identified a total of 22 witnesses. Six witnesses are located in Colorado. Two of the Colorado based witnesses, William Argall and Teresa Reddan, are former employees of Qwest and therefore would need to be subpoenaed to testify if they were unwilling to voluntarily appear. The remaining witnesses are in Connecticut, Georgia, Kansas, Ohio, New York, Texas, and Utah.

8. The parties identified their exhibits in the Colorado proceeding. Because Plaintiffs' claims in Delaware are identical to those asserted in their counterclaims in Colorado proceeding, exhibits from that proceeding will also likely be used as exhibits in this proceeding.

Qwest's exhibits and the documents it has collected and produced in discovery in the Colorado proceeding are located in Denver, Colorado.

9.   In a pleading filed on December 24, 2007 in the Colorado proceeding, Plaintiffs acknowledged that the Colorado court has jurisdiction over Plaintiffs' claims for payment of interstate charges. Plaintiffs stated: "[T]his [Colorado] Court does have jurisdiction over KMC Data's claims that Qwest is liable to pay for KMC Data's *interstate* services." Because that filing contains confidential information that is subject to a Confidentiality Order in the Colorado proceeding, it is not attached here.

I hereby declare under penalty of perjury that all of the statements made by me herein are true and correct.

Dated: January 22, 2008

_____
Amy L. Benson

# EXHIBIT 5

## WITNESS LIST:  QWEST COMMUNICATIONS CORPORATION

*Qwest Communications Corporation v. HyperCube, LLC* (Case No. 06-CV-2404)

| Name, Address, and Telephone Number | Will Call / May Call | Direct | Cross |
|---|---|---|---|
| Steve Hansen<br>Vice President of Carrier Relations<br>Qwest Services Corporation<br>1801 California Street, Denver, CO 80295<br>(303) 992-1250 | Will Call | 2 hours | 2 hours |
| Derek Canfield<br>TEOCO Corporation<br>17242 W. 70th Street, Shawnee, KS 66217<br>(913) 563-4778 | Will Call | 2 hours | 2 hours |
| Frank Gumper<br>20 Deerfield Road, Port Washington, NY 11050<br>(516) 944-6595 | Will Call | 3 hours | 2.5 hours |
| Jon Ahern<br>Director, Navigant Consulting<br>707 17th Street, Suite 3040, Denver, CO 80202<br>(303) 383-7306 | Will Call | 1 hour | .75 hours |
| Teresa Reddan<br>Manager, Finance<br>Qwest Facility Cost Department<br>1801 California Street, Denver, CO 80295<br>(303) 992-5116 | May Call | 1 hour | .5 hours |
| William Michael Argall<br>Former Manager, Finance<br>Qwest Facility Cost Department<br>(Retired)<br>P.O. Box 19247, Denver, CO  80219<br>(303) 936-2525 | May Call | 1 hour | 1 hour |

| Name, Address, and Telephone Number | Will Call / May Call | Direct | Cross |
|---|---|---|---|
| Ken Shomaker<br>Senior Staff Engineer<br>Qwest Services Corporation<br>4650 Lakehurst Court, Dublin, OH 46016<br>(614) 215-6909 | May Call | 1 hour | .75 hours |
| Gene Waldron<br>Lead Engineer<br>Qwest Facility Cost Department<br>4650 Lakehurst Court, Dublin, OH 46016<br>(614) 215-2276 | May Call | 1 hour | 5 hours |
| Joshua Nielsen<br>Supervisor, Billing Services<br>Qwest Corporation<br>250 East 2nd St , Salt Lake City, UT 84111<br>(801) 239-4016 | May Call | 1 hour | .5 hours |
| Matt Marquez<br>Regional Service Manager<br>Qwest Communications Corporation<br>1801 California Street, Denver, CO 80295<br>(303) 992-2418 | May Call | 1 hour | .5 hours |
| James Mertz<br>Vice President of Governmental Affairs<br>HyperCube, LLC | May Call | 2 hours | (Re-direct)<br>.75 hours |
| Jon Jones<br>Contractor, HyperCube<br>Director of Billing Operations | May Call | 1.5 hours | (Re-direct)<br>.75 hours |
| Doug Davis<br>Chief Technology Officer<br>HyperCube, LLC | May Call | 1.5 hours | (Re-direct)<br>.75 hours |

Mr. Gumper and Mr. Ahern are Qwest's retained experts. Mr. Gumper is an expert witness in the telecommunications field and Mr. Ahern is an expert witness in the economic damages field. Defendants do not challenge the qualifications of Mr. Gumper or Mr. Ahern to testify as an expert as to the opinions addressed.[1]

Qwest also reserves its right to amend this Draft Witness List and to supplement this Draft Witness List with any witnesses necessary for authentication, admissibility, impeachment, or rebuttal.

