## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-822-GMS |
| | ) | |
| QWEST COMMUNICATIONS | ) | **JURY TRIAL DEMANDED** |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER PROCEEDING TO COLORADO PURSUANT TO 28 U.S.C. § 1404

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
OF COUNSEL:
Hercules Plaza, 6th Floor
1313 N. Market Street
Ky E. Kirby
Wilmington, DE  19899
Jonathan S. Frankel
Tel:  (302) 984-6000
Frank Lamancusa
rhorwitz@potteranderson.com
Randall M. Levine
dmoore@potteranderson.com
BINHGAM MCCUTCHEN LLP
2020 K Street, NW
*Attorneys for Plaintiffs*
Washington, DC 20006
*HyperCube, LLC and KMC Data, LLC*
(202) 373-6000

Dated:  February 15, 2008
849011 / 32559

## **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................................... ii

I.      NATURE AND STAGE OF THE PROCEEDINGS ....................................... 1

II.     SUMMARY OF THE ARGUMENT ............................................................. 1

III.    STATEMENT OF THE FACTS .................................................................... 3

IV.     ARGUMENT .................................................................................................. 6

        A.    Applicable Legal Standard ................................................................... 6

        B.    Plaintiffs' Choice of Forum is Afforded Substantial Deference ............ 7

        C.    The Balance of the Private Interests Does Not Weigh In Favor of Transfer ......... 9

              1.    The convenience of the parties does not weigh in favor of transfer .......... 9

              2.    The convenience of the witnesses does not weigh in favor of transfer ........................................................................... 10

              3.    The location of documents does not weigh in favor of transfer .............. 11

        D.    The Balance of the Public Interests Weighs Against Transfer ............................ 12

              1.    Relative court congestion, to the extent it is given any weight, weighs against  transfer .................................................... 12

              2.    Practical considerations do not weigh in favor of transfer to Colorado ................................................................................ 13

              3.    There is no local interest in Plaintiffs' interstate charges in Colorado ................................................................................ 15

V.      CONCLUSION .............................................................................................. 16

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Affymetrix, Inc. v. Systeni, Inc.*,
28 F. Supp. 2d 192 (D. Del. 1998)..............................................................9, 11, 12

*Asten, Inc. v. Weavexx Corp.*,
C.A. No. 99-593-GMS 2000 WL 1728354 (D. Del. Feb. 11, 2000) ......................1

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
821 F. Supp. 962 (D. Del. 1993).........................................................................8, 11

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976).................................................................................................10

*De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*,
No. CIV. A. 00-2355, 2000 WL 1593978 (E.D. Pa. Oct. 25, 2000)......................14

*Jumara v. State Farm Ins. Co.*,
55 F.3d 873 (3d Cir. 1995).........................................................................................6

*Joint Stock Society "Trade House of Descendants of Peter Smirnoff" v. Walker*,
936 F. Supp. 177 (D. Del. 1996)................................................................................9

*Kirk v. Spur Distrib. Co.*,
95 F. Supp. 428 (D. Del. 1950)................................................................................14

*Kirschner Bros. Oil, Inc. v. Pannill*,
697 F. Supp. 804 (D. Del. 1988)................................................................................8

*Motorola, Inc. v. PC-Tel, Inc.*,
58 F. Supp. 2d 349 (D. Del. 1999)...........................................................................10

*Schutte v. Armco Steel, Corp.*,
431 F.2d 22 (3d Cir. 1970)......................................................................................1, 6

*Sony Elecs., Inc. v. Orion IP, LLC*,
C.A. No. 05-255-GMS, 2006 WL 680657 (D. Del. Mar. 14, 2006)......................15

*Stratos Lightwave, Inc. v. E20 Commc'ns, Inc.*,
C.A. No. 01-309-JJF, 2002 WL 500920 (D. Del. Mar. 26, 2002)...........................8

*Truth Hardware Corp. v. Ashland Prods., Inc.*,
C.A. No. 02-1541-GMS, 2003 WL 118005 (D. Del. Jan. 13, 2003)......................11

*Textron Innovations, Inc. v. The Toro Co.,*
   C.A. No. 05-486-GMS, 2005 WL 2620196 (D. Del. Oct. 14, 2005) ............................6, 8, 11

*United Indus. Corp v. Gira,*
   204 F. Supp. 410 (D. Del. 1961)............................................................................................14

## STATUTES

28 U.S.C. § 1404 ............................................................................................................... 1, 6, 16

**I.**
## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs HyperCube, LLC ("HyperCube") and KMC Data, LLC ("KMC Data")

(together "Plaintiffs") commenced this action against Defendant Qwest Communications

Corporation ("Qwest" or "Defendant") on December 17, 2007, seeking a declaratory judgment

that they have not violated the Communications Act or common law principles and seeking

payment to KMC Data for interstate access services provided to Qwest and invoiced to Qwest

since November 2005. Qwest filed its motion to transfer this case to the District of Colorado

pursuant to 28 U.S.C. § 1404 on January 22, 2008. Plaintiffs contend that Qwest has failed to

meet its substantial burden to justify transfer and, thus, hereby file their opposition to

Defendant's motion.

**II.**
## SUMMARY OF THE ARGUMENT

1.     Qwest fails to establish that this Court should transfer the present action to

Colorado pursuant 28 U.S.C. § 1404. Under the law of the Third Circuit, "a plaintiff's choice of

forum is a 'paramount' consideration that is not to be 'lightly disturbed.'"[1] The Court should not

grant a transfer unless the "balance of convenience" weighs strongly in favor of transfer.[2]

2.     Plaintiffs have a rational and legitimate reason for choosing the Delaware forum.

Qwest is incorporated in Delaware and therefore should anticipate litigating in this forum.

Qwest and its affiliates constitute a multi-billion dollar, publicly traded corporation, with

sufficient financial wherewithal to litigate in Delaware. Qwest provides telephone service to

customers all over the country, and accordingly has developed its business in anticipation of

---

[1]     *Asten, Inc. v. Weavexx Corp.*, C.A. No. 99-593-GMS, 2000 WL 1728354, at *3 (D. Del. Feb. 11, 2000) (unpublished opinion), *quoting Schutte v. Armco Steel, Corp.* 431 F.2d 22, 25 (3d Cir. 1970).

[2]     *Asten*, 2000 WL 1728354 at *3.

doing business in states other than Colorado. Under these circumstances, Plaintiffs' choice of forum is afforded substantial deference.

      3.      The balance of the private interests weighs against transfer to Colorado. Because Qwest is a substantial corporation doing business in the national market place, it must "show some sort of 'unique or unexpected" burden in order to demonstrate that Delaware is an inconvenient forum."[3] Qwest fails to show any unique or unexpected burden associated with litigating in Delaware. The convenience of witnesses does not weigh in favor of transfer, because Qwest fails to identify any witness that is actually unwilling or unable to travel to Delaware. The location of the documents also does not weigh in favor of transfer, because Qwest does not represent that any documents would be unavailable in Delaware. Furthermore, the documents in the related Colorado state court action are in electronic form, and readily available in Delaware.

