IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-822-GMS |
| | ) | |
| QWEST COMMUNICATIONS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO TRANSFER PROCEEDING TO COLORADO PURSUANT T O 28 U.S.C. § 1404**

OF COUNSEL:

Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, 22nd Floor
Denver, CO   80202-4437
303-223-1100

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
*Attorneys for Defendant*
*Qwest Communications Corporation*

Dated:  March 6, 2008

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ...........................................................................................................2

    I.    The Private Factors Favor Transfer. .............................................................2

        A.    Plaintiffs' Choice Of Forum Should Not Be Accorded Great Weight. ...........2

        B.    Colorado Is the Most Convenient Forum ....................................................4

               1.    The Witnesses Are Not Located in Delaware. .....................................6

               2.    The Documents Are Not Located in Delaware. ....................................7

    II.    The Public Factors Favor Transfer. ..............................................................7

        A.    Venue in the District of Colorado Would Afford a Prompter Disposition. ...........................................................................................7

        B.    The Related Proceeding Is In Colorado. ....................................................7

        C.    Colorado Has More of a Local Interest .....................................................9

CONCLUSION .....................................................................................................11

i

## TABLE OF AUTHORITIES

### CASES

Page

*Affymetrix, Inc. v. Synteni, Inc.*,
28 F. Supp. 2d 192 (D. Del. 1998)...................................................................................5

*Air Express Int'l Corp. v. Consol. Freightways, Inc.*,
586 F. Supp. 889 (D. Conn. 1984).................................................................................9

*Allergan, Inc. v. Alcon Labs., Inc.*,
2003 WL 473380 (D. Del. Feb. 25, 2003) .................................................................3, 5

*Brunswick Corp. v. Precor Inc.*,
2000 WL 1876477 (D. Del. Dec. 12, 2000)................................................................2, 8

*Funke v. Life Fin. Corp.*,
2003 WL 194204 (S.D.N.Y. Jan. 28, 2003) .................................................................4

*Iragorri v. United Tech. Corp.*,
274 F.3d 65 (2d. Cir. 2001)...........................................................................................4

*Jumara v. State Farm Ins. Co.*,
55 F.3d 873 (3d Cir. 1995)............................................................................................3

*Kirk v. Spur Distrib. Co.*,
95 F. Supp. 428 (D. Del. 1950)......................................................................................8

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*,
77 F. Supp. 2d 505 (D. Del. 1999).................................................................................6

*Nilssen v. Osram Sylvania, Inc., No. Civ. A. 00-695-JJF*,
2001 WL 34368395 (D. Del. May 1, 2001)..................................................................6

*Time Warner Cable, Inc. v. USA Video Tech. Corp.*,
520 F. Supp. 2d 579 (D. Del. 2007)..............................................................................4

*Tracy v. Consol. Rail Corp.*,
723 F. Supp. 1051 (D. Del. 1989)..................................................................................8

*U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*,
357 F. Supp. 2d 924 (E.D. Va. 2005) ...........................................................................4

*United Indus. Corp. v. Gira*,
204 F. Supp. 410 (D. Del. 1961)....................................................................................8

## PRELIMINARY STATEMENT

This is a parallel proceeding arising out of Plaintiffs' charges for the origination of interstate calls delivered to Qwest Communications Corporation ("Qwest"). Qwest requests that this Court transfer this case to the District of Colorado where a parallel state court proceeding has been pending since June of 2006. The case should be transferred because Plaintiffs have chosen to sue outside of their home state in a matter where none of the witnesses reside in Delaware, none of the documents reside in Delaware and the conduct at issue did not occur in Delaware. Indeed, of the 1.5 billion minutes of calls invoiced by Plaintiffs to Qwest for call origination, not a single interstate call billed to Qwest was originated in Delaware.

Although there is no connection between Delaware and the conduct at issue, Plaintiffs urge this Court to deny Qwest's motion because it is Plaintiffs' chosen forum. However, this is the second action filed by Plaintiffs. Long before filing this lawsuit, Plaintiffs chose not to remove a case pending in state court in Colorado and instead filed the exact same claims against Qwest that Plaintiffs bring here. As Plaintiffs acknowledge, the Colorado case is at an advanced stage and scheduled for trial on June 9, 2008. Plaintiffs' decision to file a parallel proceeding in Delaware instead of removing the state court case to the District Court of Colorado is a transparently tactical maneuver to complicate the impending state court trial. Section 1404 provides for transfers for the convenience of the parties and in the interests of justice. For the reasons set forth below, both require that this Court grant Qwest's motion and transfer this case to the District of Colorado.

## ARGUMENT

## I.    THE PRIVATE FACTORS FAVOR TRANSFER.

As set forth in Qwest's opening brief in support of its motion to transfer this proceeding to Colorado (D.I. 9) (the "Opening Brief"), the private factors weigh in favor of a transfer. Plaintiffs do not challenge Qwest's evidence that although both parties are incorporated in Delaware neither party has significant operations in Delaware, none of the conduct at issue occurred in Delaware, and none of the witnesses are located in Delaware. Opening Brf., pp. 7-8. Indeed, Plaintiffs concede that they have chosen a forum that is not their "home turf" and also concede that the only connection with Delaware is that both parties are incorporated in the state.[1] *See* Ans. Brf., pp. 7-8 (D.I. 16). Plaintiffs therefore rely heavily on the preference afforded a plaintiff's choice of forum to resist Qwest's motion to transfer this case to the District of Colorado. Although a plaintiff's choice of forum can be a significant factor, it should not be accorded significant weight here.

### A.    Plaintiffs' Choice Of Forum Should Not Be Accorded Great Weight.

This Court should not give Plaintiffs' choice of forum great weight in deciding this motion. First, Plaintiffs have filed in a jurisdiction where none of the conduct occurred. Plaintiffs argue that because both parties are incorporated in Delaware, their choice of forum is entitled to significant weight. Ans. Brf., pp. 7-8. But as this Court has held, even where both parties are incorporated in Delaware, a plaintiff's preference for Delaware is not given as much deference where the events at issue occurred outside of Delaware. *Brunswick Corp. v. Precor Inc.*, 2000 WL 1876477, at *2 (D. Del. Dec. 12, 2000), *citing Britamco Underwriters, Inc. v. Raymond E. Wallace Special Prods., Inc.*, 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999) ("[T]he

---

[1] While Plaintiffs suggest that they have facilities throughout the United States (*see* Ans. Brf., p. 8), they offer no evidence that they have a single facility or employee in Delaware. To Qwest's knowledge, they do not..

transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen...a forum where the alleged wrongful activity occurred."); *see also Allergan, Inc. v. Alcon Labs*, 2003 WL 473380, at *2 (D. Del. Feb. 25, 2003) (Ordering transfer because, *inter alia*, "[w]hile the plaintiffs and several of the defendants are Delaware entities, and should reasonably expect to litigate in the forum, there is little connection between Delaware and this action or the parties.").