---

[1] Defendants do seek to preclude certain testimony of Mr. Gumper on grounds other than Mr. Gumper's qualifications. *See* Defendants' Motion *In Limine* To Preclude Testimony By Frank J. Gumper Regarding Federal Communications Commission Rules and Decisions (filed Jan. 4, 2008) and Defendants' Motion *In Limine* To Exclude Expert Testimony By Frank J. Gumper That Is Based on The Opinions of Others (filed Jan. 4, 2008).

3

Attachment 2

WITNESS LIST FORM
Judge Haglund

Case No.:      06-cv-6404

Trial Date:    February 4 - 8, 2008

Case Caption: QWEST COMMUNICATIONS CORPORATION, Plaintiff and
Counterclaim-Defendant, v. HYPERCUBE, LLC , Defendant, and KMC DATA, LLC,
Defendant and Counterclaim-Plaintiff.

## HyperCube's and KMC Data's Witness List

| Name | Summary of Testimony | Will | May | Direct | Cross |
|------|---------------------|------|-----|--------|-------|
| Gary J. Ball<br><br>47 Peaceable Street<br>Ridgefield, CT 06877<br>(203) 894-1643 | Mr. Ball will provide expert testimony regarding the telecommunications industry, networks, competition, service arrangements and customer incentives, tariffs, KMC Data's services to Qwest, the applicability of KMC Data's switched access tariffs to those services, and the fair market value of those services. | X | | 2 Hrs. | 2 Hrs. |
| Derek Canfield, TEOCO Corp.<br><br>17242 W. 70th Street, Shawnee, KS 66217 | Mr. Canfield may testify regarding TEOCO's relationship with and services to Qwest, KMC Data's access charge bills to Qwest, TEOCO's analyses of KMC Data's access charge billings to Qwest and of KMC Data's Call Detail Records, TEOCO's communications with Qwest regarding the services and charges at issue, Qwest's development of PIUs, communications with HyperCube and KMC Data regarding the services and charges at issue, disputes submitted on behalf of Qwest regarding the services and charges at issue, TEOCO's analysis of KMC Data rates versus ILEC rates. | X | | 2 Hrs.[1] | .75 Hr. |

---

[1]    Mr. Canfield is listed as a "Will Call" witness on Qwest's witness list.  If he is called
in Qwest's case, then it is likely that all, or a substantial part of, the time estimated
for direct examination of Mr. Canfield in the defendants' case will be used in cross-
examination of Mr. Canfield in Qwest's case instead.

| Name | Summary of Testimony | Will | May | Direct | Cross |
|---|---|---|---|---|---|
| Doug Davis, Chief Technology Officer, HyperCube, LLC.<br><br>3200 W. Pleasant Run Rd. Suite 260 Lancaster, TX 75146 (469) 727-1517 | Mr. Davis may testify regarding KMC Data's communications network and its functionalities, interconnections with other carriers including wireless carriers and Qwest, the specific services provided by KMC Data to Qwest and the manner in which they were/are provided, KMC Data's efforts to discontinue some services to Qwest, Qwest's DAL service interruptions, modifications and disconnections and their impact, and information provided to Qwest regarding KMC Data's services to Qwest. | X | | 3 Hrs. | 1.75 Hrs. |
| Steven Hansen, Vice President, Carrier Relations, Qwest Services Corp.<br><br>1801 California Street Suite 650 Denver, CO 80295 | Mr. Hansen may testify regarding Qwest's use of KMC Data's service, Qwest's dispute of KMC Data's billing, communications with KMC Data regarding the dispute, Qwest's partial payments to KMC Data, communications with TEOCO regarding KMC Data's services and billing, Qwest's placement of HyperCube and KMC Data on credit hold, Qwest's demands for security deposits and financial statements, Qwest's modification of the DALs, Qwest's communications with HyperCube and KMC Data regarding the DALS, and Qwest's suspension and termination of services to HyperCube. | X | | 2 Hrs.[2] | 1 Hr. |
| Jon Jones, Contractor, HyperCube, LLC.<br><br>5300 Oakbrook Parkway Bldg. 300, Suite 330 Norcross, GA 30093 (678) 387-2797 | Mr. Jones may testify regarding KMC Data's general billing practices for access services provided to IXCs, special practices for billing to Qwest, billing systems used by KMC Data, billing parameters, invoices to Qwest, information and detail provided in invoices, KMC Data's call detail records for the services provided to Qwest, communications with Qwest regarding the services and billings at issue, Qwest's payments, Qwest's payment delinquencies, and amounts due KMC Data from Qwest. | X | | 2 Hrs. | 1 Hr. |