      4.      The balance of the public interests also weighs against transfer. At most, the relative docket congestion of the District of Colorado and the District of Delaware are a wash, with advantages and disadvantages in each forum. Docket efficiency should be afforded little, if any weight. The practical considerations similarly do not weigh in favor of transfer. First, there is no judicial economy benefit to transferring this case to Colorado. Here there is related litigation ongoing in Colorado *state court*, not in the federal District of Colorado. Even if the Court transfers this action to the District of Colorado, the parties will still litigate in two different fora. The District of Colorado has no greater expertise or familiarity with this case than this Court, and cannot consolidate any ongoing actions with this case. Second, in a filing simultaneous with this opposition, Plaintiffs propose that a temporary stay of the present

---

[3]    *Id.*

2

proceedings *will* serve judicial economy and efficiency, by ensuring that the parties do not engage in duplicative litigation. Lastly, local considerations do not weigh heavily in the analysis, because Plaintiffs' claims concern only *interstate* charges and services which are by their nature federal interests, and Colorado has no local interest in inherently federal issues.

Because none of the above factors weigh heavily in favor of transfer, Qwest's motion to transfer the proceeding to Colorado should be denied.

## III.
## STATEMENT OF THE FACTS

KMC Data is a Delaware limited liability corporation with its principal place of business in Texas. KMC Data is in the business of, among other things, providing telecommunications service to various customers, including interexchange ("IXC") carriers (commonly referred to as long distance carriers) and commercial mobile radio service ("CMRS") carriers (commonly referred to as wireless carriers). HyperCube, LLC is a Delaware limited liability corporation, and is the parent of its wholly owned subsidiary, KMC Data, LLC. Qwest is a publicly traded Delaware corporation with its primary place of business in Denver, Colorado. Qwest is an IXC providing long distance telephone services, including toll free services, to customers throughout the United States. According to Qwest's most recent annual consolidated financial report, the consolidated operating revenue of Qwest and its affiliates in 2006 was $13.9 billion, and its total consolidated asset value was over $21 billion.[4]

Plaintiffs' claims in the present action concern only KMC Data's provision of *interstate* access services to Qwest. KMC Data is entitled to bill and to collect access and database query charges for the services it provides to Qwest when KMC Data's telecommunications network

---

[4]     Qwest Communications International, 2006 Annual Report, 26-27, www.qwest.com/about/investor/ financial/reports/index.html. Relevant pages attached hereto as Exhibit A.

and facilities are used in connection with the completion of interstate calls from wireless carriers' customers to Qwest's toll-free service customers. Since October 2005, Qwest has received, accepted, and benefited from KMC Data's interstate access and database query services in connection with wireless calls bound for Qwest's toll-free customers. Qwest accepted the calls that KMC Data delivered to it. Qwest delivered those calls to the customers to which Qwest had assigned the toll-free numbers and charged its customers for those calls.

Commencing with KMC Data's bill for services rendered during October 2005, Qwest began withholding partial payment for interstate toll-free number (or "800") database queries provided by KMC Data to Qwest in connection with wireless toll-free calls. Over time, Qwest also started withholding payment for KMC Data's interstate access services in connection with such calls, including services that are known as common trunk port, multiplexing and tandem switching. By the date that the complaint in this matter was filed, Qwest had refused to pay approximately $1.8 million in KMC Data's charges to Qwest for interstate services rendered. The amount that Qwest has failed to pay to KMC Data grows monthly as Qwest continues to receive interstate services from KMC Data and continues to withhold full or partial payment for those services.

In June of 2006, Qwest initiated litigation against the plaintiffs in Colorado state court seeking a declaration that it is not liable for, and is entitled to return of its few partial payments of, KMC Data's invoices for intrastate access services and related database queries provided to Qwest in connection with wireless toll-free calls to Qwest's customers.[5] In April 2007, Qwest was permitted to file its second amended complaint in that proceeding by which it expanded its request for declaratory relief and for refund of monies paid to include KMC Data's charges for

---

[5]     *Qwest Communications Corporation v. HyperCube, LLC, et al.*, Civil Action No. 06CV6404.

interstate access services and related database queries that KMC Data had provided to Qwest. KMC Data counterclaimed against Qwest seeking payment for both the intrastate and interstate services provided, alleging breach of intrastate and interstate tariffs, breach of implied contract, action on open account, *quantum meruit*, unjust enrichment, and declaratory judgment.

Plaintiffs concluded that the Colorado state court lacks subject matter jurisdiction over Qwest's claims directly relating to the provision of interstate service, pursuant to the Communications Act's express grant of exclusive jurisdiction under 47 U.S.C. § 207 to the federal district courts and the Federal Communications Commission. Accordingly, on December 21, 2007, Plaintiffs filed a motion to dismiss Qwest's interstate claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Colorado Rules of Civil Procedure. Plaintiffs simultaneously moved the Colorado court to grant voluntary dismissal of all interstate portions of their own counterclaims should that court conclude that Qwest's interstate claims were improperly before the state court. Plaintiffs filed that motion to keep all claims related to KMC Data's interstate services together in a single jurisdiction. Plaintiffs' motions presently are pending before the Colorado state court and ripe for decision.

KMC Data's causes of action for the recovery of unpaid fees for interstate service began to accrue in December 2005. To ensure that its claims were not time barred under the Communications Act's two year statute of limitations, Plaintiffs brought the present action for KMC Data's recovery of unpaid fees for interstate services on December 17, 2007. To preserve its interstate claims, KMC Data's claims for recovery of unpaid fees in this Court are the same as the counterclaims it has asserted in the Colorado state court and that are the subject of Plaintiffs' motion for voluntary dismissal in Colorado state court.

## IV.
## ARGUMENT

Qwest has failed to carry its burden to prove that the balance of convenience strongly favors a transfer from the instant Court to the United States District Court for the District of Colorado. Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." As demonstrated more fully below, the balance of interests favors maintaining the action in Delaware and, therefore, the Court should deny Defendant's request to transfer this proceeding.

### A.    Applicable Legal Standard

Qwest bears the burden to establish the need for a transfer.[6] As the Third Circuit stated in *Jumara v. State Farm Inc. Co.,* the plaintiff's choice of forum is the "paramount" consideration, therefore "the plaintiff's choice of venue will not be lightly disturbed."[7] The Third Circuit holds that "unless the balance of convenience strongly favors a transfer in favor of defendant, the plaintiff's choice of forum should prevail."[8] The Third Circuit provided a list of factors to assist the district courts in determining whether, on balance, the litigation would proceed more conveniently and the interests of justice would be better served by a transfer to a different forum. This inquiry requires a balancing of factors relating to private interests and a balancing of factors relating to public interests.[9] The private interests include: the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; the convenience

---

[6]    *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995).

[7]    *Id.*

[8]    *Schutte v. Armco Steel, Corp.* 431 F.2d 22, 25 (3d Cir. 1970).