In addition, as the Third Circuit held in *Jumara v. State Farm Ins. Co*, 55 F.3d 873, 880 (3d Cir. 1995), deference to a plaintiff's choice of forum is inappropriate where plaintiff has already freely contractually chosen an appropriate venue. Although there is no contractual venue selection here, Plaintiffs nevertheless freely chose to bring their claims in the Colorado proceeding long before they filed this proceeding and continue to litigate those claims in that proceeding today. Having already freely chosen to bring their claims in the Colorado proceeding, Plaintiffs' second filing in Delaware is not entitled to deference.

Finally, Plaintiffs' filing here is the product of forum shopping. Plaintiffs could have removed the Colorado proceeding to the federal court in the District of Colorado when Qwest filed an amended complaint adding the federal claims in August of 2007.[2] Plaintiffs chose not to do so and instead filed a parallel proceeding in this Court after filing and litigating the identical claims in state court to (as Plaintiffs themselves describe it) "an advanced stage." *See* Ans. Brf., p. 13 (noting that "the parties already have litigated certain portions of the Colorado action to an advanced stage.") In fact, when viewed in light of all the circumstances, it appears that Plaintiffs chose to proceed in state court first and preserve the opportunity for a second bite at the apple in

---

[2] See Ans. Brf., p. 4 ("In April 2007 [sic], Qwest was permitted to file its second amended complaint in [the Colorado] court proceeding by which it expanded its request for declaratory relief and for refund of monies paid to include KMC Data's charges for <u>inter</u>state access services and related database queries that KMC Data had provided to Qwest.")

3

federal court.  Then, as the Colorado proceeding neared completion and Plaintiffs' expert testified he could not support Plaintiffs' position with respect to the interstate access charges (see Qwest's Mot. to Stay, p. 6) (D.I. 6), Plaintiffs chose to start from scratch in a new forum.  This case is the result of those tactical maneuvers.

A plaintiff's choice of forum is not accorded weight where, as here, it is the product of forum shopping.  *Cf. Time Warner Cable, Inc. v. USA Video Tech. Corp.*, 520 F. Supp. 2d 579, 588 (D. Del. 2007) (Forum shopping is a proper basis for departing from the first-filed rule); *see also, U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*, 357 F. Supp. 2d 924, 936-37 (E.D.Va. 2005) ("[Plaintiff] has already filed related actions in three other fora…inviting an inference of forum shopping.  Thus, the presumption favoring plaintiff's chosen forum should be accorded little weight if the other factors favor transfer."); *Funke v. Life Fin. Corp.*, 2003 WL 194204, at *3 (S.D.N.Y. Jan. 28, 2003) ("[A] plaintiff's choice of forum is to be afforded … diminishing deference to the extent it was motivated by tactical advantage."); *cf. Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d. Cir. 2001) (In deciding whether a case should be transferred under the doctrine of *forum non conveniens,* "the more it appears that the plaintiff's choice of U.S. forum was motivated by forum-shopping reasons… the less deference the plaintiff's choice commands.").    As these cases demonstrate, this Court should not reward Plaintiffs' forum shopping by according Plaintiffs' choice of forum the weight that it might otherwise ordinarily deserve.

**B.    Colorado Is the Most Convenient Forum.**

Colorado is clearly the most convenient forum.  The parties are already litigating the claims at issue in Colorado, and absent a stay of the federal proceedings, the parties will have to litigate parallel actions in two jurisdictions.  It is clearly more convenient to litigate two parallel proceedings in the same city than in cities separated by more than 1500 miles.  In addition, there

4

is no dispute that proceeding in Delaware requires that each party retain local counsel that would not otherwise be needed if the case were transferred to Colorado. Although Plaintiffs argue that they already have to maintain local counsel in Colorado and they will not achieve any savings if the case is transferred to Colorado (Ans. Brf., p. 15), their argument lacks logic. Today, both parties have Delaware counsel and Colorado counsel. If the case is transferred to Colorado, it is undisputed that there will be no need for either party to retain Delaware counsel resulting in a savings for both sides.

Thus, even if the litigation of Plaintiffs' claims in Delaware might not have been sufficiently inconvenient in a vacuum, such litigation is surely inconvenient where the same claims have long been proceeding in Colorado. These unique circumstances give rise to a "unique and unexpected burden" associated with litigating this action in the Delaware forum. *Cf Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 202 (D. Del. 1998) (requiring defendant to show a "unique or unexpected burden" of the Delaware forum in the context of a motion to transfer); *Allergan, Inc*, 2003 WL 473380, at *5 (ordering transfer to district with parallel proceeding even though the plaintiffs and several defendants were incorporated in Delaware).

Acknowledging the inefficiency and waste of judicial resources Plaintiffs' filing has created, Plaintiffs respond by seeking a temporary stay of this proceeding to alleviate the problems their filing produced. Ans. Brf., p. 14. The stay, however, offers no relief. First, Plaintiffs' argument rests upon the faulty assumption that the Colorado court will grant Plaintiffs' motion to voluntarily dismiss their parallel claims in the state court without prejudice so that they can go forward here. *Id.* If (as Qwest believes will happen) the Colorado state court denies Plaintiffs' motion to voluntarily dismiss their state claims, the stay does nothing to alleviate the inefficiencies they have created. Even if the Colorado court dismisses these claims,

this case should be transferred to Colorado because the Colorado proceeding will continue with respect to the related claims concerning the intrastate charges.

### 1. The Witnesses Are Not Located in Delaware.

Plaintiffs do not identify a single witness located in Delaware. Instead, as set forth in Qwest's Opening Brief, all of the 22 witnesses identified by the parties are located outside of Delaware. Opening Brf., p. 8. Six of these 22 witnesses are in Colorado and others are located in the central or western United States, including Texas (where Plaintiffs have their principal place of business), Utah and Kansas. *Id.*, Ex. 4 (Benson Dec., ¶ 7). Of the six witnesses in Colorado, two are former employees of Qwest. *Id.*

Plaintiffs argue that this Court must assume that former employees "would be willing to testify absent a subpoena." Ans. Brf., p. 11. This is incorrect. "A party need not allege that a witness definitely will be unavailable for trial; rather, it is sufficient for purposes of venue transfer analysis if the witness is not subject to a court's subpoena power." *Nilssen v. Osram Sylvania, Inc.*, 2001 WL 34368395, at *2 (D. Del. May 1, 2001); *see also Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 77 F. Supp. 2d 505, 510 (D. Del. 1999) (the presence of three former employees in the transferee state weighs strongly in favor of transfer even though the witness declarations do not state that the witnesses will not testify in transferor state).

Here, two witnesses, Mike Argall and Terri Reddan, identified as trial witnesses in the Colorado proceeding are former employees of Qwest who currently reside in Colorado and would not be subject to the subpoena power of the Court. Opening Brf., Ex. 4 (Benson Dec., ¶ 7). Qwest does not know whether these witnesses will be willing to voluntarily appear and testify on Qwest's behalf in a proceeding in Delaware which the statistics suggest will be tried in 2010. (The Declaration of Amy L. Benson attached hereto as Ex. A, (Benson Dec., ¶3)). As set forth in the attached declaration from Ms. Reddan, testifying in Delaware would be an

6

inconvenient hardship and she does not know whether she would voluntarily agree to do so. (The Declaration of Teresa Reddan attached hereto as Ex. B (Reddan Dec., ¶ 5)). Therefore, the inability to subpoena these witnesses for trial in this venue weighs in favor of a transfer.