[2]   Mr. Hansen is listed as a "Will Call" witness on Qwest's witness list. If he is called in Qwest's case, then it is likely that all, or a substantial part of, the time estimated for direct examination of Mr. Hansen in the defendants' case will be used in cross-examination of Mr. Hansen in Qwest's case instead.

| Name | Summary of Testimony | Will | May | Direct | Cross |
|------|---------------------|------|-----|--------|-------|
| James Mertz, Vice President - Government Affairs, HyperCube, LLC.<br><br>5300 Oakbrook Parkway Bldg. 300, Suite 330 Norcross, GA 30093 (678) 387-2801 | Mr. Mertz may testify regarding HyperCube's relationship to KMC Data and services provided to KMC Data, HyperCube's Wholesale Services Agreement with Qwest and services thereunder, HyperCube's and KMC Data's relationships with wireless carriers, KMC Data's switched access tariffs, the access services offered and provided by KMC Data to Qwest, KMC Data's access charge billings, credits and adjustments to Qwest, Qwest's dispute of those billings, and communications with Qwest regarding the tariffs and billings. | X | | 2 Hrs. | 1.25 Hrs. |
| William M. Argall, Manager Finance, Qwest Communications Corp.<br><br>1801 California Street Suite 650 Denver, CO 80295 | Mr. Argall may testify regarding Qwest's practice of disputing access charges in connection with wireless toll-free calls, KMC Data's access charges to Qwest, Qwest's dispute of KMC Data's charges, Qwest's communications with KMC Data and HyperCube regarding the disputed billings, Qwest's relationship with TEOCO, and Qwest's discussions with and directions to TEOCO regarding KMC Data services and billings. | | X | 1 Hr. | .75 Hr. |
| Ron Beaumont, Chief Executive Officer, HyperCube, LLC<br><br>3200 W. Pleasant Run Rd. Suite 260 Lancaster, TX 75146 (469) 727-1515. | Mr. Beaumont may testify regarding HyperCube's Wholesale Services Agreement with Qwest and services thereunder, communications with Qwest regarding KMC Data's billings and services, Qwest's payment delinquencies, Qwest's partial payments to defer service suspension, Qwest's demands for security deposit and financial statements, and Qwest's communications with HyperCube and KMC Data regarding DALs. | | X | 45 Min. | .5 Hr. |
| Kelly Dennis, Operations Controller, HyperCube, LLC<br><br>3200 W. Pleasant Run Rd. Suite 260 Lancaster, TX 75146 (469) 727-1541 | Ms. Dennis may testify regarding Qwest's wholesale services billing to HyperCube and KMC Data for the direct connections over which KMC Data delivered toll-free calls to Qwest and the payment of those billings. | | X | 30 Min. | .4 Hr. |