[9]    *Textron Innovations, Inc. v. The Toro Co.,* C.A. No. 05-486-GMS, 2005 WL 2620196, at *1 (D. Del. Oct. 14, 2005) (unpublished opinion).

of the parties; and the location of books and records, to the extent that they could not be produced in the alternative forum.[10] The relevant public interests include: practical considerations that would make the trial easy, expeditious, or inexpensive; the relative administrative difficulty of the two fora resulting from court congestion; and the local interest in deciding local controversies at home.[11] Applying this multifactor balancing test, Qwest fails to establish a strong necessity or propriety of transferring the present action to Colorado.

**B.    Plaintiffs' Choice of Forum is Afforded Substantial Deference**

Plaintiffs' choice of forum is afforded substantial deference, even though Plaintiffs have chosen a forum that is not their "home turf." While courts will afford less deference to a plaintiff's choice of forum when the forum is not the plaintiff's "home turf," or principal place of business, "it is not appropriate to disregard a plaintiff's choice of forum where it has a rational and legitimate reason for choosing the forum."[12] Here, plaintiffs chose the Delaware forum because all parties are incorporated in Delaware, all parties are subject to personal jurisdiction in Delaware, and the Delaware forum is no more or less convenient for the majority of expected witnesses and counsel than any other forum.

Plaintiffs' reasons for choosing the Delaware forum are rational and legitimate. It is well established law that the fact that Qwest is incorporated in Delaware is a "rational and legitimate

---

[10]    *Id.* This Court held that the first three factors, plaintiff's choice of forum, defendant's preference, and whether the claim arose elsewhere, collapse into other portions of the *Jumara* analysis. Accordingly, these factors will be addressed in the context of the entire *Jumara* inquiry. *Id.* at n.1.

[11]    *See, id.*

[12]    *Id.* at *2; citing *Joint Stock Society "Trade House of Descendants of Peter Smirnoff" v. Walker*, 936 F. Supp. 177, 188-89 (D. Del. 1996).

reason" for choosing to sue Qwest in the Delaware forum.[13] "Having received the benefits of Delaware incorporation," Qwest "cannot not now complain that another corporation has chosen to sue it here."[14] Second, both the Plaintiffs and the Defendant have "facilities throughout the United States," mitigating against the effect of the "home turf" rule.[15]

Thus, notwithstanding Qwest's argument that it is not required to make a high showing of inconvenience because Plaintiffs chose a forum outside their "home turf," the Court should still transfer the action only if the "interests of justice weigh *strongly* in favor of" transfer.[16] Plaintiffs' forum preference and Qwest's Delaware incorporation, among other considerations, "weigh in favor of maintaining this action in Delaware."[17]

---

[13]    *Textron*, 2005 WL 2620196, at *2; *Stratos Lightwave, Inc. v. E20 Commc'ns, Inc.*, C.A. No. 01-309-JJF, 2002 WL 500920, at *2 (D. Del. Mar. 26, 2002) (unpublished opinion) (holding that the fact that defendant "has incorporated in Delaware is a rational and legitimate reason for choosing to sue" in Delaware); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 821 F. Supp. 962, 965 (D. Del. 1993) ("At the outset, the fact that BDVA incorporated in Delaware should not be disregarded lightly. By incorporating in Delaware, it can be assumed that BDVA desired the benefits it believed Delaware provides to chartered corporations. BDVA chose Delaware as its legal home and should not now complain that another corporation has decided to sue BDVA in Delaware.").

[14]    *Textron*, 2005 WL 2620196, at *2.

[15]    *Critikon, Inc.*, 821 F. Supp. at 965 ("The Court is persuaded that it would be inappropriate for a court to transfer an action based on a plaintiff's choice of a non-"home turf" forum, as defined in *Kirschner Bros. Oil, Inc. v. Pannill*, 697 F. Supp. 804, 806 (D. Del. 1988), where, as here, the plaintiff has substantial facilities throughout the United States.").

[16]    *Id.* (emphasis in original).

[17]    *Stratos Lightwave, Inc.* 2002 WL 500920, at *2.

C. **The Balance of the Private Interests Does Not Weigh In Favor of Transfer**

In balancing private interests, this Court considers: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the location of the records and other documents. These factors weigh against a transfer to Colorado.[18]

1. **The convenience of the parties does not weigh in favor of transfer.**

This Court has observed that "technological advances have made it more difficult for defendants to establish that litigating in Delaware is inconvenient for the parties and the witnesses."[19] This Court held that "[t]his is especially true when the defendants are substantial companies doing business in the national market place."[20] Because Qwest is a substantial corporation doing business in the national market place, it must "show some sort of 'unique or unexpected" burden in order to demonstrate that Delaware is an inconvenient forum."[21]

Qwest fails to show any unique or unexpected burden associated with litigating in Delaware. According to Qwest's consolidated financial statements, Qwest and its affiliates are a multi-billion dollar corporation with interests and activities all over the country.[22] The charges at issue in this litigation alone stem from interstate access services provided to Qwest in 24

---

[18]     While additional private interests were identified in *Jumara*, this Court has declined to give any weight to three of those "interests," because they collapse into the overall analysis: plaintiff's choice of forum, defendant's preferred forum, and whether the claim arose elsewhere. *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 197 (D. Del. 1998).

[19]     *Joint Stock Society "Trade House of Descendants of Peter Smirnoff" v. Walker*, 936 F. Supp. 177, 187 (D. Del. 1996).

[20]     *Affymetrix, Inc. v. Systeni, Inc.*, 28 F. Supp. 2d 192, 202 (D. Del. 1998) (internal citations omitted).

[21]     *Id.*

[22]     Qwest Communications International, 2006 Annual Report, 26-27, www.qwest.com/about/investor/ financial/reports/index.html.  Relevant pages attached hereto as Exhibit A.

different states.  Because Qwest's financial resources are vast, litigating in Delaware should not impose an undue financial burden on it.[23]

Qwest erroneously argues that because there is related litigation presently ongoing in Colorado state court, the United States District Court for the District of Colorado is a more convenient forum for Plaintiffs' federal claims than the District of Delaware.  Plaintiffs, in a filing simultaneous with this Opposition, propose that a temporary stay of the present proceedings will better serve the interests of efficiency and judicial economy.[24]  A stay until the Colorado state court rules on the pending motions to dismiss the interstate service-related claims before it will serve to avoid duplicative litigation over those claims.  Accordingly, this factor does not weigh in favor of transfer to Colorado.

### 2.    The convenience of the witnesses does not weigh in favor of transfer.

The convenience of the expected witnesses also weighs against transfer.  Under the *Jumara* factors, the convenience of the witnesses is only to be considered "to the extent that they may be unavailable for trial in one of the fora... ."[25]  Qwest fails to identify any witnesses that are *actually unwilling or unable* to travel to Delaware.

Qwest asserts that "Colorado is the state with the most witnesses and two of the witnesses are former employees of Qwest who must be subpoenaed if they will not appear voluntarily."[26] To the extent that the witnesses referred to by Qwest are Qwest employees, the locations of these witnesses "carry no weight in the balance of convenience analysis since each party is able,

---

[23]    *Id.*; *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 357-58 (D. Del. 1999).