### 2.     The Documents Are Not Located in Delaware.

In addition, the documents are not located in Delaware. Qwest's documents are in Colorado. Opening Brf., Ex. 4 (Benson Dec., ¶ 8). Ms. Kirby's declaration attached to Plaintiffs' brief confirms that Plaintiffs' documents are in Washington, D.C. *See* Ans. Brf., Ex. B (Kirby Dec., ¶ 4). Although as Ms. Kirby states, the documents have been produced in electronic format, Qwest's paper copy of the transcripts and trial exhibit notebooks needed for trial are in Colorado. Opening Brf., Ex. 4 (Benson Dec., ¶ 8). Plaintiffs do not challenge Qwest's contention stated in its Opening Brief that Plaintiffs also have a set of these trial exhibits and transcripts in Colorado. *See* Opening Brf., p. 9.

## II.     THE PUBLIC FACTORS FAVOR TRANSFER.

### A.     Venue in the District of Colorado Would Afford a Prompter Disposition.

Plaintiffs acknowledge that the average time to disposition in Colorado is almost half of that in Delaware. Ans. Brf., p. 12. However, Plaintiffs contend that this time to disposition should be ignored because the parties are unlikely to resolve the dispute by settlement or summary judgment. *Id.* Plaintiffs cite no evidence in support of their argument and there is none. As this Court is well aware, the overwhelming majority of civil cases are disposed of without a trial through settlement and summary judgment. Plaintiffs' speculation that the case may go to trial is contrary to the overwhelming history that suggests it will not.

### B.     The Related Proceeding Is In Colorado.

As set forth in Qwest's Opening Brief, the interests of justice favor transferring a case to a jurisdiction where related matters are pending. *E.g. Tracy v. Consol. Rail Corp.*, 723 F. Supp.

1051, 1052 (D. Del. 1989); *see also Brunswick Corp.*, 2000 WL 1876477, at *3 ("Where related lawsuits exist, 'it is in the interests of justice to permit suites involving the same parties and issues to proceed before one court.'"). Plaintiffs argue otherwise, contending that because the related proceeding is in state court and there is no prospect of consolidating the cases, the pending litigation in Colorado does not weigh in favor of a transfer. Ans. Brf., pp. 13-14.

The fact that the cases cannot be consolidated is not dispositive. First, as discussed above, it is clearly more convenient for the parties to litigate parallel proceedings in the same geographic location when the alternative is litigating in courts which are more than half a continent apart. Second, Delaware courts have noted the efficiencies and convenience to be obtained by litigating cases in the same state even where consolidation is not possible. *See United Indus. Corp. v. Gira*, 204 F. Supp. 410, 1413 (D. Del. 1961) (noting cogent and sound reasons to retaining the case in Delaware in light of related proceeding in the Delaware Court of Chancery); *Kirk v. Spur Distrib. Co.*, 95 F. Supp. 428, 429 (D. Del. 1950) (noting that prior pending parallel state court proceeding affected convenience for witness and parties).

Plaintiffs argue that *United Industries* is not relevant because the court ultimately dismissed the case for lack of jurisdiction instead of transferring the case. Ans. Brf., p. 14 n. 39. But prior to dismissing the case *sua sponte* for lack of jurisdiction, the Court noted in considering Defendants' motion to transfer the case that it would be wasteful and confusing for all parties if the case was transferred to California and away from related proceedings in the Delaware Court of Chancery. *United Indus.*, 204 F. Supp. at 413. Similarly, in the earlier Kirk case, the court noted that where the pending state proceeding in the transferee state had been close to completion when "the plaintiff took a voluntary non-suit," a trial in the transferee state "could not fail to be more convenient" for the parties and the witnesses. *Kirk*, 95 F. Supp. at

8

429.  As one federal court explained in *Air Express Int'l Corp. v. Consol Freightways, Inc.*:

> "Plaintiffs cite [case law] ...for the proposition that related proceedings in the transferee forum must also be federal civil proceedings so that the option of consolidation can be exercised.  Consolidation is the ideal, but not the only, method of conserving resources of the parties and the courts.  Under the circumstances of this case, transfer is far preferable to simultaneous litigation on opposite coasts."

586 F. Supp. 889, 893 n. 4 (D. Conn. 1984).

Finally, the interests of justice support the transfer of this case to Colorado to preclude forum shopping.  Although Plaintiffs' attempt to justify their filing on the ground that the state court lacks jurisdiction over Qwest's federal claims, they concede that the state court has jurisdiction over the claims Plaintiffs' assert here.  *See* Ans. Brf., Ex. A (Mot. to Dismiss (Colorado Proceeding), p. 16 (seeking voluntary dismissal of counterclaims)); Opening Brf., Ex. 4 (Benson Dec., ¶ 4).  Qwest is confident that the state court has concurrent jurisdiction over its federal claims.  Moreover, Plaintiffs initially chose to leave the case in state court after Qwest added its federal claims.  Plaintiffs' second filing here should be viewed for what it is – an effort to forum shop and to postpone and complicate an impending trial of the same issues.

## C.    Colorado Has More of a Local Interest.

Plaintiffs argue that Colorado has no local interest because the charges at issue arose in interstate commence and the services were provided "nationally." Ans. Brf., p. 15.  Although services may have been provided in multiple states outside of Delaware, Colorado has a clear local interest in this matter.  Colorado is Qwest's home.  Plaintiffs charged Qwest for interstate calls originating in Colorado.  Plaintiffs have even commenced their own separate action in Colorado in which they sought expedited relief from the Colorado state court for conduct arising

out of the transmission of the calls at issue.[3]  With Plaintiffs twice having availed themselves of the Colorado courts, Colorado has a continuing local interest in the resolution of this controversy.

---

[3] On June 14, 2007, Plaintiffs filed a separate action arising out of Qwest's modification of certain lines over which calls at issue were sent and sought expedited relief  *See* Ex. C (Complaint) attached hereto; Ex. D (Motion for Temporary Restraining Order) attached hereto. This case was subsequently stayed pending arbitration and dismissed when the parties settled the claims. Ex. E (Order) attached hereto.

10

## CONCLUSION

For the reasons set forth herein and in Qwest's Opening Brief, Qwest requests that this

Court transfer this case to the District of Colorado pursuant to 28 U.S.C. § 1404.

OF COUNSEL:

Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, 22nd Floor
Denver, CO   80202-4437
303-223-1100

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
*Attorneys for Defendant*
*Qwest Communications Corporation*

Dated:  March 6, 2008

11

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 6, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF and caused the same to be served on the defendant at the addresses and in the manner indicated below:

## BY HAND DELIVERY

Richard L. Horwitz
Potter Anderson & Corroon, LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE   19899-0951


Jeffrey L. Moyer (#3309)

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO.: 07-822 |
| ) | |
| QWEST COMMUNICATIONS ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**DECLARATION OF AMY L. BENSON**

I, Amy L. Benson, of full age, hereby declare as follows:

1. I am a partner at Brownstein Hyatt Farber Schreck, LLP, which represents Qwest Communications Corporation ("Qwest") in this action and in a parallel proceeding that is pending as *Qwest Communications Corporation v. HyperCube, LLC, et al.*, Civil Action No. 06CV6404, in the District Court for the City and County of Denver, Colorado (the "Colorado proceeding"). I make this Declaration in support of Defendant's Motion to Transfer Venue to the District of Colorado ("Motion to Transfer") and in support of Defendant's Motion to Stay Federal Proceedings Pending Resolution of Parallel State Court Action ("Motion to Stay").