| Name | Summary of Testimony | Will | May | Direct | Cross |
|---|---|---|---|---|---|
| John Evans, Director of Engineering, HyperCube, LLC.<br><br>5300 Oakbrook Parkway Bldg. 300, Suite 330 Norcross, GA 30093 (678) 387-2798 | Mr. Evans may testify regarding KMC Data's communications network and its functionalities, interconnections with other carriers including wireless carriers and Qwest, the specific services provided by KMC Data to Qwest and the manner in which they were/are provided, KMC Data's efforts to discontinue some services to Qwest, Qwest's DAL service interruptions, modifications and disconnections and their impact, information provided to Qwest regarding KMC Data's services to Qwest | | X | 2 Hr. | 1.25 Hrs. |
| Chris Malinowski, Senior Vice President, Marketing & Sales, HyperCube, LLC<br><br>W. Pleasant Run Rd. Suite 260 Lancaster, TX 75146 (469) 727-1530 | Mr. Malinowski may testify regarding HyperCube's and KMC Data's relationships with wireless carriers and communications with them regarding Qwest and KMC Data service interruptions and discontinuances. | | X | 45 Min. | .5 Hr. |
| James Michaud, Account Manager, Qwest Communications Corp.<br><br>1801 California Street Suite 650 Denver, CO 80295 | Mr. Michaud may testify regarding Qwest's communications with HyperCube and KMC Data about traffic traversing the DALs, Qwest's wholesale billing to HyperCube, Qwest's placement of HyperCube and KMC Data on credit hold, Qwest's demands for security deposits and financial statements, Qwest's suspension of order processing and services to HyperCube. | | X | 1 Hr. | 1 Hr. |
| Brian Murdoch, Director of Carrier Relations, HyperCube, LLC<br><br>5300 Oakbrook Parkway Bldg. 300, Suite 330 Norcross, GA 30093 (678) 387-2802 | Mr. Murdoch may testify regarding HyperCube's and KMC Data's relationships with wireless carriers, including the connections between KMC Data and the wireless carriers, KMC Data's switched access tariffs, the access services offered and provided by KMC Data to Qwest, KMC Data's access charge billings, credits and adjustments to Qwest, Qwest's dispute of those billings, communications with Qwest regarding the tariffs and billings, Qwest's suspension of service to HyperCube, and communications with Qwest regarding Qwest's order and service suspension. | | X | 1.0 Hr. | .75 Hr. |

| Name | Summary of Testimony | Will | May | Direct | Cross |
|---|---|---|---|---|---|
| Clay Myers, Chief Financial Officer, HyperCube, LLC<br><br>3200 W. Pleasant Run Rd. Suite 260 Lancaster, TX 75146 (469) 727-1520 | Mr. Myers may testify regarding HyperCube's relationship with and services to KMC Data, HyperCube's and KMC Data's general and special billing practices for access services, billings to Qwest for access services, Qwest's payments, communications with Qwest regarding the services and billings at issue, Qwest's payment delinquencies, and amounts due to KMC Data from Qwest. |  | X | 1.5 Hrs. | 1 Hr. |
| Rosaland Thomas, Contractor, Regulatory, HyperCube, LLC<br><br>5300 Oakbrook Parkway Bldg. 300, Suite 330 Norcross, GA 30093 (678) 387-2805 | Ms. Thomas may testify regarding KMC Data's switched access tariffs. |  | X | 1.0 Hr. | .75 Hr. |

Mr. Ball is HyperCube's and KMC Data's retained expert in this matter. Mr. Ball is an expert witness in the field of telecommunications. Defendants have been advised that Qwest challenges Mr. Ball's qualifications as follows: Qwest only objects to Mr. Ball's qualifications "to conduct a 'market survey' to determine whether the intrastate rates charged Qwest are within the range of rates charged by other carriers for similar functions, and to his qualifications to determine whether rates are 'appropriate.'"

HyperCube and KMC Data reserve their right to call any person identified on Qwest's witness list, to amend this Witness List and to supplement this Witness List with any witnesses necessary for authentication, admissibility, impeachment, or rebuttal.

# EXHIBIT 6

6

Judicial Caseload Profile Report                                                    Page 1 of 1