[24]    Qwest also has moved to stay the present proceedings pursuant to the abstention doctrine set forth in *Colorado River* pending resolution of the related Colorado state court case. Defendant's Motion for Stay of Federal Proceedings; *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

[25]    *Motorola, Inc.*, 58 F. Supp. 2d at 357; *citing Jumara*, 55 F.3d at 879.

[26]    Defendant's Opening Brief in Support of Its Motion to Transfer Proceeding, at 8.

indeed, obligated to procure attendance of its own employees for trial."[27]  While Qwest refers to two non-party witnesses, Qwest does not represent that they are either unwilling or unable to appear in Delaware or that their testimony cannot be presented at trial by deposition.  Because both non-party witnesses are former Qwest employees, this Court "must assume that [they] would be willing to testify absent a subpoena."[28]

The majority of all other expected witnesses are scattered across the country.[29]  Delaware is no more or less convenient for the expected witnesses than Colorado or any other forum.  This Court has repeatedly held that "a flight to Delaware is not an onerous task warranting transfer."[30]  Accordingly, the convenience of the witnesses does not weigh in favor of a transfer.

### 3.    The location of documents does not weigh in favor of transfer.

Qwest contends that many of the documents and records necessary for this case are already in Colorado due to the pending related litigation.  While a court "should consider the location of books and records in its analysis," it should only do so "to the extent that the files could not be produced in the alternative forum."[31]  Furthermore, as stated in *Affymetrix*, "[t]he technological advances of recent years have significantly reduced the weight of this factor in the

---

[27]    *Affymetrix, Inc.*, 28 F. Supp. 2d at 203.

[28]    *Critikon, Inc.*, 821 F. Supp. at 967 (holding that where non party witness is retired employee of Defendant, and Defendant has not represented that witness is unwilling to testify, the court "must assume that he would be willing to testify absent a subpoena.").

[29]    As Qwest notes in its Opening Brief, only six of twenty two expected witnesses are located in Colorado.  The remaining witnesses are in Connecticut, Georgia, Kansas, Ohio, New York, Texas and Utah.  Qwest Opening Brief at Exhibit 4, ¶ 7.

[30]    *Textron Innovations, Inc.*, 2005 WL 2620196, at *2; *Truth Hardware Corp. v. Ashland Prods., Inc.*, C.A. No. 02-15410-GMS, 2003 WL 118005, at *2 (D. Del. Jan. 13, 2003).

[31]    *Id.* ("A court should consider the location of books and records in its analysis.  However it must only do so to the extent that the files could not be produced in the alternative forum.").

'balance of convenience' analysis."[32] Defendants have not represented that a single document cannot be produced in Delaware. To the contrary, all documents in the related action in Colorado already are in electronic format, and can be readily transported to Delaware.[33] To the extent that Defendant has generated exhibits to use in the Colorado proceeding that it may also wish to use in this action, Defendant does not represent that it will be unable to produce these exhibits in Delaware, or that it will be unduly arduous or expensive to transport them to Delaware.

**D.    The Balance of the Public Interests Against Transfer**

When weighing the balance of the public interest, this Court considers: (1) the relative administrative difficulty in the two fora resulting from court congestion; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; and (3) the local interest in deciding local controversies at home.

**1.    Relative court congestion, to the extent it is given any weight, weighs against transfer.**

As of September 30, 2006, the average time from filing to disposition of a civil action in Delaware was 16.8 months.[34] In the same period in 2006, the average time from filing to disposition of a civil action in Colorado was 8.8 months – a difference of 8 months.[35] The average time from filing to trial in Delaware in 2006 was 26 months.[36] The average time from

---

[32]    *Affymetrix, Inc.*, 28 F. Supp.2d at 205.

[33]    Declaration of Ky E. Booth Kirby, attached hereto as Exhibit B.

[34]    *See*, U.S. District Court- Judicial Case Load Profile (2006), www. uscourts.gov/cgi-bin/cmsd2006.pl, attached to Defendant's Opening Brief in Support of Motion to Transfer, Ex. 6, at 1-2.

[35]    *Id.*

[36]    *Id.*

filing to trial in Colorado in 2006 was 32 months – a difference of 6 months.[37]  Qwest erroneously argues that based on these figures, and because the majority of cases are resolved without trial, the Colorado court represents the more efficient forum.

Even assuming that these year and a half old figures accurately represent the two courts' current dockets, Qwest's argument fails.  At most, the relative congestion in both courts is a wash, with both courts possessing advantages and disadvantages.  In this particular case, the time from filing to trial is the more relevant period of time, for two reasons.  First, the parties have already completed discovery with regard to many of the issues in the present action in the related Colorado litigation, and so the parties will not require substantial time for additional discovery.  Second, because the parties already have litigated certain portions of the Colorado action to an advanced stage, it is evident that the parties are unlikely to resolve the present dispute by settlement.  Moreover, no party filed a motion for summary judgment relating to the interstate claims in the Colorado state court action and the dispositive motion deadline there has passed.  Accordingly, the time from filing to trial should bear more heavily on the Court's analysis, and this figure weighs against transfer to Colorado.

### 2.    Practical considerations do not weigh in favor of transfer to Colorado.

Qwest erroneously argues that practical considerations weigh in favor of transferring the case to Colorado because Colorado is the geographical location where there is ongoing related litigation.  First, transfer of this proceeding to the United States District Court for the District of Colorado will not increase the efficiency of the litigation, or serve judicial economy. Here related litigation is pending *in state court*.  Unlike a situation where the defendant seeks transfer to another federal district court where there is ongoing related litigation, here there is no prospect of

---

[37]     *Id.*

consolidating the two cases.[38] Even if this Court transfers the case to Colorado, the litigation will still proceed in two different fora- the state court and the federal district court.[39]

Furthermore, the District of Colorado has no greater expertise or familiarity with this case than this Court, and so transfer will not benefit judicial economy. There also is no practical benefit associated with maintaining electronic documents in one *state* if the parties will still have to litigate in two different *fora*. The technical effort necessary to transfer electronic documents from the state court in Denver to the federal court in Denver is no greater than the technical effort necessary to transfer electronic documents from state court in Denver to federal court in Delaware. Accordingly, there is no judicial economy or other practical benefit associated with transferring this action to the District of Colorado.

In addition, as discussed above, Plaintiffs propose that a temporary stay of the present proceeding *will* promote efficiency and judicial economy, whereas a transfer of the proceedings *will not*. If the Court grants a temporary stay of the proceedings, the parties will not litigate the claims raised here until after the Colorado state court rules on the pending motion to dismiss those same claims for lack of subject matter jurisdiction, ensuring that there will not be duplicative litigation.

---

[38]     *See, De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*, No. CIV. A. 00-2355, 2000 WL 1593978, at *2 n. 9 (E.D. Pa. Oct. 25, 2000) (rejecting defendants' motion to transfer federal case to district court in the same district as an ongoing state court litigation, because even though "there is an 'integral relationship' between the two actions … [the] California action … is pending in a state court and there is no available mechanism to consolidate these two actions upon any transfer.").