2. As set forth in my initial affidavit, two of the trial witnesses identified by the parties in the Colorado proceeding, Mike Argall and Terri Reddan, are former employees of Qwest. To my knowledge, both currently reside in Colorado.

3. Counsel for Qwest has not been able to reach Mr. Argall to discuss appearing without subpoena to voluntarily testify in Delaware.

4. On June 14, 2007, Plaintiffs filed a separate action in Colorado state court arising out of Qwest's modification of certain lines over which Plaintiffs sent calls at issue to

Qwest. A copy of this complaint is attached as Exhibit C. In connection with this action, Plaintiffs sought expedited injunctive relief. See Motion for a Temporary Restraining Order, attached as Exhibit D. This case was subsequently stayed pending arbitration and dismissed when the parties settled the claims. A copy of the dismissal is attached as Exhibit E.

I hereby declare under penalty of perjury that all of the statements made by me herein are true and correct.

Dated: March 6, 2008

_____
Amy L. Benson

5408\276·1|30414 1

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HYPERCUBE, LLC and KMC DATA, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 07-822 |
| | ) | |
| QWEST COMMUNICATIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF TERESA REDDAN IN SUPPORT OF DEFENDANT'S MOTION**
**TO TRANSFER PROCEEDING TO COLORADO PURSUANT TO 28 U.S.C. § 1404**

I, Teresa Reddan, of full age, hereby declare as follows:

1.       I am the former Manager of Finance for Qwest Communications Corporation's

("Qwest's") Facility Cost Department. I held that position from approximately March 2007 until

January 18, 2008, when I left Qwest.

2.       In my former position as the Manager of Finance for Qwest's Facility Cost

Department, I was responsible for overseeing the evaluation and auditing of invoices for

switched access services, including invoices from HyperCube for switched access services

performed by KMC Data. I am familiar with HyperCube's billings and claims for originating

access charges for wireless toll-free calls; Qwest's analysis, dispute, and payment of the billed

charges; and communications with HyperCube regarding those charges.

3.       I have been identified as a possible witness in Qwest's lawsuit against HyperCube

in Colorado state court, *Qwest Communications Corporation v. HyperCube, LLC* (Case No. 06-

CV-2404). I have been informed by Qwest's counsel that I may also be called as a witness in the

above-captioned federal case.

4.    I am a resident of Colorado. My current address is 9071 East Mississippi Avenue, #33A, Denver, Colorado 80247.

5.    I do not know whether I will be available to testify for a trial in Delaware in 2009 or 2010. I also do not know if I will be willing to appear voluntarily on Qwest's behalf for a trial in 2009 or 2010. Because I am no longer employed by Qwest and I reside in Colorado, testifying in Delaware would be significantly more difficult and a great inconvenience for me.

I hereby declare under penalty of perjury that all of the statements made by me herein are true and correct.

Teresa Reddan

Dated: March 4, 2008.

2

Exhibit C

# EXHIBIT C

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO 1437 Bannock Street Denver, Colorado 80202 | |
| HYPERCUBE, LLC and KMC DATA, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>QWEST COMMUNICATIONS CORPORATION,<br><br>Defendant. | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiffs HyperCube, LLC and KMC Data, LLC:<br><br>Richard L. Fanyo, #7238<br>David W. Furgason, #2122<br>Dufford & Brown, P.C.<br>1700 Broadway, Suite 2100<br>Denver, Colorado 80290-2101<br>Telephone: (303) 861-8013<br>Facsimile: (303) 832-3804<br>E-mail: rfanyo@duffordbrown.com<br>    dfurgason@duffordbrown.com | Case Number:<br><br>Courtroom |
| VERIFIED COMPLAINT AND JURY DEMAND | |

Plaintiffs, HyperCube, LLC ("HyperCube") and KMC Data, LLC ("KMC Data"), through undersigned counsel, state the following for their Verified Complaint against Defendant Qwest Communications Corporation ("Qwest"):

## PARTIES

1.    HyperCube is a Delaware limited liability company with its principal place of business in Texas. KMC Data is a Delaware limited liability company with its principal place of business in Texas. HyperCube and KMC Data are referred to collectively as "HyperCube."

2.    Qwest is a Delaware corporation with its primary place of business in Denver, Colorado. Qwest is an Interexchange Carrier ("IXC") providing long distance telephone services, including toll free services, to customers throughout the United States.

## JURISDICTION AND VENUE

3.      This court has jurisdiction over this action because Qwest resides in Colorado, because the Agreement at issue between HyperCube and Qwest provides for jurisdiction over the parties in Colorado and because Qwest and KMC Data transact business in Colorado.

4.      Venue is proper in this District pursuant to Colo. R. Civ. P. 98(c)

## BACKGROUND FACTS

5.      The parties are telecommunications carriers. Qwest is an IXC. HyperCube's wholly-owned subsidiary, KMC Data, is a Competitive Local Exchange Carrier ("CLEC") and among other things, offers switching and transport services between telecommunications service providers in some two dozen states nationwide. As such, HyperCube is a direct competitor of Qwest's Incumbent Local Exchange Carrier ("ILEC") affiliate, Qwest Corporation ("QC").

6.      One type of call delivered by HyperCube to IXCs such as Qwest is an 800 or "8XX" call. These are numbers that begin with a three-digit code such as "800," "888," "877" or the like. 8XX calls are distinguished from so-called regular long distance calls (numbers that begin with three-digit codes other than "800" or the like) in that the called party, rather than the caller, pays the toll charges associated with the call. The provider of the 8XX number (typically, an IXC like Qwest) charges its own end user customer to whom it assigns the 8XX number.

7.      When a wireless caller dials an 8XX number, the wireless carrier must connect the call to the Public Switched Telephone Network ("PSTN") to enable the call to connect to the owner of the 8XX number. The wireless carrier can access the PSTN by delivering the call either to a CLEC such as HyperCube or to an ILEC such as Qwest's affiliate QC.

8.      In many cases, HyperCube has entered into contracts with wireless carriers to transmit their 8XX calls to HyperCube rather than to its competitor QC. HyperCube also has agreements with other entities, including CLECs, to deliver to Qwest 8XX calls that are destined to Qwest 8XX customers.