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **DELAWARE** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 1,077 | 1,190 | 1,797 | 1,362 | 2,028 | 1,004 | U.S. | Circuit |
| | Terminations | | 1,419 | 1,448 | 1,516 | 1,507 | 1,478 | 1,020 | | |
| | Pending | | 1,501 | 1,853 | 2,085 | 1,836 | 1,999 | 1,477 | | |
| | % Change in Total Filings | Over Last Year | | -9.5 | | | | | 74 | 6 |
| | | Over Earlier Years | | | -40.1 | -20.9 | -46.9 | 7.3 | 34 | 3 |
| | Number of Judgeships | | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | 1.9 | 3.1 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 270 | 298 | 449 | 340 | 507 | 251 | 82 | 5 |
| | | Civil | 233 | 264 | 414 | 306 | 462 | 233 | 73 | 5 |
| | | Criminal Felony | 30 | 28 | 29 | 25 | 38 | 18 | 88 | 5 |
| | | Supervised Release Hearings** | 7 | 6 | 6 | 9 | 7 | - | 87 | 4 |
| | Pending Cases | | 375 | 463 | 521 | 459 | 500 | 369 | 48 | 5 |
| | Weighted Filings** | | 367 | 422 | 534 | 424 | 516 | 379 | 71 | 4 |
| | Terminations | | 355 | 362 | 379 | 377 | 370 | 255 | 69 | 4 |
| | Trials Completed | | 15 | 20 | 19 | 23 | 18 | 16 | 65 | 3 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 9.3 | 9.4 | 9.1 | 8.3 | 9.8 | 8.0 | 56 | 2 |
| | | Civil** | 16.8 | 10.9 | 14.0 | 11.2 | 8.2 | 12.6 | 91 | 5 |
| | From Filing to Trial** (Civil Only) | | 26.0 | 23.5 | 26.0 | 24.0 | 22.5 | 21.0 | 49 | 3 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 142 | 156 | 65 | 66 | 99 | 77 | | |
| | | Percentage | 10.6 | 9.1 | 3.4 | 3.9 | 5.4 | 5.5 | 76 | 5 |
| | Average Number of Felony Defendants Filed Per Case | | 1.2 | 1.2 | 1.2 | 1.3 | 1.1 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 39.60 | 39.82 | 38.50 | 34.98 | 33.84 | 32.68 | | |
| | | Percent Not Selected or Challenged | 24.1 | 22.8 | 20.9 | 24.0 | 24.4 | 19.9 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 930 | 32 | 6 | 233 | 12 | 6 | 20 | 76 | 52 | 160 | 132 | 51 | 150 |
| Criminal* | 117 | - | 26 | 14 | 29 | 20 | - | 2 | 5 | 10 | 2 | - | 9 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not
\*\* See "Explanation of Selected Terms."

Judicial Caseload Profile Report                                                                  Page 1 of 1

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **COLORADO** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 3,399 | 3,305 | 3,520 | 3,418 | 3,233 | 3,092 | U.S. | Circuit |
| | Terminations | | 3,587 | 3,441 | 3,545 | 3,201 | 3,294 | 3,081 | | |
| | Pending | | 2,592 | 2,764 | 2,910 | 2,966 | 2,950 | 3,041 | | |
| | % Change in Total Filings | Over Last Year | | 2.8 | | | | | 12 | 1 |
| | | Over Earlier Years | | | -3.4 | -.6 | 5.1 | 9.9 | 30 | 4 |
| | Number of Judgeships | | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | 3.0 | 10.1 | 17.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 486 | 472 | 504 | 488 | 461 | 442 | 29 | 2 |
| | | Civil | 401 | 380 | 407 | 383 | 372 | 381 | 15 | 1 |
| | | Criminal Felony | 62 | 71 | 75 | 87 | 79 | 61 | 56 | 5 |
| | | Supervised Release Hearings** | 23 | 21 | 22 | 18 | 10 | - | 44 | 4 |
| | Pending Cases | | 370 | 395 | 416 | 424 | 421 | 434 | 50 | 3 |
| | Weighted Filings** | | 522 | 544 | 579 | 557 | 550 | 538 | 22 | 3 |
| | Terminations | | 512 | 492 | 506 | 457 | 471 | 440 | 25 | 2 |
| | Trials Completed | | 23 | 26 | 26 | 23 | 27 | 35 | 28 | 3 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 8.4 | 8.1 | 8.5 | 7.4 | 9.4 | 7.9 | 40 | 8 |
| | | Civil** | 8.8 | 8.3 | 8.7 | 9.3 | 9.9 | 10.0 | 34 | 2 |
| | From Filing to Trial** (Civil Only) | | 32.0 | 28.4 | 26.4 | 26.0 | 28.0 | 33.4 | 66 | 6 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 138 | 157 | 151 | 160 | 181 | 174 | | |
| | | Percentage | 6.6 | 6.9 | 6.2 | 6.3 | 7.4 | 6.6 | 47 | 3 |
| | Average Number of Felony Defendants Filed Per Case | | 1.3 | 1.5 | 1.5 | 1.4 | 1.4 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 40.94 | 33.26 | 36.91 | 38.89 | 31.14 | 35.53 | | |
| | | Percent Not Selected or Challenged | 43 5 | 27 4 | 37 8 | 45 6 | 35 8 | 41 9 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2809 | 173 | 61 | 891 | 68 | 31 | 112 | 385 | 196 | 158 | 413 | 5 | 316 |
| Criminal* | 425 | 1 | 44 | 145 | 82 | 65 | 37 | 10 | 8 | 12 | 7 | 3 | 11 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not
\*\* See "Explanation of Selected Terms."