[39]     Qwest references *United Indus. Corp v. Gira*, 204 F. Supp. 410 (D. Del. 1961) and *Kirk v. Spur Distrib. Co.*, 95 F. Supp. 428 (D. Del. 1950) to support its contention that efficiency can be achieved by transferring a case to the same geographic location where there is an ongoing parallel state proceeding. Neither case stands for the proposition asserted as there were no parallel proceedings in either case. In *United Indus. Corp. v. Gira*, the court denied a motion to transfer for lack of jurisdiction and remanded the matter back to state court. *Gira*, 204 F. Supp. at 414. In *Kirk v. Spur Distrib. Co.*, there was no parallel proceeding in state court. *Kirk*, 95 F. Supp. at 429-31.

Qwest next argues that by filing in Delaware, the parties were required to retain local counsel in Delaware. Qwest argues that the Court may eliminate the expense of Delaware counsel for both parties. Qwest's argument should be afforded little if any weight in the balance of interests. Plaintiffs already have had to retain local counsel in connection with the Colorado state court litigation. Plaintiffs' expenses associated with local counsel will not be reduced by a transfer to Colorado --Plaintiffs must maintain local counsel even if these claims are litigated in Colorado. As to Qwest's retention of local counsel, as discussed above, Qwest and its affiliates constitute a multi-billion dollar, Delaware corporation that markets its services in the national market. Qwest has therefore assumed the risk that it may have to retain local counsel in Delaware. Qwest certainly has the financial ability to retain local counsel in Delaware. Accordingly, this factor does not weigh in favor of transfer.

### 3. There is no local interest in Plaintiffs' interstate charges in Colorado.

Qwest erroneously argues that Colorado has more of a local interest in deciding Plaintiffs' interstate claims. All of the charges at issue in this action arose in interstate commerce, and so did not arise in any state in particular. By their very nature, Plaintiffs' claims present uniquely federal issues. That Qwest has offices in Colorado does not weigh in favor of transfer where the access charges in question deal with service provided nationally.[40] Colorado's interest is limited to the fact that Qwest's corporate headquarters are in Colorado, but *all* parties to this case are incorporated in Delaware. Delaware has as much interest in regulating the practices of companies formed under its laws as Colorado might have in how Qwest is charged

---

[40] *See, Sony Elecs., Inc. v. Orion IP, LLC*, C.A. No. C.A. 05-255-GMS, 2006 WL 680657, at * 2 (D. Del. Mar. 14, 2006) ("By the same token, the fact that [defendant] has offices in Texas does not weigh in favor of transfer where the patents deal with technology used in internationally-accessible websites.").

for service.  Local interest therefore should be afforded little to no weight in the balance of the

interests.

## V.
## CONCLUSION

For the foregoing reasons, Defendant's Motion to Transfer Proceeding to Colorado

Pursuant to 28 U.S.C. § 1404 should be denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Ky E. Kirby
Jonathan S. Frankel
Frank Lamancusa
Randall M. Levine
BINHGAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
(202) 373-6000

Dated:  February 15, 2008
849011 / 32559

By:  /s/ David E. Moore
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19899
     Tel:  (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Plaintiffs*
*HyperCube, LLC and KMC Data, LLC*

16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on February 15, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on February 15, 2008, the attached document was Electronically Mailed to the following person(s):

Thomas C. Grimm
Benjamin J. Schladweiler
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
tgrimm@mnat.com
bschladweiler@mnat.com

Robert G. Krupka
Laura M. Burson
Helen Hong
Kirkland & Ellis LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA 90017
service-solvay@kirkland.com

By: /s/ David E. Moore
    Richard L. Horwitz
    David E. Moore
    Potter Anderson & Corroon LLP
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

799366 / 30651

# EXHIBIT A







2006 Annual Report

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
for the fiscal year ended December 31, 2006

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
for the transition period from                    to

Commission File No. 001-15577

# QWEST COMMUNICATIONS INTERNATIONAL INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **84-1339282** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1801 California Street, Denver, Colorado** | **80202** |
| (Address of principal executive offices) | (Zip Code) |

**(303) 992-1400**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock ($0.01 per share, par value) | New York Stock Exchange |
| 7½% Senior Notes due 2014—Series B (and the guarantees thereof by Qwest Services Corporation and Qwest Capital Funding, Inc.) | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check One):
Large accelerated filer ☒            Accelerated filer ☐            Non-accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

On February 1, 2007, 1,867,305,716 shares of Qwest common stock were outstanding. The aggregate market value of the Qwest voting stock held by non-affiliates as of June 30, 2006 was $6.5 billion.

## DOCUMENTS INCORPORATED BY REFERENCE:

Information required by Part III (Items 10, 11, 12, 13 and 14) is incorporated by reference to portions of Qwest's definitive proxy statement for its 2007 Annual Meeting of Stockholders, which will be filed with the Securities and Exchange Commission within 120 days of December 31, 2006.

## PART II

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES

#### Market for Qwest Common Stock

The United States market for trading in our common stock is the New York Stock Exchange. As of February 1, 2007, our common stock was held by approximately 320,000 stockholders of record. The following table sets forth the high and low sales prices per share of our common stock for the periods indicated.

|  | Market Price | |
|---|---|---|
|  | High | Low |
| **2006** | | |
| Fourth quarter | $9.03 | $7.41 |
| Third quarter | 9.22 | 7.46 |
| Second quarter | 8.09 | 6.12 |
| First quarter | 7.48 | 5.10 |
| **2005** | | |
| Fourth quarter | $5.95 | $3.92 |
| Third quarter | 4.23 | 3.58 |
| Second quarter | 3.94 | 3.30 |
| First quarter | 4.86 | 3.50 |

We did not pay any cash dividends on our common stock in 2006 or 2005. Some of our debt instruments contain restrictions on the amount of dividends we can pay. See Note 9—Borrowings to our consolidated financial statements in Item 8 of this report for more information about these restrictions. The most restrictive covenant currently is under our Credit Facility, which is currently undrawn. The Credit Facility currently allows us to pay dividends and repurchase shares up to $1.7 billion, plus any cumulative net income and net proceeds from the issuance of common stock, less any dividends paid or shares repurchased. In addition, like other companies that are incorporated in Delaware, we are also limited by Delaware law in the amount of dividends we can pay.

#### Issuer Purchases of Equity Securities

The following table contains information about repurchases of our common stock during the fourth quarter of 2006:

| Period | (a) Total Number of Shares Purchased | (b) Average Price Paid Per Share | (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | (d) Approximate Dollar Value of Shares That May Yet Be Purchased Under the Plans or Programs[1] |
|---|---|---|---|---|
| October 2006 | — | — | — | $2,000,000,000 |
| November 2006 | 26,030,874[2] | $8.03 | 26,026,600 | $1,790,983,062 |
| December 2006 | 669,416[3] | $8.37 | — | $1,790,983,062 |
| Total | 26,700,290 | | 26,026,600 | |

(1) In October 2006, our Board of Directors approved a stock repurchase program for up to $2 billion of our common stock over two years.

(2) Amount includes 4,274 shares of common stock delivered to us as payment of withholding taxes due on the vesting of restricted stock issued under our Equity Incentive Plan.