9.      Qwest has challenged HyperCube's charges to Qwest for delivery of calls destined to Qwest's 8XX customers in the action styled *Qwest Communication Corp. v. HyperCube, LLC and KMC Data, LLC*, Case No. 06-cv-6404 (the "6404 Case"), currently pending in this Court. Qwest has refused to pay the bulk of HyperCube's invoices for access services provided in connection with 8XX calls from wireless carriers' customers, resulting in HyperCube considering whether to stop delivering these calls to Qwest altogether. In response, Qwest moved for a temporary restraining order, arguing *inter alia* that HyperCube's non-delivery (what Qwest described as "blocking") of wireless 8XX calls directed to Qwest's 8XX numbers amounted to "real, immediate and irreparable injury." *See* Motion for TRO and/or Preliminary Injunction, Case No. 2006cv6404 (filed June 13, 2006) ("Qwest TRO"), at 2; Brief

in Support of Motion for TRO and/or Preliminary Injunction, Case No. 20006cv6404 (filed June 13, 2006) ("Qwest TRO Br."), at 15-17

10.     HyperCube delivers these 8XX calls from wireless callers to Qwest's 8XX customers (and the 8XX customers of other IXCs) in this way:  The call is handed off from the wireless carrier's Mobile Telecommunications Switching Office ("MTSO") to a HyperCube facility, or trunk, which connects the wireless carrier's MTSO to the HyperCube Class 4/5 switch (a particular kind of telecommunications computer).  *See* Answer and Counterclaim of HyperCube, LLC and KMC Data, LLC, Case No. 2006cv6404 (filed Oct. 31, 2006) ("HyperCube Counterclaim"), at ¶ 9.  Non-wireless 8XX calls are delivered to HyperCube's Class 4/5 switch as well.  The HyperCube Class 4/5 switch functions as a tandem switch.

11.     While an 8XX call is in the switch, HyperCube performs switching and routing functions and additional services, such as running a query of the national 8XX telephone number database to determine where the call should be routed.  In the case of 8XX calls to Qwest's customers, HyperCube's switch routes the call directly to Qwest via dedicated connections between HyperCube's network and Qwest's switch.  HyperCube Counterclaim ¶ 10.  HyperCube pays for these direct connections and charges Qwest for the access and database query services it provides to Qwest in connection with 8XX calls. *Id.*

12.     After an 8XX call is identified as belonging to a Qwest end user and HyperCube delivers the call to Qwest via direct connections, Qwest services must be provided in order for the call to be delivered to its final destination - a Qwest end user 8XX customer.

13.     The contract by which HyperCube purchases services for use in terminating traffic to Qwest is a Qwest Wholesale Services Agreement ("WSA"), a copy of which is attached to this Verified Complaint as Exhibit A.  The individual services that HyperCube purchases from Qwest are described in "service exhibits" appended to that WSA.  HyperCube purchases from Qwest the right to use services, referred to as Direct Access Lines or "Carrier DAL" ("DAL"), to terminate traffic to Qwest, including 8XX traffic, pursuant to Service Exhibit L1.  A separate service exhibit—Service Exhibit M1—governs Qwest's origination of 8XX traffic to others using the same DAL facilities.  Copies of Service Exhibits L1 and M1 are included within the WSA at attached Exhibit A.  At all times relevant to this complaint, Qwest has known that KMC Data delivers 8XX calls to Qwest over the DALs and Qwest has claimed in the 6404 case that it has a right to receive those calls from KMC Data.

14.     By letter dated June 7, 2007, Qwest notified HyperCube that Qwest believed HyperCube to be using the DALs in a manner proscribed by the WSA.  Specifically, Qwest alleged that HyperCube was using the DALs to *originate* calls, when the WSA provided that HyperCube was permitted to use the DALs only for *terminating* calls to Qwest.  *See* Letter from Steven Hansen to Ron Beaumont, June 7, 2007, attached to the Verified Complaint as Exhibit B (the "Hansen Letter").  The Hansen Letter advised that Qwest was undertaking "modification" of the DAL service "to conform to the terms of the WSA," *id.*, but did not provide any explanation of what "modification" meant.

15.    Yesterday afternoon (June 13, 2007), without notice to HyperCube, Qwest took the extraordinary step of "blocking" the overwhelming majority of the 8XX traffic that HyperCube delivers to Qwest and which is terminated by Qwest using the DALs purchased by HyperCube. On inquiry, HyperCube's counsel was advised by Qwest's counsel that this blocking was being performed by Qwest pursuant to Mr. Hansen's June 7, 2007 letter. Qwest's letter does not mention "blocking" but alludes only to some undescribed "modification." Qwest's allegation in the June 7, 2007 letter that HyperCube was using the DALS "for the origination of voice calls" in violation of the WSA is wrong. HyperCube uses its own facilities in connection with the origination of 8XX traffic that is delivered to Qwest and uses the DAL services provided by Qwest so that Qwest may terminate such wireless 8XX traffic. Moreover, Qwest has itself alleged that the 8XX traffic at issue in the 6404 Case—which is the same 8XX traffic at issue here—is "not originated by HyperCube" at all. Qwest TRO ¶ 3. Qwest can not have it both ways - that is, it cannot block 8XX calls from HyperCube on the alleged ground that HyperCube is using the DALS to originate voice calls in violation of the WSA, but also assert in the 6404 Case that HyperCube does not originate the very same traffic.

16.    Because HyperCube's delivery of 8XX traffic for termination to Qwest did not use the DALs "in a manner proscribed by the WSA," Qwest's unilateral decision to block this traffic is wrongful and violates the parties' agreement.

## ARBITRATION OF DISPUTES

17.    Section 21 of the WSA requires that any disputes arising out of, or relating to, the WSA be settled by arbitration in Denver, Colorado. See Exhibit A, section 21.1. Because HyperCube's injuries from Qwest's breach of the WSA are immediate and irreparable, HyperCube is unable to obtain relief in a timely fashion from an arbitrator and thus requests injunctive relief from this court to enjoin Qwest's wrongful behavior until such time as an arbitrator is appointed and can address HyperCube's claims for relief.

## IRREPARABLE INJURY

18.    HyperCube's injury resulting from this breach is real, immediate and irreparable because the impact of Qwest's breach is that millions of telephone calls currently are wrongfully blocked and cannot reach their intended recipient.

19.    HyperCube delivers approximately tens of millions of minutes of calls to Qwest on a monthly basis. See Qwest TRO Br. at 15 (HyperCube transmitted approximately 80 million minutes of calls to Qwest in April 2007). That translates to approximately over 2.6 million minutes of 8XX call traffic *per day.*

20.    The DALs provided by Qwest under the WSA are presently the only sufficient means by which HyperCube can achieve delivery to Qwest of 8XX calls destined to Qwest's toll-free customers. Alternative means can not immediately be established, but require the procurement by HyperCube of connections and facilities to carriers other than Qwest -- none of which can occur in a short time frame. As a consequence, because of Qwest's intentional

blocking of the 8XX calls, callers are receiving busies when they dial the 8XX telephone numbers or are receiving "call failed" or "network failed" messages on their cell phone screens.

21. Qwest's wrongful and intentional blocking of the 8XX calls is an injury not just to HyperCube, which is suffering loss of goodwill with its customers and the public as well as damage to market position, but also to the individual callers who are unable to complete 8XX calls on their phones and to the agencies, organizations and businesses with 8XX numbers who will not receive those calls. The 8XX calls Qwest is blocking include calls to emergency agencies and organizations such as the California Highway Patrol, Battered Women's Shelters and other public service agencies that subscribe to 800 service for end users to reach them.

22. Qwest's breach also "threaten[s] to compromise the ubiquity and seamlessness of the nation's telecommunications network and could result in consumer confusion." Qwest TRO Br. at 16. These are the precise considerations that Qwest previously argued amounted to "real, immediate and irreparable injury." *Id.* at 15.