(3) Represents shares of common stock delivered to us as payment of withholding taxes due on the vesting of restricted stock issued under our Equity Incentive Plan.

26

## ITEM 6. SELECTED FINANCIAL DATA

The following selected consolidated financial data should be read in conjunction with, and are qualified by reference to, the consolidated financial statements and notes thereto in Item 8 of this report and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of this report. The comparability of the following selected financial data is significantly impacted by various changes in accounting principles and merger, acquisition and disposition activity, including:

- the adoption of Statement of Financial Accounting Standards, or SFAS, No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-An amendment of FASB Statements No. 87, 88, 106, and 132(R)," or SFAS No. 158, which was effective on December 31, 2006;

- the adoption of SFAS No. 143, "Accounting for Asset Retirement Obligations," which was effective on January 1, 2003;

- the adoption of SFAS No. 142, "Goodwill and Other Intangible Assets," which was effective January 1, 2002; and

- the disposition of our directory business in 2003 and 2002.

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| | (Dollars in millions, shares in thousands except per share amounts) | | | | |
| Operating revenue | $ 13,923 | $ 13,903 | $ 13,809 | $ 14,288 | $ 15,371 |
| Operating expenses | 12,368 | 13,048 | 14,097 | 14,542 | 34,288 |
| Income (loss) from continuing operations | 593 | (757) | (1,794) | (1,313) | (17,618) |
| Income from and gain on discontinued operations, net of taxes | — | — | — | 2,619 | 1,950 |
| Cumulative effect of changes in accounting principles, net of taxes | — | (22) | — | 206 | (22,800) |
| Net income (loss)[1] | $ 593 | $ (779) | $ (1,794) | $ 1,512 | $ (38,468) |
| Basic income (loss) per share: | | | | | |
| Income (loss) from continuing operations | $ 0.31 | $ (0.41) | $ (1.00) | $ (0.76) | $ (10.48) |
| Income (loss) per share | $ 0.31 | $ (0.42) | $ (1.00) | $ 0.87 | $ (22.87) |
| Diluted income (loss) per share: | | | | | |
| Income (loss) from continuing operations | $ 0.30 | $ (0.41) | $ (1.00) | $ (0.76) | $ (10.48) |
| Income (loss) per share | $ 0.30 | $ (0.42) | $ (1.00) | $ 0.87 | $ (22.87) |
| Weighted average shares outstanding: | | | | | |
| Basic | 1,889,857 | 1,836,374 | 1,801,405 | 1,738,766 | 1,682,056 |
| Diluted | 1,971,545 | 1,836,374 | 1,801,405 | 1,738,766 | 1,682,056 |
| Other data: | | | | | |
| Cash provided by operating activities | $ 2,789 | $ 2,313 | $ 1,848 | $ 2,175 | $ 2,388 |
| Cash used for investing activities | 1,700 | 459 | 1,905 | 2,730 | 2,738 |
| Cash used for financing activities | 694 | 2,159 | 158 | 4,856 | 789 |
| Capital expenditures | 1,632 | 1,613 | 1,731 | 2,088 | 2,764 |

| | December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| | (Dollars in millions) | | | | |
| Balance sheet data: | | | | | |
| Total assets | 21,239 | 21,497 | 24,324 | 26,343 | 29,473 |
| Total debt[2] | 14,892 | 15,480 | 17,286 | 17,508 | 22,540 |
| Total debt to total capital ratio[3] | 110.75% | 126.23% | 117.80% | 106.16% | 114.36% |

27

(1) See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations" in Item 7 of this report for a discussion of unusual items affecting the results for 2006, 2005, and 2004. Results for 2003 and 2002 were affected by the items described above and by the following items (shown net of taxes).

- 2003 net income includes a charge of $140 million ($0.08 per basic and diluted share) for an impairment of assets and a net charge of $241 million ($0.14 per basic and diluted share) resulting from the termination of services arrangements with Calpoint and another service provider.

- 2002 net loss includes charges aggregating $14.927 billion ($8.87 per basic and diluted share) for goodwill and asset impairments, a net charge of $112 million ($0.07 per basic and diluted share) for merger-related, restructuring and other charges, a charge of $1.190 billion ($0.71 per basic and diluted share) for the losses and impairment of investment in KPNQwest, and a gain of $1.122 billion ($0.67 per basic and diluted share) relating to the gain on the early retirement of debt.

(2) Total debt is the summation of current borrowings and long-term borrowings—net on our consolidated balance sheets. For total obligations, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Future Contractual Obligations" in Item 7 of this report.

(3) The total debt to total capital ratio is a measure of the amount of total debt in our capitalization. The ratio is calculated by dividing total debt by total capital. Total debt includes current borrowings and long-term borrowings—net as reflected on our consolidated balance sheets. Total capital is the sum of total debt and total stockholders' deficit.

## QWEST COMMUNICATIONS INTERNATIONAL INC.
## CONSOLIDATED STATEMENTS OF OPERATIONS

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (Dollars in millions except per share amounts, shares in thousands) | | |
| Operating revenue | $ 13,923 | $ 13,903 | $ 13,809 |
| Operating expenses: | | | |
| Cost of sales (exclusive of depreciation and amortization) | 5,607 | 5,836 | 5,890 |
| Selling, general and administrative | 3,991 | 4,147 | 4,971 |
| Depreciation | 2,381 | 2,612 | 2,626 |
| Capitalized software and other intangible assets amortization | 389 | 453 | 497 |
| Asset impairment charges | — | — | 113 |
| Total operating expenses | 12,368 | 13,048 | 14,097 |
| Other expense (income)—net: | | | |
| Interest expense—net | 1,169 | 1,483 | 1,531 |
| Loss on early retirement of debt—net | 5 | 462 | 1 |
| Gain on sale of assets | (68) | (263) | (8) |
| Other—net | (108) | (67) | (106) |
| Total other expense (income)—net | 998 | 1,615 | 1,418 |
| Income (loss) before income taxes and cumulative effect of changes in accounting principles | 557 | (760) | (1,706) |
| Income tax benefit (expense) | 36 | 3 | (88) |
| Income (loss) before cumulative effect of changes in accounting principles | 593 | (757) | (1,794) |
| Cumulative effect of changes in accounting principles, net of taxes | — | (22) | — |
| Net income (loss) | $ 593 | $ (779) | $ (1,794) |
| Basic income (loss) per share: | | | |
| Income (loss) before cumulative effect of changes in accounting principles | $ 0.31 | $ (0.41) | $ (1.00) |
| Cumulative effect of changes in accounting principles, net of taxes | — | (0.01) | — |
| Basic income (loss) per share | $ 0.31 | $ (0.42) | $ (1.00) |
| Diluted income (loss) per share: | | | |
| Income (loss) before cumulative effect of changes in accounting principles | $ 0.30 | $ (0.41) | $ (1.00) |
| Cumulative effect of changes in accounting principles, net of taxes | — | (0.01) | — |
| Diluted income (loss) per share | $ 0.30 | $ (0.42) | $ (1.00) |
| Weighted average shares outstanding: | | | |
| Basic | 1,889,857 | 1,836,374 | 1,801,405 |
| Diluted | 1,971,545 | 1,836,374 | 1,801,405 |

The accompanying notes are an integral part of these consolidated financial statements.