23. There is no adequate remedy at law for Qwest's breach, because money damages cannot recompense the damages to HyperCube's reputation from its inability to deliver 8XX calls due to Qwest's disruption of the connection between individual callers' phones and the called parties that they're trying to reach. At present, HyperCube and its wireless carrier customers are being flooded with calls regarding the failure of 8XX calls to complete.

24. Having deposed HyperCube in Case 6404 on this subject on June 5, 2007, at the time of the blocking, Qwest had full knowledge that HyperCube's alternative facilities for delivering 8XX calls do not have anywhere near the capacity required to carry 8XX calls to Qwest. As a consequence, Qwest knew, and intended, that vast numbers of 8XX calls would not complete and would raise alarms with callers and with wireless and other carriers. Qwest's intentional blocking appears maliciously designed to cause HyperCube's carrier customers to terminate their relationship with HyperCube and seek services elsewhere -- such as from Qwest's affiliate, QC. With every minute that Qwest's breach of the WSA perpetuates, millions of minutes of 8XX traffic are being blocked. All of these callers are finding it impossible to connect to the 8XX telephone numbers that they dial on their phones.

25. No matter the amount, money damages obtained in the future cannot remedy the immediate harm that Qwest's blocking is inflicting on HyperCube, its carrier customers and the public.

## COUNT ONE
### (Willful Breach of WSA)

26. Plaintiffs re-alleges and incorporates the allegations of Paragraphs 1 through 25 above.

27. As alleged herein, Qwest provides services to HyperCube pursuant to the WSA, including termination services which use DALs.

28.    At all times pertinent hereto, HyperCube has fulfilled its obligations under the WSA and acted in accordance with the WSA.

29.    Qwest has breached its obligation under the WSA to provide those termination services by modifying the DAL services in such a way that the vast majority of HyperCube's 8XX calls are being blocked by Qwest and, as a consequence, HyperCube is unable to deliver such calls on behalf of its customers.

30.    Qwest's breach of the WSA appears willful and maliciously designed to harm HyperCube's reputation, it relationships with its customers and its goodwill with the public generally.

### REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PENDING ARBITRATION RESOLUTION

31.    Plaintiffs re-allege and incorporate the allegations of Paragraphs 1 through 30 above.

32.    HyperCube's claims have a reasonable probability of success on the merits.

33.    There is no plain, speedy and adequate remedy at law to prevent the risk of immediate and irreparable harm to HyperCube. HyperCube cannot prevent the risk of immediate and irreparable harm by filing a demand for arbitration under the WSA.

34.    The granting of a temporary restraining order and a preliminary injunction will not disserve the public interest. The blocking of calls by Qwest is not in the public interest because it prevents customers from making calls to 8XX end users and prevents 8XX end users from receiving those calls.

35.    The balance of equities in this case favors the granting of a temporary restraining order and then a preliminary injunction.

36.    Injunctive relief will help to restore the status quo for those calls that Qwest is already blocking and maintain the status quo for those calls that Qwest has threatened to block but has not yet started blocking.

37.    HyperCube has suffered and continues to suffer damages as a result of Qwest's breach of the WSA.

## PRAYER FOR RELIEF

WHEREFORE, HyperCube requests that this Court:

(a)     Enter a temporary restraining order restraining Qwest from blocking or otherwise interfering with HyperCube's delivery of 8XX calls to Qwest's network for termination to Qwest 8XX numbers pending a hearing on an Order to Show Cause or until further Order of this Court;

(b)     Enter an order compelling Qwest to take all actions necessary to , reestablish the network connections and functionality in use by HyperCube prior to Qwest's blocking;

(c)     Enter an order directing Qwest to appear before the Court within ten days to show cause, if there be any, why the Temporary Restraining Order should not be converted to a Preliminary Injunction;

(d)     Enter an order staying this matter after the preliminary injunction hearing and determination pending arbitration among the parties pursuant to section 21.1 of the Wholesale Services Agreement.

(e)     Any other relief that this Court deems just and proper.

## JURY DEMAND

In the event this court does not compel arbitration, HyperCube requests a trial by jury on all issues so triable.

State of Georgia       )
                       )    ss:
County of Gwinnett     )

 I. Doug Davis, am the Chief Technology Office of Plaintiff HyperCube, LLC and, in that capacity. provide technology services to KMC Data, LLC.  I am familiar with the factual allegations made in this Verified Complaint and they are true and correct to the best of my knowledge and belief.

Doug Davis

Subscribed and sworn to before me by Doug Davis. this 14th day of June. 2007.

Notary Public in and for the State of Georgia

Notary Public, Gwinnett County, GA
My Commission Expires July 14, 2009

DATED: June 14, 2007

DUFFORD & BROWN, P.C.

_Daniel W. Furgason_
Richard Fanyo, #7238
David W. Furgason, #2122
1700 Broadway, Suite 2100
Denver, Colorado 80290
Tel. No. (303) 861-8013
Fax No. (303) 832-3804
E-mail: rfanyo@duffordbrown.com
         dfurgason@duffordbrown.com

Ky E. Kirby*
Jonathan S. Frankel*
Jason R. Scherr*
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 373-6000

ATTORNEYS FOR PLAINTIFFS

*Motions for Pro Hac Vice Admission Pending

# EXHIBIT D

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | |
| HYPERCUBE, LLC and KMC DATA, LLC<br><br>Plaintiffs,<br><br>v.<br><br>QWEST COMMUNICATIONS CORPORATION<br><br>Defendant. | ▲ **COURT USE ONLY** ▲ |
| Attorneys for Plaintiffs HyperCube, LLC and KMC Data, LLC:<br><br>Richard L. Fanyo, #7238<br>David W. Furgason, #2122<br>Dufford & Brown, P.C.<br>1700 Broadway, Suite 2100<br>Denver, Colorado 80290-2101<br>Telephone: (303) 861-8013<br>Facsimile: (303) 832-3804<br>E-mail: rfanyo@duffordbrown.com<br>    dfurgason@duffordbrown.com | Case Number:<br><br>Courtroom |

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

HyperCube, LLC ("HyperCube") and KMC Data, LLC ("KMC Data"), through undersigned counsel, hereby move the Court pursuant to C.R.C.P. 65(b) for entry of a Temporary Restraining Order in the form attached hereto, and a preliminary injunction prohibiting Defendant Qwest Communications Corp. ("Qwest") from blocking calls delivered to Qwest by KMC Data that are destined to Qwest's 8XX customers, and in support thereof state as follows:

1.    Qwest is an interexchange carrier ("IXC"). KMC Data is a wholly-owned subsidiary of HyperCube, and is a Competitive Local Exchange Carrier ("CLEC"), which offers switching and transport services between telecommunications service providers in some two dozen states nationwide. HyperCube and KMC Data are referred to collectively as "HyperCube." As a CLEC, HyperCube is a direct competitor of Qwest's incumbent local exchange carrier ("ILEC") affiliate, Qwest Corporation ("QC").