57

## QWEST COMMUNICATIONS INTERNATIONAL INC.
## CONSOLIDATED BALANCE SHEETS

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (Dollars in millions, shares in thousands) | |

### ASSETS

| | | |
|---|---|---|
| **Current assets:** | | |
| Cash and cash equivalents | $ 1,241 | $ 846 |
| Short-term investments | 248 | 101 |
| Accounts receivable—net of allowance of $146 and $167, respectively | 1,600 | 1,525 |
| Prepaid expenses and other current assets | 565 | 692 |
| Total current assets | 3,654 | 3,164 |
| Property, plant and equipment—net | 14,579 | 15,568 |
| Capitalized software and other intangible assets—net | 891 | 1,007 |
| Prepaid pension asset | 1,311 | 1,165 |
| Other assets | 804 | 593 |
| Total assets | $ 21,239 | $ 21,497 |

### LIABILITIES AND STOCKHOLDERS' DEFICIT

| | | |
|---|---|---|
| **Current liabilities:** | | |
| Current borrowings | $ 1,686 | $ 512 |
| Accounts payable | 997 | 1,314 |
| Accrued expenses and other current liabilities | 1,856 | 1,776 |
| Deferred revenue and advance billings | 621 | 633 |
| Total current liabilities | 5,160 | 4,235 |
| Long-term borrowings—net of unamortized debt discount of $209 and $221, respectively | 13,206 | 14,968 |
| Post-retirement and other post-employment benefit obligations | 2,366 | 3,459 |
| Deferred revenue | 506 | 522 |
| Other long-term liabilities | 1,446 | 1,530 |
| Total liabilities | 22,684 | 24,714 |
| Commitments and contingencies (Note 17) | | |
| **Stockholders' deficit—** | | |
| Preferred stock—$1.00 par value, 200 million shares authorized; none issued or outstanding | — | — |
| Common stock—$0.01 par value, 5 billion shares authorized; 1,902,642 and 1,867,422 shares issued, respectively | 19 | 19 |
| Additional paid-in capital | 43,384 | 43,290 |
| Treasury stock—1,993 and 1,062 shares, respectively (including 62 shares held in rabbi trusts at both dates) | (24) | (17) |
| Accumulated deficit | (45,907) | (46,500) |
| Accumulated other comprehensive income (loss) | 1,083 | (9) |
| Total stockholders' deficit | (1,445) | (3,217) |
| Total liabilities and stockholders' deficit | $ 21,239 | $ 21,497 |

The accompanying notes are an integral part of these consolidated financial statements.

## QWEST COMMUNICATIONS INTERNATIONAL INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (Dollars in millions) | | |
| **Operating activities:** | | | |
| Net income (loss) | $ 593 | $ (779) | $(1,794) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 2,770 | 3,065 | 3,123 |
| Provision for bad debts—net | 155 | 173 | 194 |
| Cumulative effect of changes in accounting principles—net of taxes | — | 22 | — |
| Asset impairment charges | — | — | 113 |
| Gain on sale of assets | (68) | (263) | (8) |
| Deferred income taxes | (5) | (5) | 7 |
| Loss on early retirement of debt—net | 5 | 462 | 1 |
| Other non-cash charges—net | 57 | 37 | 91 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (223) | (104) | 170 |
| Prepaid expenses and other current assets | 168 | (8) | (20) |
| Accounts payable and accrued expenses and other current liabilities | (372) | 73 | (80) |
| Deferred revenue and advance billings | (33) | (73) | (255) |
| Other non-current assets and liabilities | (258) | (287) | 306 |
| Cash provided by operating activities | 2,789 | 2,313 | 1,848 |
| **Investing activities:** | | | |
| Expenditures for property, plant and equipment and capitalized software and other intangible assets | (1,632) | (1,613) | (1,731) |
| Proceeds from sale of property and equipment | 173 | 420 | 48 |
| Proceeds from sale of investment securities | 70 | 1,793 | 1,922 |
| Purchases of investment securities | (217) | (1,086) | (2,137) |
| Acquisition of OnFiber Communications, Inc. | (107) | — | — |
| Other | 13 | 27 | (7) |
| Cash used for investing activities | (1,700) | (459) | (1,905) |
| **Financing activities:** | | | |
| Proceeds from long-term borrowings | 600 | 3,152 | 2,601 |
| Repayments of long-term borrowings, including current maturities | (1,180) | (4,716) | (2,714) |
| Proceeds from issuances of common stock | 205 | 39 | 10 |
| Repurchases of common stock | (209) | — | — |
| Early retirement of debt costs | (9) | (567) | — |
| Other | (101) | (67) | (55) |
| Cash used for financing activities | (694) | (2,159) | (158) |
| **Cash and cash equivalents:** | | | |
| Increase (decrease) in cash and cash equivalents | 395 | (305) | (215) |
| Beginning balance | 846 | 1,151 | 1,366 |
| Ending balance | $ 1,241 | $ 846 | $ 1,151 |

The accompanying notes are an integral part of these consolidated financial statements.