2.    One type of call delivered by HyperCube to IXCs such as Qwest is a toll-free or "8XX" call. These are calls to telephone numbers that begin with a three-digit code such as "888," "877" or the like. 8XX calls are distinguished from regular long-distance calls (numbers

that begin with three-digit codes other than "800" or the like) in that the called party, rather than the caller, pays the toll charges associated with the call. The provider of the 8XX number (typically, an IXC like Qwest) charges its own end user customer to whom it assigns the 8XX number. Verified Complaint ("Verif. Compl.") ¶ 6.

3. When a wireless caller dials an 8XX number, the wireless carrier must connect the call to the Public Switched Telephone Network ("PSTN") to enable the call to connect to the owner of the 8XX number. The wireless carrier can access the PSTN by delivering the call either to a CLEC such as HyperCube (through KMC Data) or to an ILEC such as Qwest's affiliate QC. Verif. Compl. ¶ 7.

4. In many cases, HyperCube has entered into contracts with wireless carriers to transmit their 8XX calls to HyperCube rather than to its competitor QC. HyperCube also has arrangements to carry non-wireless 8XX traffic from other entities as well. Verif. Compl. ¶ 8.

5. Qwest has challenged HyperCube's charges to Qwest for delivery of calls destined to Qwest's 8XX customers in the action styled *Qwest Communication Corp. v. HyperCube, LLC and KMC Data, LLC,* Case No. 06-cv-6404 (the "6404 Case"), currently pending in this Court. Qwest has refused to pay the bulk of HyperCube's invoices for access services provided in connection with 8XX calls from wireless carriers' customers, resulting in HyperCube considering whether to stop delivering these calls to Qwest altogether. In response, Qwest moved for a temporary restraining order, arguing *inter alia* that HyperCube's non-delivery (what Qwest described as "blocking") of wireless 8XX calls directed to Qwest's 8XX numbers amounted to "real, immediate and irreparable injury." *See* Motion for TRO and/or Preliminary Injunction, Case No. 2006cv6404 (filed June 13, 2006) ("Qwest TRO"), at 2; Brief in Support of Motion for TRO and/or Preliminary Injunction, Case No. 20006cv6404 (filed June 13, 2006) ("Qwest TRO Br."), at 15-17.

6. HyperCube delivers 8XX calls from wireless callers to Qwest's 8XX customers (and the 8XX customers of other IXCs) in this way: The call is handed off from the wireless carrier's Mobile Telecommunications Switching Office ("MTSO") to a HyperCube facility, or trunk, which connects the wireless carrier's MTSO to the HyperCube Class 4/5 switch (a particular kind of telecommunications computer). *See* Answer and Counterclaim of HyperCube, LLC and KMC Data, LLC, Case No. 2006cv6404 (filed Oct. 31, 2006) ("HyperCube Counterclaim"), at ¶ 9. Non-wireless 8XX calls to Qwest's 8XX customers are delivered to HyperCube's Class 4/5 switch as well. The HyperCube Class 4/5 switch functions as a tandem switch.

7. While an 8XX call is in the switch, HyperCube performs switching and routing functions and additional services, such as running a query of the national 8XX telephone number database to determine where the call should be routed. In the case of 8XX calls to Qwest's customers, HyperCube's switch routes the call directly to Qwest via dedicated connections between HyperCube's network and Qwest's switch. HyperCube Counterclaim ¶ 10. HyperCube pays for these direct connections and charges Qwest for the access and database query services it provides to Qwest in connection with 8XX calls. *Id.*

8.    After an 8XX call is identified as belonging to a Qwest end user and HyperCube delivers the call to Qwest via direct connections, Qwest services must be provided in order for the call to be delivered to its final destination—a Qwest end user 8XX customer. Verif. Compl. ¶ 12.

9.    The contract by which HyperCube purchases services for use in terminating traffic to Qwest is a Qwest Wholesale Services Agreement ("WSA"), a copy of which is attached to the Verified Complaint as Exhibit A. The individual services that HyperCube purchases from Qwest are described in "service exhibits" appended to that WSA. HyperCube purchases from Qwest the right to use services, referred to as Direct Access Lines or "Carrier DAL" ("DAL"), to terminate traffic to Qwest, including 8XX traffic, pursuant to Service Exhibit L1. A separate service exhibit—Service Exhibit M1—governs Qwest's origination of 8XX traffic to others using the same DAL facilities. Copies of Service Exhibits L1 and M1 are included within the WSA at Exhibit A to the Verified Complaint. At all times relevant to this dispute, Qwest has known that KMC Data delivers 8XX calls to Qwest over the DALs and Qwest has claimed in the 6404 case that it has a right to receive those calls from KMC Data. Verif. Compl. ¶ 13.

10.    By letter dated June 7, 2007, Qwest notified HyperCube that Qwest believed HyperCube to be using the DALs in a manner proscribed by the WSA. Specifically, Qwest alleged that HyperCube was using the DALs to *originate* calls, when the WSA provided that HyperCube was permitted to use the DALs only for *terminating* calls to Qwest. *See* Letter from Steven Hansen to Ron Beaumont, June 7, 2007, attached to the Verified Complaint as Exhibit B (the "Hansen Letter"). The Hansen Letter advised that Qwest was undertaking "modification" of the DAL service "to conform to the terms of the WSA," *id.*, but did not provide any explanation of what "modification" meant. Verif. Compl. ¶ 14.

11.    Yesterday afternoon, without notice to HyperCube, Qwest took the extraordinary step of "blocking" the overwhelming majority of the 8XX traffic that HyperCube delivers to Qwest using the DALs purchased by HyperCube. On inquiry, HyperCube's counsel was advised by Qwest's counsel that this blocking was being performed by Qwest pursuant to Mr. Hansen's June 7, 2007 letter. Qwest's letter does not mention "blocking" but alludes only to some undescribed "modification." Qwest's allegation in the June 7, 2007 letter that HyperCube was using the DALs "for the origination of voice calls" in violation of the WSA is wrong. HyperCube uses its own facilities in connection with the origination of wireless 8XX traffic that is delivered to Qwest and uses the DAL services provided by Qwest so that Qwest may terminate such wireless 8XX traffic. Moreover, Qwest has itself alleged that the 8XX traffic at issue in the 6404 Case—which is the same 8XX traffic at issue here—is "not originated by HyperCube" at all. Qwest TRO ¶ 3. Qwest cannot have it both ways; that is, it cannot block 8XX calls from HyperCube on the alleged ground that HyperCube is using the DALs to originate voice calls in violation of the WSA, but also assert in the 6404 Case that HyperCube does not originate the very same traffic. Verif. Compl. ¶ 15.

12.    Because HyperCube's delivery of wireless 8XX traffic for termination to Qwest did not use the DALs "in a manner proscribed by the WSA," Qwest's unilateral decision to block this traffic is wrongful and violates the parties' agreement.

13.     Although the WSA contains an arbitration clause for disputes arising out of its breach, injunctive relief is warranted here because HyperCube's injuries from Qwest's breach of the WSA are immediate and irreparable. *See* Verif. Compl. ¶ 17.

14.     HyperCube's injury resulting from this breach is real, immediate and irreparable because the impact of Qwest's breach is that millions of telephone calls currently are wrongfully blocked and cannot reach their intended recipient.