## QWEST COMMUNICATIONS INTERNATIONAL INC.

### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT

| | Shares of Common Stock | Common Stock and Additional Paid-in Capital | Treasury Stock at cost | Accumulated Deficit | AOCI(L)[1] | Total | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|---|
| | (Shares in thousands) | | | (Dollars in millions) | | | |
| Balance as of December 31, 2003 . . . . . . . . . . . | 1,769,896 | $42,943 | $ (15) | $(43,927) | $ (17) | $(1,016) | |
| Net loss . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (1,794) | — | (1,794) | $(1,794) |
| Other comprehensive income—net of taxes . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 17 | 17 | 17 |
| Total comprehensive loss . . . . . . . . . . . . . . | | | | | | | $(1,777) |
| Common stock issuances: | | | | | | | |
| Stock options exercised . . . . . . . . . . . | 794 | 2 | — | — | — | 2 | |
| Employee stock purchase plan . . . . . . . | 2,257 | 7 | — | — | — | 7 | |
| 401(k) plan match . . . . . . . . . . . . . . . | 7,454 | 33 | — | — | — | 33 | |
| Stock-based compensation expense . . . | — | (2) | — | — | — | (2) | |
| Extinguishment of debt . . . . . . . . . . . . | 36,354 | 144 | — | — | — | 144 | |
| Rabbi trusts treasury share disposition (issuance) . . . . . . . . . . . . . . . . . . . | 159 | (8) | 9 | — | — | 1 | |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . | (528) | 10 | (14) | — | — | (4) | |
| Balance as of December 31, 2004 . . . . . . . . . . . | 1,816,386 | 43,129 | (20) | (45,721) | — | (2,612) | |
| Net loss . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (779) | — | (779) | $ (779) |
| Other comprehensive loss—net of taxes . . . | — | — | — | — | (9) | (9) | (9) |
| Total comprehensive loss . . . . . . . . . . . . . . | | | | | | | $ (788) |
| Common stock issuances: | | | | | | | |
| Stock options exercised . . . . . . . . . . . | 8,432 | 26 | — | — | — | 26 | |
| Employee stock purchase plan . . . . . . . | 2,064 | 7 | — | — | — | 7 | |
| 401(k) plan trustee discretionary purchases . . . . . . . . . . . . . . . . . . . . | 1,084 | 5 | — | — | — | 5 | |
| Extinguishment of debt . . . . . . . . . . . . | 38,348 | 145 | — | — | — | 145 | |
| Rabbi trusts treasury share disposition (issuance) . . . . . . . . . . . . . . . . . . . | 106 | (3) | 4 | — | — | 1 | |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . | (60) | — | (1) | — | — | (1) | |
| Balance as of December 31, 2005 . . . . . . . . . . . | 1,866,360 | 43,309 | (17) | (46,500) | (9) | (3,217) | |
| Net income . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 593 | — | 593 | $ 593 |
| Other comprehensive income—net of taxes . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 9 | 9 | 9 |
| Total comprehensive income . . . . . . . . . . . | | | | | | | $ 602 |
| Initial impact upon adoption of SFAS No. 158: | | | | | | | |
| Pension—net of taxes . . . . . . . . . . . | — | — | — | — | 210 | 210 | |
| Other post-retirement obligations—net of taxes . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 873 | 873 | |
| Common stock repurchases . . . . . . . . . . . . . | (26,027) | (209) | — | — | — | (209) | |
| Common stock issuances: | | | | | | | |
| Stock options exercised . . . . . . . . . . . | 43,213 | 181 | — | — | — | 181 | |
| Employee stock purchase plan . . . . . . . | 1,543 | 10 | — | — | — | 10 | |
| 401(k) plan trustee discretionary purchases . . . . . . . . . . . . . . . . . . . . | 1,906 | 14 | — | — | — | 14 | |
| Extinguishment of debt . . . . . . . . . . . . | 8,593 | 66 | — | — | — | 66 | |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . | 5,061 | 32 | (7) | — | — | 25 | |
| Balance as of December 31, 2006 . . . . . . . . . . . | 1,900,649 | $43,403 | $ (24) | $(45,907) | $1,083 | $(1,445) | |

(1) Accumulated Other Comprehensive Income (Loss)

The accompanying notes are an integral part of these consolidated financial statements.

QWEST COMMUNICATIONS INTERNATIONAL INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the Years Ended December 31, 2006, 2005 and 2004

*Unless the context requires otherwise, references in this report to "Qwest," "we," "us," the "Company" and "our" refer to Qwest Communications International Inc. and its consolidated subsidiaries. References in this report to "QCII" refer to Qwest Communications International Inc. on an unconsolidated, stand-alone basis.*

## Note 1: Business and Background

We provide voice, data and video services. We operate most of our business within our local service area, which consists of the 14-state region of Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington and Wyoming.

## Note 2: Summary of Significant Accounting Policies

### *Basis of Presentation*

The accompanying consolidated financial statements include our accounts and the accounts of our subsidiaries over which we exercise control. All intercompany amounts and transactions with our consolidated subsidiaries have been eliminated.

### *Business Combination*

On August 31, 2006, we completed our acquisition of OnFiber Communications, Inc., a provider of custom-built and managed network solutions, for a purchase price of $107 million in cash. We continue to evaluate the purchase price allocation for this transaction relative to the determination of the fair values of certain tangible and identifiable intangible assets acquired and liabilities assumed. As of December 31, 2006, we assigned to goodwill the $21 million excess of the aggregate purchase price over the estimated fair value of net assets acquired. We expect to finalize the purchase price allocation in early 2007.

### *Use of Estimates*

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). These accounting principles require us to make certain estimates, judgments and assumptions. We believe that the estimates, judgments and assumptions made when accounting for items and matters such as, but not limited to, long-term contracts, customer retention patterns, allowance for bad debts, depreciation, amortization, asset valuations, internal labor capitalization rates, recoverability of assets, impairment assessments, employee benefits, taxes, reserves and other provisions and contingencies are reasonable, based on information available at the time they are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities as of the date of the consolidated financial statements, as well as the reported amounts of revenue and expenses during the periods presented. We also assess potential losses in relation to threatened or pending legal and tax matters. For matters not related to income taxes, if a loss is considered probable and the amount can be reasonably estimated, we recognize an expense for the estimated loss. If we have the potential to recover a portion of the estimated loss from a third party, we make a separate assessment of recoverability and reduce the estimated loss if recovery is also deemed probable. For income tax related matters, we record a liability computed at the statutory income tax rate if we determine that (i) we do not believe we are more-likely-than-not to prevail on an uncertainty related to the timing of recognition for an item, or (ii) we do not believe it is probable that we will prevail and the uncertainty is not related to the timing of recognition. However, effective January 1, 2007, our policy for accounting for income taxes changed upon adoption of FASB Interpretation ("FIN") No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"). See Note 14—Income Taxes for further discussion. Actual results could differ from these estimates. See Note 17—Commitments and Contingencies.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KMC DATA, LLC, and <br> HYPERCUBE, LLC <br>                Plaintiffs, <br><br>     v. <br><br> QWEST COMMUNICATIONS <br> CORPORATION <br>                Defendant. | )<br>)<br>)<br>)<br>)   C.A. No. 07-822-GMS<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF KY E. BOOTH KIRBY

I, Ky E. Booth Kirby, hereby declare as follows:

1. I am a partner in the law firm of Bingham McCutchen, LLP, which represents the plaintiffs, KMC Data, LLC and HyperCube LLC, in this action and in a related action that is pending as *Qwest Communications Corporation v. HyperCube, LLC, et al.*, Civil Action No. 06CV6404, in the District Court for the City and County of Denver, Colorado (the "Colorado Proceeding"). I make this Declaration in support of Plaintiffs' Answering Brief in Opposition to Defendant's Motion to Transfer Venue to the District of Colorado ("Motion to Transfer").

2. As counsel for Plaintiffs I have overseen all discovery in the Colorado Proceeding. By agreement of the parties, all documents produced during discovery in the Colorado Proceeding have been produced in an electronic format and transferred to the other party either by DVD or CD. Plaintiffs' entire document production to date consists of 16 computer discs. Qwest's entire document production to date consists of 5 computer discs. All

1

deposition transcripts have been rendered into an electronic format. All expert reports have been produced in electronic format.

3.      Discovery in the Colorado Proceeding is ongoing, and is scheduled to be completed by April 20, 2008.  In accordance with the parties' agreement, any future production in the Colorado Proceeding will also be in an electronic format.

4.      Plaintiffs' counsel maintains all evidence produced in the Colorado Proceeding in their offices in Washington, DC.

5.      All of the evidence produced in the Colorado Proceeding can be readily transmitted to Delaware by electronic means.

Dated: February 15, 2008

Ky E. Booth Kirby

*Counsel for Plaintiffs KMC Data, LLC and HyperCube, LLC.*