15.     HyperCube delivers approximately tens of millions of minutes of 8XX calls to Qwest on a monthly basis. *See* Qwest TRO Br. at 15; accord Verif. Compl. ¶ 19. HyperCube transmitted approximately 80 million minutes of 8XX calls to Qwest in April 2007 alone. That translates to approximately over 2.6 million minutes of 8XX call traffic *per day. Id.*

16.     The DALs provided by Qwest under the WSA are presently the only sufficient means by which HyperCube can achieve delivery to Qwest of 8XX calls destined to Qwest's toll-free customers. Alternative means can not immediately be established, but require the procurement by HyperCube of connections and facilities to carriers other than Qwest—none of which can occur in a short time frame. As a consequence, because of Qwest's intentional blocking of the 8XX calls, wireless callers are receiving "busy" signals when they dial the 8XX telephone numbers or are receiving "call failed" or "network failed" messages on their cell phone screens.

17.     Qwest's wrongful and intentional blocking of the 8XX calls is an injury not just to HyperCube, which is suffering loss of goodwill with its customers and the public as well as damage to market position, but also to the individual callers who are unable to complete 8XX calls on their wireless phones and to the agencies, organizations and businesses with 8XX numbers who will not receive those calls. The 8XX calls Qwest is blocking include calls to emergency agencies and organizations such as the California Highway Patrol, Battered Women's Shelters and other public service agencies that subscribe to 800 service for end users to reach them. Verif. Compl. ¶ 21.

18.     Qwest's breach also "threaten[s] to compromise the ubiquity and seamlessness of the nation's telecommunications network and could result in consumer confusion." Qwest TRO Br. at 16. These are the precise considerations that Qwest previously argued amounted to "real, immediate and irreparable injury." *Id.* at 15.

19.     There is no adequate remedy at law for Qwest's breach, because money damages cannot recompense the damages to HyperCube's reputation from its inability to deliver 8XX calls due to Qwest's disruption of the connection between individual callers' phones and the called parties that they're trying to reach. At present, HyperCube and its wireless carrier customers are being flooded with calls regarding the failure of 8XX calls to complete. Verif. Compl. ¶ 23.

20.     Having deposed HyperCube in Case 6404 on this subject on June 5, 2007, at the time of the blocking, Qwest had full knowledge that HyperCube's alternative facilities for delivering 8XX calls do not have anywhere near the capacity required to carry 8XX calls to Qwest. As a consequence, Qwest knew, and intended, that vast numbers of 8XX calls would not

complete and would raise alarms with wireless customers, wireless carriers, and other entities. Qwest's intentional blocking appears maliciously designed to cause HyperCube's wireless carrier customers to terminate their relationship with HyperCube and seek services elsewhere -- such as from Qwest's affiliate, QC. With every minute that Qwest's breach of the WSA perpetuates, millions of minutes of 8XX traffic are being blocked. All of these callers are finding it impossible to connect to the 8XX telephone numbers that they dial on their phones. Verif. Compl. ¶ 24.

21.    No matter the amount, money damages obtained in the future cannot remedy the immediate harm that Qwest's blocking is inflicting on HyperCube, its wireless carrier customers and the public.

WHEREFORE, HyperCube and KMC Data request that this Court:

(a)    Enter a temporary restraining order restraining Qwest from blocking or otherwise interfering with HyperCube's delivery of 8XX calls to Qwest's network for termination to Qwest 8XX numbers pending a hearing on an Order to Show Cause why a preliminary injunction should not issue or until further Order of this Court;

(b)    Enter an order compelling Qwest to take all actions necessary to reestablish the network connections and functionality that permitted delivery by HyperCube of Qwest 8XX calls prior to Qwest's blocking;

(c)    Enter an order directing Qwest to appear before the Court within ten days to show cause, if there be any, why the Temporary Restraining Order should not be converted to a Preliminary Injunction;

(d)    Enter an order staying this matter after the preliminary injunction hearing and determination pending arbitration among the parties pursuant to section 21.1 of the Wholesale Services Agreement.

(e)    Any other relief that this Court deems just and proper.

DATED:    June 14, 2007.

DUFFORD & BROWN, P.C.

*David W. Furgason*

Richard Fanyo, #7238
David W. Furgason, #2122
Dufford & Brown, P.C.
1700 Broadway, Suite 2100
Denver, Colorado 80290
Tel. No. (303) 861-8013
Fax No. (303) 832-3804
E-mail: rfanyo@duffordbrown.com
        dfurgason@duffordbrown.com

Ky E. Kirby*
Jonathan S. Frankel*
Jason R. Scherr*
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 373-6000

**ATTORNEYS FOR HYPERCUBE, LLC AND
KMC DATA, LLC**

**\*Pro Hac Vice Admission Pending**

**Plaintiffs' Address:**
3200 W. Pleasant Run Road, Suite 260
Lancaster, TX 75146

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of June, 2007, a true and correct copy of the foregoing **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was served hand delivery upon the following:

Timothy R. Beyer
Amy L. Benson
Lauren E. Schmidt
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, 22nd Floor
Denver, Colorado 80202-4437
tbeyer@bhf-law.com
abenson@bhf-law.com
lschmidt@bhf-law.com

Carol A. Larsen Cook

# EXHIBIT E

GRANTED    Movant shall serve copies of this ORDER on any pro se parties, pursuant to CRCP 5, and file a certificate of service with the Court within 10 days.

*Norman D. Haglund*

**Norman D. Haglund**
**District Court Judge**
DATE OF ORDER INDICATED ON ATTACHMENT

EFILED Document
CO Denver County District Court 2nd JD
Filing Date: Aug 27 2007 9:08AM MDT
Filing ID: 16088539
Review Clerk: Rebecca Archuleta

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | |
| HYPERCUBE, LLC and KMC DATA, LLC<br><br>Plaintiffs,<br><br>v.<br><br>QWEST COMMUNICATIONS CORPORATION<br><br>Defendant. | ▲ COURT USE ONLY ▲ |
| | Case Number: 07CV5775<br><br>Courtroom: 19 |

**ORDER GRANTING JOINT MOTION FOR DISMISSAL WITH PREJUDICE AND FOR RELEASE OF SECURITY FOR PRELIMINARY INJUNCTION**

THE COURT having read the parties Joint Motion for Dismissal with Prejudice and for Release of Security for Preliminary Injunction and being fully advised in the premises;

IT IS HEREBY ORDERED THAT this action is DISMISSED WITH PREJUDICE, with each party to bear its own costs and attorney's fees.

IT IS FURTHER ORDERED THAT the Clerk of the Court shall release to Plaintiffs the $300,000.00 cash security filed by Plaintiffs on June 26, 2007, pursuant to the Preliminary Injunction Order dated July 2, 2007, *nunc pro tunc* June 20, 2007.

DONE THIS _____ day of _____, 2007.

BY THE COURT:

_____
Norman D. Haglund, District Judge

{00336916 1}

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---|---|
| **Court:** | CO Denver County District Court 2nd JD |
| **Judge:** | Norman D Haglund |
| **File & Serve Transaction ID:** | 16005955 |
| **Current Date:** | Aug 27, 2007 |
| **Case Number:** | 2007CV5775 |
| **Case Name:** | HYPERCUBE LLC et al vs. QWEST COMMUNICATIONS CORP |

/s/ Judge Norman D Haglund